**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| ABSOLUTE ACTIVIST VALUE MASTER FUND LIMITED, ABSOLUTE EAST WEST FUND LIMITED, ABSOLUTE EAST WEST MASTER FUND LIMITED, ABSOLUTE EUROPEAN CATALYST FUND LIMITED, ABSOLUTE GERMANY FUND LIMITED, ABSOLUTE INDIA FUND LIMITED, ABSOLUTE OCTANE FUND LIMITED, ABSOLUTE OCTANE MASTER FUND LIMITED, AND ABSOLUTE RETURN EUROPE FUND LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>SUSAN ELAINE DEVINE,<br><br>Defendant. | CASE NO. _____ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**(INJUNCTIVE RELIEF SOUGHT)**

SPEARS & IMES LLP
51 Madison Avenue
New York, New York  10010
Tel:    (212) 213-6996
Fax:    (212) 213-0849

KOZYAK TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida  33134
Tel:    (305) 372-1800
Fax:    (305) 372-3508

*Attorneys for Plaintiffs*

Dated:  Fort Myers, Florida
        June 1, 2015

## TABLE OF CONTENTS

**Page**

I.    Overview of the Complaint ...........................................................................1

II.   Parties to the Action ...................................................................................5

III.  Non-Party Co-Conspirators .........................................................................5

IV.   Jurisdiction and Venue ................................................................................12

V.    Basis for Allegations ...................................................................................13

VI.   The Penny Stock Scheme .............................................................................14

    A.    Participants in the Penny Stock Scheme ...........................................15

    B.    Background on FM/ACM ..................................................................18

    C.    Mechanics of the Penny Stock Scheme .............................................19

    D.    Example of Fraudulent Trading: ProElite ..........................................23

    E.    The Hunter Fund ..............................................................................29

    F.    Funds' Losses as a Result of the Penny Stock Scheme .......................31

    G.    Benefits to Homm and Co-Conspirators from the Fraudulent Scheme ...............32

VII.  Email Detailing Aspects of the Fraud ...........................................................34

VIII. The Origins of the Money Laundering Enterprise ..........................................39

    A.    Concealment of Art and Furniture .....................................................39

    B.    Homm's False Passport .....................................................................40

    C.    Strategic Divorce ..............................................................................40

        1.    Petition for Divorce and Related Documentation ....................41

        2.    Modifications to CSI's Beneficiary Structure ..........................42

        3.    Evidence That Devine and Homm Remained Close After Their Sham Divorce ........................................................50

    D.    Homm's Promise to Devine of a "Multigenerational Fortune" ...........52

i

    E.        Homm's Resignation ....................................................................52

IX.    Devine's Use, Transfer, and Concealment of Proceeds of the Penny Stock Scheme........54

    A.        Summary of Devine's Bank Accounts....................................................54

    B.        Devine's Knowledge of the Penny Stock Scheme................................60

    C.        Transfers from Homm to Devine..........................................................64

    D.        Additional Money Laundering Transactions in the
                Immediate Wake of the Arness Email ..................................................66

    E.        Continued Money Laundering Activity After the Sham Divorce.........67

        1.        Floma ......................................................................................67

        2.        Gold Purchases Through Marius Grossenbacher......................71

        3.        Cash Withdrawals from Accounts Managed by Eichmann ......72

        4.        Purchase and Improvement of Naples Property........................75

        5.        Purchase of Properties in Spain ..............................................77

        6.        Global Trade Group ................................................................78

        7.        Additional Money Laundering Transactions ...........................78

    F.        Transfers to Avoid Swiss Freeze Orders .............................................79

        1.        Brek Account at PHZ................................................................80

        2.        Devine Account at PHZ............................................................83

        3.        Hosifa Account at PHZ ............................................................86

X.    Devine Directed Money Laundering from Florida .........................................88

XI.    Devine's Fraudulent Concealment....................................................................89

COUNT I (Violations of RICO, 18 U.S.C. § 1962(c)) ...........................................95

COUNT II (RICO Conspiracy, 18 U.S.C. § 1962(d)) ...............................................103

COUNT III (Florida RICO and Civil Remedies for
Criminal Activities) ...........................................................................103

COUNT IV (Florida RICO and Florida Civil Remedies
for Criminal Activities – Conspiracy).............................................................................107

COUNT V (Unjust Enrichment – Common Law)......................................................108

COUNT VI (Constructive Trust – Common Law)......................................................109

JURY DEMAND.............................................................................................................109

DEMAND FOR JUDGMENT AND RELIEF ..........................................................109

Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Germany Fund Limited, Absolute India Fund Limited, Absolute Octane Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited (collectively, the "**Funds**"), by their undersigned attorneys, allege as follows:

## I.  Overview of the Complaint

1.      Newly available information demonstrates that since at least 2006 and continuing to this day (the "**Relevant Period**"), Defendant Susan Elaine Devine ("**Devine**"), a longtime resident of Naples, Florida, has been engaged in a criminal enterprise with her notorious former husband and father of her two children, Florian Wilhelm Jürgen Homm ("**Homm**"), knowingly concealing, transferring, and using for her own benefit tens of millions of dollars fraudulently taken from the Plaintiff Funds.

2.      This money constitutes proceeds of a massive market manipulation scheme orchestrated by Homm and others from at least September 2004 through September 2007 (the "**Penny Stock Scheme**").  Authorized to make investment decisions on behalf of the Funds, Homm and others caused the Funds to purchase and then trade at inflated prices billions of shares of stock of virtually worthless U.S. microcap companies, enriching Homm and his co-conspirators in a variety of ways while causing the Funds to lose more than $200,000,000.

3.      No later than 2006, when they learned that the Penny Stock Scheme was at risk of being publicly disclosed, Devine and Homm established their money laundering enterprise (the "**Money Laundering Enterprise**"), acting in concert and with the common

purpose of hiding and preserving proceeds from the Penny Stock Scheme.  That effort –

including a strategic divorce; the creation of a network of entities in far-flung locales,

including known bank secrecy havens; the use of accounts for which the Homm children

were the nominal beneficiaries to shield assets; the fabrication of records; the use of aliases;

difficult-to-trace transactions in cash, gold, and fine art; and innumerable bank transfers – is

ongoing.  On information and belief, Devine directed, controlled, and participated in the

affairs of the Money Laundering Enterprise while residing in Naples, Florida.

4.      The underlying Penny Stock Scheme, from which Devine's ill-gotten funds

derive, has long been the subject of civil, criminal, and regulatory proceedings in the United

States, as well as asset seizure orders by government authorities in the United States and

Switzerland.  In 2009, for example, the Funds sued Homm and his co-conspirators for their

roles in the Penny Stock Scheme; that case is pending.  In 2011, the Securities and Exchange

Commission ("**SEC**") brought an enforcement proceeding in California against Homm and

others; that case is also pending.  In 2013, Homm was indicted by a federal grand jury in

California, and he is currently on the FBI's "Most Wanted" list.  Others involved in the

Penny Stock Scheme face federal criminal charges, as well.

5.      Until recently, Devine successfully concealed her criminal activities from the

Funds.  Her primary role in the Money Laundering Enterprise began to come to light only

when records were made available to the Funds in connection with an investigation

conducted by the Office of the Attorney General of Switzerland (the "**Swiss Prosecutor's**

**Office**") into the money laundering activities of Homm and others (the "**Swiss Money**

**Laundering Investigation**").  On or about May 31, 2013, the Swiss Prosecutor's Office

2

formally recognized the Funds as the victims of the crimes under investigation and thereafter

began to disclose to the Funds certain documents in its massive investigative file.  The Funds

analyzed those documents – including voluminous bank records, emails, company files,

testimony transcripts, and the like, in multiple languages including French and German –

over time as they were made available.  It was not until December 16, 2014 that the Swiss

Prosecutor's Office issued a 219-page report in French (the "**Swiss Report**") that

"synthesized" the available evidence and set out in meticulous detail damning findings of

laundering activity by Devine and others.  Between January and March 2015, the Funds were

granted access to voluminous "annexes," which contain the documents, in several languages,

that are cited in the Swiss Report as well as additional relevant evidence.  To date, the Swiss

Prosecutor's Office has frozen over €15,000,000 in Swiss accounts controlled by Devine.

6.     On May 20, 2015, the Swiss Prosecutor's Office issued an indictment of Urs

Meisterhans (the "**Meisterhans Indictment**") for aggravated money laundering, document

forgery, and insufficient vigilance in financial transactions based on his role in laundering

Penny Stock Scheme proceeds controlled by Homm and Devine.  The Meisterhans

Indictment details certain aspects of Devine's involvement in the Money Laundering

Enterprise, describing, among other things, her role in several financial transactions

involving Penny Stock Scheme proceeds and her effort, in May 2006, to shield assets owned

by Homm and located at the couple's shared home in Mallorca, Spain by creating false,

backdated documentation indicating that such property was merely on loan to her.

7.     Throughout the Relevant Period, Devine has profited handsomely from

proceeds of the Penny Stock Scheme.  At least $45,000,000 of those proceeds were

channeled into or through accounts for which Devine and/or her children were beneficiaries. Among other things, Devine – who acknowledged in testimony before the Swiss Prosecutor's Office that she has not done any paid work since 1989 – used Penny Stock Scheme proceeds to purchase a $2.2-million house in Naples, Florida; real property in Spain; and, in a particularly egregious example of concealment, more than $1,000,000 in gold coins. Additionally, millions of dollars of the Funds' money have been deposited in and transferred among a vast web of bank accounts around the world (including in the United States) for which Devine or her children are the beneficiaries.  Although several bank accounts held in Devine's name or for her benefit are currently frozen pursuant to orders by the Swiss Prosecutor's Office and one account held for her benefit is the subject of a U.S. seizure warrant, Devine continues to have unrestricted access to other bank accounts that contain the Funds' money.  Notably, in 2011 and 2012, to evade the imminent freezing of certain assets by the Swiss Prosecutor's Office, Devine transferred more than $5,000,000 out of one Swiss bank account into accounts outside of Switzerland (including more than $4,500,000 into four U.S. accounts), evidently after being tipped off.

8.      Through these activities, Devine, in league with Homm, has committed numerous acts of money laundering and other criminal offenses in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1961, *et seq.*; the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et seq*.; and the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. § 895, *et seq.* Additionally, Devine has been unjustly enriched with assets belonging to the Funds, and her

conduct has resulted in the creation of a constructive trust over those assets for the benefit of the Funds.

## II.  Parties to the Action

9.     Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Germany Fund Limited, Absolute India Fund Limited, Absolute Octane Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited are nine companies previously operated as mutual (hedge) funds that invested in a variety of asset classes on behalf of hundreds of investors in the United States and around the world.  The Funds are limited liability corporations registered in the Cayman Islands and, as such, citizens of the Cayman Islands.

10.     Defendant Susan Elaine Devine, formerly Susan Elaine Devine Homm, is a citizen of the United States and Brazil.  She has resided in the Middle District of Florida for many years and at her current address in Naples, Florida since 2008.

## III.  Non-Party Co-Conspirators

11.     Other non-party individuals and entities played roles, direct or indirect, in advancing the objectives of the Money Laundering Scheme.  Foremost among them are the individuals and entities identified below.

12.     Homm is a German national.  He holds passports from Germany, the United Kingdom, and Liberia, as well as a fake Irish passport under the alias "Colin Trainor."  On information and belief, he has also used other aliases, including "Martin Joseph McDonald." Homm was Devine's husband until May 2007, when they were formally divorced in Florida,

5

although that proceeding bears clear badges of fraud.  Homm and Devine have two children,
Conrad and his minor sister, "I."  Homm was a primary architect of and participant in the
underlying Penny Stock Scheme.  He founded Fortune Management Limited, later known as
FM Fund Management Limited (collectively, "**FM**"), a Cayman Islands company that began
operating on or about March 1, 2002.  Between May and July 2005, FM's business was
merged into, and thereafter continued as, Absolute Capital Management Holdings Limited
(collectively with FM, "**ACM**").  ACM was the investment manager for the Funds, and, as
ACM's Chief Investment Officer, Homm was responsible for investments by the Funds until
September 18, 2007, when he abruptly resigned from ACM and went into hiding for five
years.  He has worked in concert with Devine in the Money Laundering Enterprise to transfer
and conceal the money he fraudulently obtained through the Penny Stock Scheme to preserve
it for himself, Devine, and their children.  According to the Swiss Report, Homm is a target
of the Swiss Money Laundering Investigation.  Additionally, in the United States, civil and
criminal actions have been commenced against Homm based on his role in the Penny Stock
Scheme, as follows:

(a)     On October 19, 2009, the Funds sued Homm and certain of his co-
conspirators in the U.S. District Court for the Southern District of New York
for federal securities fraud, common law fraud, and breach of fiduciary duty,
based on their roles in the Penny Stock Scheme (the "**SDNY Action**").  *See*
Second Amended Complaint, *Absolute Activist Value Master Fund Ltd., et al.
v. Homm, et al.*, No. 09 Civ. 8862 (GBD), ECF No. 107 (operative complaint,
filed July 6, 2012).  The District Court denied Homm's motion to dismiss in

its entirety on March 28, 2013.  Discovery in the SDNY Action is currently stayed at the request of the U.S. Attorney's Office for the Central District of California.

(b)     On February 24, 2011, the SEC filed an enforcement action against Homm and certain other participants in the Penny Stock Scheme in the U.S. District Court for the Central District of California, alleging securities fraud.  *See SEC v. Ficeto, et al.*, No. 11 Civ. 1637, 2011 WL 658558 (C.D. Cal. Feb. 24, 2011) (amended on May 17, 2011) (the "**SEC Enforcement Action**").  The allegations in the SEC Enforcement Action are similar to those in the SDNY Action.  The SEC Enforcement Action is currently stayed at the request of the U.S. Attorney's Office for the Central District of California.

(c)     On March 6, 2013, a Magistrate Judge in the Central District of California issued a warrant for the arrest of Homm based on a sworn criminal complaint, with allegations similar to those in the SDNY Action and the SEC Enforcement Action.  On March 8, 2013, on the basis of that warrant, Italian police arrested Homm while he was visiting the Uffizi Gallery in Florence, Italy with Devine and their son.  Pending extradition to the United States, Homm was imprisoned in Italy.

(d)     On March 19, 2013, a grand jury in the Central District of California returned a ten-count indictment against Homm based on his role in the Penny Stock Scheme (the "**Homm Indictment**").  After Italy's highest court approved Homm's extradition to the United States, Homm made a raft of filings in

multiple venues for the purpose of delaying his extradition, including an appeal to the European Court of Human Rights.  While that appeal was pending, Homm argued to Italy's highest court that the length of his incarceration violated the Italian Constitution, and that court ruled in his favor – despite the fact that the delays were entirely of Homm's own making. Homm was released on or about June 3, 2014 without prior notice to the U.S. Department of Justice.  He immediately fled to Germany, where, on information and belief, he remains today and is apparently safe from extradition to the United States due to Germany's policy of not extraditing nationals based on criminal charges in a foreign state.  Homm is on the FBI's "Most Wanted" list. *See* http://www.fbi.gov/wanted/wcc/florian-wilhelm-jrgen-homm/view.  The Swiss Prosecutor's Office has also issued an arrest warrant for Homm.

13.     CSI Asset Management Establishment ("**CSI**") is an *Anstalt* (an autonomous legal entity with beneficiaries) established under Liechtenstein law on August 12, 1997.  On information and belief, the letters CSI are the initials of the first names of Devine ("S") and the two Homm children ("C" and "I").  Since at least September 2004, CSI's primary activity has been to hold ACM shares on behalf of Devine, Homm, and/or their children.  As discussed herein, Devine and Homm repeatedly changed the beneficiary structure of CSI to advance the aims of the Money Laundering Enterprise, shuffling the interests among themselves and their children.  CSI held at least two bank accounts in Switzerland and Liechtenstein.

14.     Urs Meisterhans ("**Meisterhans**") resides in Switzerland.  He is the principal of Swiss-based Sinitus AG, a financial services company he founded.  The Swiss Financial Market Supervisory Authority, the Swiss equivalent to the SEC, took control of Sinitus AG and, after an investigation, put it into liquidation.  The liquidator has since filed for bankruptcy.  From at least 2006 through 2008, Meisterhans assisted Devine and Homm in the laundering of proceeds from the Penny Stock Scheme.  According to the Swiss Report, in 2007 and 2008, he transferred at least $17,300,000 to accounts accessible by Homm while he was in hiding after his resignation from ACM.  He also facilitated Devine's money laundering activities, including by sending Penny Stock Scheme proceeds via complex routes through at least a dozen countries, employing false identities, using offshore companies, and executing transactions in cash, gold, and fine art, which are not easily traceable.  Swiss authorities have estimated that, between May 2006 and October 2007, Devine and Homm transferred assets valued at approximately $65,900,000 to companies controlled by Meisterhans.  On May 20, 2015, the Swiss Prosecutor's Office issued the Meisterhans Indictment for aggravated money laundering, among other crimes, based on Meisterhans's role in laundering Penny Stock Scheme proceeds controlled by Homm and Devine.

15.     Sinitus Ltd. ("**Sinitus**") is an affiliate of Sinitus AG incorporated in Mauritius, under the control of Meisterhans.  Sinitus's account at Investec Bank Ltd. in Australia (formerly NM Rothschild & Sons Australia Ltd.) was a central exchange point for money laundering during the Relevant Period, including the laundering of funds by Devine and Homm.  Money transferred through this account was used to fund the Floma Foundation

("**Floma**"), one of many entities controlled by Devine.  The Swiss authorities have frozen four Sinitus-related accounts holding more than 24,000,000 Swiss francs ("**CHF**").

16.     Marcel Eichmann ("**Eichmann**") resides in Switzerland.  He was a banker at CBH Compagnie Bancaire Helvétique SA, formerly known as Banque SCS Alliance SA (collectively, "**CBH**"), before co-founding PHZ Privat- und Handelsbank ("**PHZ**").  Eichmann was a personal banker for both Devine and Homm, and Devine and her children were shareholders in PHZ.  As the head of CBH's Zurich branch, Eichmann managed and monitored Devine's and Homm's accounts in 2006 and 2007; according to CBH, their ill-gotten fortune constituted as much as 25% of Eichmann's overall business at the time.  The Swiss Report states that in 2006 and 2007, Eichmann accepted into Homm's account at CBH almost $20,000,000 in Penny Stock Scheme proceeds that originated from the United States.  After transferring Devine's and Homm's assets to PHZ, Eichmann was responsible for at least four accounts controlled by Devine that held over €15,000,000 in assets.  At PHZ, between 2007 and at least 2009, Eichmann facilitated and verified over one dozen cash transactions on behalf of Devine and Homm to assist their concealment of assets from law enforcement and potential judgment creditors – including simulated transactions falsely and unlawfully recorded as cash withdrawals followed by immediate cash deposits to other accounts at the same bank in order to cut the paper trail.  Eichmann regularly used a private email address to receive instructions from Devine, in violation of bank policy.  He is currently the target of a Swiss criminal investigation for aggravated money laundering.

17.     Pascal Frei ("**Frei**") is a banker who resides in Switzerland.  Frei worked for Eichmann at CBH and PHZ, helping to manage Devine's and Homm's affairs and assisting

with their money laundering activities.  Frei worked with Eichmann to facilitate certain withdrawals and deposits on behalf of Devine and Homm.  With Eichmann, Frei is currently the target of a Swiss criminal investigation for aggravated money laundering involving Homm and Devine's assets.

18.     Sammy Kapleta ("**Kapleta**") is a Belgian citizen who has resided in Spain. He formerly resided in Florida, starting two businesses that were registered with the Florida Secretary of State.  Devine and Homm used accounts in Switzerland, Luxembourg, Panama, and Spain in the names of Kapleta and Fairland Consulting, a vehicle controlled by Kapleta, to launder more than $6,000,000 in Penny Stock Scheme proceeds during the Relevant Period.  Kapleta was a shareholder in PHZ (Eichmann's bank), purportedly as a fiduciary shareholder on behalf of the two Homm children.  According to the Swiss Report, Kapleta is a target of the Swiss Money Laundering Investigation, and the Swiss authorities have frozen a Credit Suisse account in his name.  Kapleta has been convicted in Switzerland of procuring false Irish passports.

19.     Phillipe Meyer ("**Meyer**") is an attorney who resides in Switzerland.  Meyer has extensive connections with Meisterhans and Sinitus.  In 2007 and 2008, he assisted Devine in the establishment of, and subsequent transfers of funds out of, Floma, an entity that laundered proceeds of the Penny Stock Scheme at the direction of Devine through Singapore, Ireland, and the Czech Republic, including under the guise of real estate and metals investments.

20.     Jürg Brand ("**Brand**") is an attorney who resides in Switzerland.  Introduced to Devine by Eichmann, Brand ostensibly served as one of her lawyers in connection with

11

her divorce from Homm.  Through an account Brand held at CBH, millions of dollars in

Penny Stock Scheme proceeds were transferred to accounts controlled by Devine in Florida

and elsewhere.  The Brand account also served as a conduit for proceeds from the sale of

5,200,000 ACM shares transferred by CSI in August and September 2007, which made their

way to Devine's PHZ account.  Additionally, Brand had close connections with Eichmann.

### IV.  Jurisdiction and Venue

21.     This action arises under RICO, 18 U.S.C. § 1961, *et seq.*; the Florida Civil

Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et seq.*; the Florida RICO

(Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. § 895, *et seq.*; and the

common law of Florida.

22.     Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331,

1332, and 1367 and 18 U.S.C. § 1961, *et seq.*  There is complete diversity of citizenship

between the parties because the Funds are citizens of a foreign state and Devine is a citizen

of Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

The Funds' state law claims arise out of the same case or controversy as the federal law

claims, and all claims in this action arise out of a common nucleus of operative facts.

23.     Exercise of personal jurisdiction over Devine is reasonable and proper in this

District because:  (a) Devine is a citizen of Florida; (b) Devine has resided in Florida

throughout the Relevant Period; and (c) Devine has conducted substantial and not isolated

activity with Florida throughout the Relevant Period, including by continuously residing in

Florida; filing for a strategic divorce with a Florida court; using the services of a Florida

attorney; regularly using at least one Florida bank account to launder money; purchasing and

improving real estate in Florida using proceeds of the Penny Stock Scheme; maintaining a Florida driver's license since at least 2008; owning a vehicle with a Florida title issued in 2006; registering to vote in Florida; and, on information and belief, directing many of the money laundering transactions described in this Complaint from her residence in Florida. Personal jurisdiction is further proper under 18 U.S.C. § 1965(a) because Devine resides in Florida and transacts her affairs here.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 18 U.S.C. § 1965(a) because Devine resides within the District.

### V.  Basis for Allegations

25.     The factual allegations in this Complaint are based on investigation by counsel into the facts and circumstances alleged herein, including, without limitation, review and analysis of:  documents and emails; filings with the SEC; trading records (including trade confirmations, subscription agreements, offering memoranda, wiring instructions, and trading data); criminal and forfeiture filings in the United States, including the Homm Indictment; and the complaint filed in the SEC Enforcement Action.

26.     The factual allegations in this Complaint are also based on an analysis of documents made available to the Funds in connection with the Swiss Money Laundering Investigation.  The Swiss Prosecutor's Office commenced its investigation in or about 2009, but the Funds had no knowledge of the investigation until late 2012.  On January 23, 2013, the Funds petitioned to be recognized as victims of the crimes under investigation.  On or about May 31, 2013, the Swiss Prosecutor's Office formally recognized the Funds as the victims of the crimes under investigation.  Only then did the Swiss Prosecutor's Office begin

13

to make certain documents in its massive investigative file available to the Funds, including, without limitation, voluminous bank records, primarily in German and French, relating to accounts controlled by Devine; emails sent by and to Devine; transcripts, in French, of Devine's testimony before the Swiss Prosecutor's Office on May 29 and May 30, 2012; and transcripts of certain other witnesses' testimony.

27.     On December 16, 2014, after an investigation spanning many years, the Swiss Prosecutor's Office issued the Swiss Report, a "synthesis" report (in French) that detailed in 219 pages and 540 footnotes the prosecutor's findings regarding the activities of Devine, Homm, and others.  The Funds have expended considerable time and resources having the Swiss Report translated into English.  Between January and March 2015, the Funds were granted access to the voluminous annexes that contain documents in several languages cited in the Swiss Report and additional relevant evidence.

28.     Many additional facts and documents supporting the allegations herein are known only to Devine and/or are within her exclusive custody and control.  The Funds believe that additional evidentiary support for the allegations herein will emerge through discovery against Devine and non-parties.

## VI.  The Penny Stock Scheme

29.     The money and assets improperly held by Devine are traceable to the money taken from the Plaintiff Funds by means of the Penny Stock Scheme – a market manipulation scheme carried out from at least September 2004 through September 2007 (the "**Penny Stock Scheme Period**") involving the rigged purchase and sale of billions of shares of

microcap stocks (the "**Penny Stocks**") of virtually worthless U.S. companies (collectively,

the "**Penny Stock Companies**").

A.     **Participants in the Penny Stock Scheme**

30.     The Penny Stock Scheme involved conspirators across multiple continents

operating in concert with each other.  In addition to Homm, those conspirators included, but

are not limited to, the individuals and entities identified below.

31.     Todd Ficeto ("**Ficeto**") is a U.S. citizen.  During the Penny Stock Scheme

Period, Ficeto served as President and Director of Hunter World Markets, Inc. ("**Hunter**")

and was a 50% owner of Hunter.  He managed all aspects of Hunter's business and was

familiar with its trading activities, customers, business records, agents, employees, and

affairs.  During the Penny Stock Scheme Period, Ficeto held Series 7, 24, 55, and 63

securities licenses from the Financial Industry Regulatory Authority, Inc. ("**FINRA**") and

was a registered securities agent in California, Florida, and elsewhere.  He is a defendant in

the SDNY Action and the SEC Enforcement Action.  Additionally, on November 25, 2013,

the U.S. Attorney's Office for the Central District of California filed three civil forfeiture

complaints against assets controlled by Ficeto, based on his role in the Penny Stock Scheme.

In August 2014, consent judgments of forfeiture were entered in those forfeiture cases, and in

September 2014, the U.S. Department of Justice remitted payments from the forfeited assets

to the Funds, in recognition of the Funds' status as victims of the Penny Stock Scheme.

32.     Hunter is a California corporation with offices in Beverly Hills, California.

During the Penny Stock Scheme Period, Ficeto and Homm each owned 50% of Hunter,

which was registered with the SEC and FINRA as a broker-dealer and held state registrations

as a broker-dealer in California, Florida, and elsewhere.  Hunter was a placement agent for, or was otherwise involved in, the offerings of the Penny Stock Companies whose shares the Funds were caused to purchase.  Hunter was also affiliated with CIC Global Capital Ltd. ("**CIC**"), which sold the Funds millions of shares of the Penny Stock Companies.  Hunter is a defendant in the SDNY Action and the SEC Enforcement Action.

33.     Colin Heatherington is a Canadian national.  During the Penny Stock Scheme Period, he was an ACM employee who served as Homm's lead trader and as his right-hand man at ACM.  With knowledge and in furtherance of the fraudulent Penny Stock Scheme, he placed many of the orders in the Penny Stock transactions at ACM.  He was also a principal of CIC.  He is a defendant in the SDNY Action and the SEC Enforcement Action.  On October 8, 2013, a Magistrate Judge in the Central District of California issued a warrant for the arrest of Colin Heatherington based on a sworn criminal complaint, which was amended on January 27, 2014.

34.     Tony Ahn ("**Ahn**") is a resident of California.  During the Penny Stock Scheme Period, he was the primary trader for Hunter.  On January 10, 2011, Ahn consented to the entry of an SEC administrative Cease-and-Desist Order (the "**Ahn Order**") relating to his involvement with Colin Heatherington and the execution of fraudulent trades to and from the Funds.  Among other things, the Ahn Order directed Ahn to pay a civil monetary penalty and barred him from association with any broker-dealer.  The Ahn Order contains findings that Ahn executed numerous trades that manipulated upward the price of a number of penny stocks (including certain of the Penny Stocks used in the Penny Stock Scheme) between September 2005 and September 2007, that Ahn received his orders from Colin Heatherington

(who was acting at the direction of Homm) via an instant messaging system for which records were not retained, and that Ahn used several methods to accomplish the price manipulation, including matched orders between the Funds.

35.     In this Complaint, the term "**Trading Conspirators**" refers to Homm, Ficeto, Hunter (including Ahn), and Colin Heatherington.

36.     Craig Heatherington is Colin Heatherington's brother.  He is a Canadian national and, on information and belief, a resident of Australia.  During the Penny Stock Scheme Period, he worked in ACM's back office, and, with knowledge and in furtherance of the fraudulent Penny Stock Scheme, he performed essential back-office functions in connection with many of the Penny Stock transactions.  With his brother, he was a principal of CIC.  He is a defendant in the SDNY Action.  On January 27, 2014, a criminal complaint was filed against Craig Heatherington in the Central District of California.

37.     CIC was a company incorporated by Craig Heatherington in the British Virgin Islands in January 2005.  SEC filings refer to CIC at times as Hunter's affiliate and at other times as its client.  Craig Heatherington is listed in certain SEC filings as a director of CIC, and the address CIC used in SEC filings was Colin and Craig Heatherington's residential address in Mallorca, Spain.  CIC is a defendant in the SDNY Action.

38.     Sean Ewing ("**Ewing**") is an Irish national.  He was a founder of ACM and served as its Chief Executive Officer and Chairman of the Board from the middle of 2005 until he resigned as CEO and Chairman in July and August 2007, respectively.  Among other responsibilities at ACM, Ewing oversaw compliance and risk management in ACM's activities as the investment manager for the Funds.  As CEO and Chairman, Ewing was

17

involved in almost every operational aspect of ACM, including functions that were central to the Penny Stock Scheme, such as calculation of the Net Asset Value ("**NAV**") of each Fund and transfers of the Funds' money to the United States to pay for fraudulent Penny Stock purchases.  During the Penny Stock Scheme Period, Ewing owned a substantial percentage of the outstanding shares of ACM through an investment vehicle he controlled.  Ewing is a defendant in the SDNY Action.  On August 20, 2013, a Magistrate Judge in the Central District of California issued a warrant for the arrest of Ewing based on a sworn criminal complaint.  He is currently a fugitive residing in Dubai, United Arab Emirates, and, on information and belief, the U.S. government is seeking his extradition to the United States. On July 2, 2014, a Magistrate Judge in the Central District of California issued a seizure warrant for all funds and securities on deposit in 15 accounts at ABN AMRO (Guernsey) Limited and Cannacord Genuity Wealth (International) Limited, in Guernsey, related to Ewing, his family, and related businesses and trusts, based on a sworn FBI affidavit tracing the assets in those accounts to the Penny Stock Scheme.  That matter is pending.

### B.    Background on FM/ACM

39.     FM was founded by Homm on or about December 3, 2001 and began operating on or about March 1, 2002.  On information and belief, in its early days, FM was operated out of Devine and Homm's home in Mallorca, Spain.  At various times, CSI held 60% of FM's shares.  FM's business was merged into, and thereafter continued as, ACM between May and July 2005.

40.     Each of the Plaintiff Funds engaged ACM to act as its investment manager pursuant to a written Investment Management Agreement.  ACM typically charged each

Fund a management fee of 2% per annum based on the particular Fund's NAV, calculated and charged monthly, and a performance fee of 20% of the increase in value of the particular Fund's NAV, calculated and charged monthly on unrealized gains in the Funds' portfolios. During the Penny Stock Scheme Period, ACM's business was the management of the Absolute funds, including the Plaintiff Funds, and substantially all of ACM's revenues were derived from performance and management fees charged to the Absolute funds.

41.     Homm was Chief Investment Officer of ACM.  Powers of attorney enabled him to invest on the Absolute funds' behalf.

**C.     Mechanics of the Penny Stock Scheme**

42.     From at least September 2004 and escalating dramatically until Homm's resignation from ACM on September 18, 2007, the Trading Conspirators caused the Funds to invest in securities of Penny Stock Companies, including:

(a)     ProElite, Inc. ("**ProElite**");

(b)     MicroMed Cardiovascular, Inc. ("**MicroMed**");

(c)     Berman Center, Inc. ("**Berman Center**");

(d)     InterMetro Communications, Inc. (f/k/a Lucy's Cafe, Inc.) ("**InterMetro**");

(e)     NuRx Pharmaceuticals, Inc. (f/k/a Quest Group International, Inc.) ("**NuRx**");

(f)     Java Detour, Inc. ("**Java Detour**");

(g)     Logistical Support, Inc. ("**Logistical Support**"); and

(h)     DuraVest, Inc. ("**DuraVest**").

43.     The Penny Stock Companies were thinly capitalized, and their securities – often referred to as "Pink Sheet" securities or "penny stocks" – were thinly traded.  Given the

lack of substantial trading in these securities, such stocks are highly susceptible to price manipulation.

44.     The pattern of fraud worked as follows.  Throughout the Penny Stock Scheme Period, Homm, Ewing, and others each raised money for the Funds without disclosing to investors their knowledge of and participation in the Penny Stock Scheme.  Concealing the fraudulent scheme from existing and potential investors (including investors in the United States) was essential to persuading them to invest in the Funds.

45.     Homm and Ficeto, through Hunter (in which they each had 50% ownership), would obtain control of a dormant or near-dormant Penny Stock Company.  In some instances, Homm and Ficeto obtained control of the shell company through capital from The Hunter Fund Ltd. ("**The Hunter Fund**"), a fraudulent vehicle incorporated in the British Virgin Islands of Ficeto and Homm's creation in which certain of the Funds were made to be the only investors.  Once Homm, Ficeto, and Hunter controlled the Penny Stock Company, they caused the Funds to purchase shares of the company in private offerings.  All told, they caused the Funds to purchase billions of shares of the Penny Stock Companies.

46.     At the time of these purchases, the Trading Conspirators and CIC either (a) already held in their own names, or otherwise controlled, substantial amounts of shares and/or warrants of the Penny Stock Companies, or (b) received such shares and/or warrants from the Penny Stock Companies in exchange for causing the Funds to invest in the Penny Stocks.  Typically, the Trading Conspirators paid nothing or almost nothing to acquire such shares and/or warrants.

47.     Thereafter, the Trading Conspirators manipulated and artificially inflated the prices of the Penny Stocks by causing the Funds to trade those shares between and among themselves and others at increasing prices on the U.S. over-the-counter ("**OTC**") securities trading market.  To rig the OTC market for the Penny Stocks, the Trading Conspirators used a number of classic manipulative techniques, including placing matched orders, placing orders that marked the close or otherwise set the closing price for the day, conducting wash sales, and backdating trades.

48.     Homm or Colin Heatherington, ACM's head trader, usually bought and sold the Penny Stocks on behalf of the Funds by placing trades with Ficeto and Hunter (including Ahn).  In the SEC Enforcement Action, the SEC quotes from instant messages between Colin Heatherington and Ahn sent via an unmonitored instant-messaging system that allowed them to communicate freely without fear that regulators would discover the scheme.  For example, in multiple quoted instant messages to Ahn, Colin Heatherington identified the price at which he wanted a Penny Stock to close that day.  Ewing also personally directed millions of dollars in payments of the Funds' money for the purchase of Penny Stocks.

49.     Craig Heatherington, who worked in ACM's back office and handled Penny Stock trades made by his brother Colin or Homm, was frequently responsible for processing the trades by matching buy and sell orders for the trades in ACM's systems and attending to back-office trade administration functions, including communicating with Hunter about the trades (hereafter, "**processing**"), to ensure that the scheme was not detected.

50.     The churning activity centered around Hunter was enormously lucrative for all of the Trading Conspirators, and in particular Homm.  Homm, Ficeto, and Hunter paid

themselves enormous placement fees and other fees as compensation for arranging the financing for the transactions.  That financing was the Funds' money, which the Trading Conspirators had caused to be invested in next-to-worthless securities.  Moreover, the Trading Conspirators, in collusion with Craig Heatherington and CIC, arranged for stock purchase warrants to be issued to Hunter and CIC, often on very favorable terms.  The issuance of the warrants was a fraud because it served no purpose other than to enrich the conspirators, not the Funds.

51.     When the Trading Conspirators had manipulated the prices of the Penny Stocks to the levels that they desired, they caused the Funds to purchase from the Trading Conspirators the shares that the Trading Conspirators owned or otherwise controlled, including new shares that the Trading Conspirators obtained by exercising the warrants they held, at the artificially high prices that the Trading Conspirators had created by means of, and as an object of, their fraudulent scheme.  Because the Trading Conspirators had obtained those shares for nothing or almost nothing, they were wrongfully enriched by the amounts the Funds paid to the Trading Conspirators to purchase those shares.

52.     By September 19, 2007, at Homm's direction, the Funds' investments in the Penny Stock Companies exceeded $440,000,000 at the values at which they were carried, constituting nearly half of some of the Funds' NAVs.

53.     Once the manipulation ended, the Penny Stocks ultimately returned to their essentially illiquid state, and the price plunged to just pennies per share (or less).

**D.**   **Example of Fraudulent Trading:  ProElite**

54.    One example that illustrates the mechanics of the Penny Stock Scheme is the

fraudulent trading in ProElite.  During the Penny Stock Scheme Period, ProElite operated as

an online and live event sports entertainment company featuring mixed martial arts,

sometimes referred to as "cage fighting."

55.    The fraudulent trading in ProElite began in August 2006.  On August 22,

2006, a company called I-Fight, Inc. ("**I-Fight**") obtained a bridge loan of $350,000 from

The Hunter Fund.  Following a reverse merger in October 2006, ProElite became the sole

owner of Real Sport, Inc., which in turn was the sole owner of I-Fight (then ProElite.com).

ProElite was able to repay The Hunter Fund's loan to I-Fight only after the Trading

Conspirators caused a number of the Funds to purchase a subscription for ProElite shares.

56.    On September 26, 2006, Ficeto wrote Colin Heatherington an email stating:

"Everything is moving according to plan with I-fight.  We just closed on the purchase of the

shell."

57.    A few days later, on September 29, 2006 and October 2, 2006, the

subscription purchase took place.  On those dates, the Trading Conspirators caused Plaintiffs

Absolute Activist Value Master Fund Limited, Absolute East West Master Fund Limited,

Absolute European Catalyst Fund Limited, Absolute Octane Master Fund Limited, and

Absolute Return Europe Fund Limited to spend approximately $9,250,000 on shares of

ProElite, at the price of $0.002 (pre-reverse split) per share.  Hunter paid itself a placement

fee for this transaction, totaling about $1,000,000.  The $1,000,000 placement fee – as with

all of the fees paid to Hunter – ultimately benefited Homm and Ficeto, as Homm and Ficeto

23

each owned 50% of Hunter.  In addition to receiving this placement fee, Hunter issued itself five-year warrants to purchase shares of ProElite, equal to 30% of the shares sold in the offering, at the price of $0.004 per share, along with three-year warrants to purchase 175,000,000 shares of ProElite at the price of $0.0012 per share.  Hunter's five-year warrants had a cashless exercise feature, which allowed Hunter to convert the warrants into equity without making any cash payment.  On information and belief, these stock purchase warrants, along with other warrants that were issued to CIC, were fraudulently exercised by Hunter and CIC in the months that followed.

58.     Around the same time, Ficeto caused shares of ProElite to be issued in the names of his minor children, and Hunter caused shares of ProElite to be issued in its own name.  Ficeto and Hunter, respectively, retained control over those shares and, on information and belief, subsequently caused them to be sold to the Funds at grossly inflated prices.  Additionally, the Trading Conspirators, in collusion with Craig Heatherington and CIC, caused shares of ProElite to be issued to CIC.  The Trading Conspirators, Craig Heatherington, and CIC retained control over those shares and, on information and belief, subsequently caused them to be sold to the Funds at grossly inflated prices.

59.     In April 2007, the Trading Conspirators began trading shares of ProElite between and among certain of the Funds and others, thereby generating trading volume, increasing the reported price of the securities, and producing commissions for Hunter (and Homm and Ficeto as owners of Hunter).  For instance, on or about April 27, 2007, the Trading Conspirators caused Plaintiff Absolute European Catalyst Fund Limited to sell 3,000,000 shares of ProElite to Plaintiff Absolute Return Europe Fund Limited for

approximately $3.25 per share.  In connection with this matched order – *i.e.*, a predetermined

transaction in which both sides were already lined up – Hunter (and Homm and Ficeto as

owners of Hunter) collected outrageously high commissions, taking approximately $150,000

on the sale by Absolute European Catalyst Fund Limited and $150,000 on the purchase by

Absolute Return Europe Fund Limited.  Hunter (and Homm and Ficeto as owners of Hunter)

were thus able to collect a total of about $300,000 in commissions on this single Fund-to-

Fund transaction.  These commissions were outrageous by any measure because stockbrokers

typically charge commissions based on the liquidity of the stock, including the risk attendant

to finding a buyer and seller, and this matched order was entirely risk-free from a brokerage

perspective.  Trading records reveal that Craig Heatherington was responsible for processing

the purchase by Absolute Return Europe Fund Limited, along with other Fund-to-Fund trades

in ProElite.

       60.     On or about April 30, 2007, the Trading Conspirators artificially inflated the

price of ProElite by causing Plaintiff Absolute Return Europe Fund Limited to

simultaneously buy and sell approximately 100 shares of ProElite at approximately $12.00

per share.  The shares were sold for approximately $12.00 per share despite the fact that, just

three days earlier, ProElite had been trading from one Fund to another at approximately

$3.25 per share.  This sale, which was done after business hours, had the effect of nearly

quadrupling the price of the stock overnight.  By temporarily elevating the price of ProElite

at the end of the month to approximately $12.00 per share, the Trading Conspirators

fraudulently increased the performance fee for ACM.  Homm received the benefit of this

inflated performance fee in the form of a semi-annual bonus from ACM and a semi-annual

dividend paid to the investment vehicle that owned Homm's ACM shares.

61.     Inflating the price of ProElite also enabled the Trading Conspirators, Craig

Heatherington, and CIC to reap proceeds from sales to the Funds.  For example, on or about

June 4, 2007, Hunter sold just 50 shares of ProElite stock to an unknown buyer at $14.00 per

share, double the share price of the most recent ProElite trade (which was itself a matched

trade between two Funds).  Two days later, on June 6, 2007, Hunter and CIC sold a total of

300,000 shares of ProElite stock to The Hunter Fund (in which certain Plaintiff Funds were

made to invest, as explained in more detail herein) at approximately $14.00 per share.  On

information and belief, this spike was due solely to manipulation; there were no significant

announcements by ProElite, or any other relevant news, that day.  These trades generated

proceeds of approximately $4,200,000 for Hunter (and Homm and Ficeto as the owners of

Hunter) and CIC (and Colin and Craig Heatherington as the owners of CIC).  Then, on June

14, 2007, Hunter sold just 109 shares of ProElite stock to an unknown buyer at $15.00 per

share.  The next day, June 15, 2007, Hunter and CIC sold another 180,000 shares of ProElite

stock to Plaintiffs Absolute Return Europe Fund Limited, Absolute Octane Master Fund

Limited, and Absolute European Catalyst Fund Limited at approximately $15.00 per share,

generating additional proceeds to Hunter and CIC of approximately $2,700,000.  Trading

records reveal that Craig Heatherington was responsible for processing at least some of these

trades, along with other "market" purchases of ProElite.

62.     Additionally, on June 29, 2007, the Trading Conspirators caused Plaintiffs

Absolute Activist Value Master Fund Limited, Absolute East West Master Fund Limited,

Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited to purchase a second offering of ProElite shares.  In this offering, which consisted of both a subscription component and a $5,000,000 placement by existing shareholders (including, on information and belief, Ficeto, Hunter, and CIC), the Trading Conspirators caused the investing Funds to spend approximately $25,000,000 on shares of ProElite, at a price of $7.00 per share.  This money, like the money taken through "market" purchases, was effectively stolen from the Funds.  In connection with this offering, Hunter (and Homm and Ficeto as owners of Hunter) collected a commission of approximately $178,500; a placement agent fee of 10% of the gross proceeds, valued at approximately $2,500,000; and warrants to purchase 3,571,428 shares of ProElite at $7.00 per share.  On information and belief, these stock purchase warrants were fraudulently exercised by Hunter in the months that followed. Trading records reveal that Craig Heatherington was responsible for processing the second offering purchase.

63.     The offering memorandum for the second offering provides that prior to the closing of that offering, ProElite's principal shareholders, along with persons who had been granted warrants to purchase shares in ProElite, would execute a lock-up agreement prohibiting them from selling their stock or exercising their warrants for a specified period of time.  The offering memorandum further provides, however, that the lock-ups would not apply if the price per share reached $15.00.  Thus, the Trading Conspirators continued to trade shares of ProElite between and among certain of the Funds and others, to ensure that the price was artificially inflated to $15.00 per share, thereby releasing the lock-up.  At this price per share, ProElite would have had fully diluted market capitalization of over $1.17

billion, an absurd valuation for a start-up company with no earnings and little business activity.

64.     Just before Homm's resignation from ACM on September 18, 2007, the volume of trades in ProElite shares dropped dramatically.  When the Trading Conspirators were no longer artificially propping up the price, the quoted price of the illiquid ProElite shares declined sharply (to as low as $0.01 per share) and never recovered.  Since 2008, the Funds' shares in ProElite have either been sold for an immaterial amount or are still being held by the Funds because they are worthless and/or not saleable.

65.     In the SEC Enforcement Action, the SEC, which has access to complete trading records, has identified a host of manipulative matched orders in ProElite shares through Hunter during the Penny Stock Scheme Period.  The SEC has also identified numerous examples of "marking the close" transactions in ProElite shares through Hunter – *i.e.*, trades executed for the purpose of artificially setting the day's closing price for ProElite shares.

66.     All told, on ProElite alone, the fraudulent scheme caused the Funds to lose approximately $29,131,725 through rigged "market" purchases, approximately $9,250,000 on the first subscription, approximately $25,000,000 on the second offering, approximately $1,070,066 in commissions paid to Hunter (and Homm and Ficeto as owners of Hunter), and approximately $3,500,000 in placement fees paid to Hunter (and Homm and Ficeto as owners of Hunter), totaling at least $67,951,791.  Moreover, the scheme caused the Funds to pay inflated performance and management fees to ACM, thereby causing the Funds to suffer

additional losses while fraudulently increasing ACM dividends and share value for Homm and others.

### E.   <u>The Hunter Fund</u>

67.   As noted, the Trading Conspirators also caused three of the Plaintiff Funds (Absolute European Catalyst Fund Limited, Absolute Return Europe Fund Limited, and Absolute Octane Master Fund Limited) to invest in a fraudulent vehicle called The Hunter Fund, a British Virgin Islands company of Ficeto and Homm's creation.  The Hunter Fund's offering document provides it would be charged a 2% management fee as well as a 5% performance fee by entities owned and controlled by Homm and Ficeto, and its only investors were the three Absolute Funds.  Between December 2004 and July 2007, the Trading Conspirators caused the three Funds to invest over $34,600,000 in The Hunter Fund.

68.   These investments were made through a series of subscription purchases, which occurred in the following manner:

(a)   On or about December 1, 2004, Homm and Ficeto caused Plaintiffs Absolute European Catalyst Fund Limited and Absolute Return Europe Fund Limited to spend approximately $5,500,000 on an initial series subscription of shares in The Hunter Fund.

(b)   On or about December 29, 2004, Homm and Ficeto caused Plaintiffs Absolute European Catalyst Fund Limited and Absolute Return Europe Fund Limited to spend approximately $6,114,991 on another initial series subscription of shares in The Hunter Fund.  Trading records indicate that Colin Heatherington was aware of and authorized these purchases.

(c) On or about April 10, 2007, Homm and Ficeto caused Plaintiffs Absolute Octane Master Fund Limited and Absolute Return Europe Fund Limited to spend approximately $15,000,000 on Series 0507 subscriptions of shares in The Hunter Fund.

(d) On or about June 14, 2007, Homm and Ficeto caused Plaintiffs Absolute Octane Master Fund Limited and Absolute Return Europe Fund Limited to spend approximately $8,000,000 on Series 0707 subscriptions of shares in The Hunter Fund.  Trading records indicate that Colin Heatherington was aware of and authorized these purchases.

69. Upon obtaining these Funds' money, The Hunter Fund invested it in certain of the Penny Stock Companies.  When the Funds were able to liquidate their positions in The Hunter Fund in September 2008, of the $34,600,000 invested, they received only approximately $14,000,000 in cash and millions of nearly worthless shares in Penny Stock Companies.

70. The Funds derived no benefit whatsoever from the funneling of their money through The Hunter Fund prior to being invested in illiquid Penny Stocks.  Rather, Homm and Ficeto simply used The Hunter Fund as another vehicle through which they could milk additional fees and through which they could further conceal the extent to which the Funds were invested in the Penny Stocks.  Homm, Ficeto, and Hunter also profited by using money the Funds had invested in The Hunter Fund to make loans to and subscription purchases in the Penny Stock Companies and by getting placement fees and other fees on these transactions.

71.     Though he was an ACM employee, Colin Heatherington was intimately involved in the operations of The Hunter Fund.  In a January 30, 2007 email to The Hunter Fund's external administration firm (copying Colin Heatherington), Ficeto directed that the only persons who should receive The Hunter Fund's NAV were Ficeto, a Hunter employee, and Colin Heatherington.

### F.     Funds' Losses as a Result of the Penny Stock Scheme

72.     The Trading Conspirators repeated the pattern of market manipulation described above for at least seven other Penny Stocks.  As a result of this fraudulent conduct, the Funds ultimately suffered at least $197,313,667 in investment losses, as follows:

(a)     ProElite:  $67,951,791

(b)     MicroMed:  $39,274,102

(c)     Berman Center:  $14,837,600

(d)     InterMetro:  $12,260,828

(e)     NuRx:  $24,593,305

(f)     Java Detour:  $13,028,845

(g)     Logistical Support:  $6,614,254

(h)     DuraVest:  $18,752,942

73.     In addition, because of the Penny Stock Scheme, the Funds paid tens of millions of dollars in inflated management and performance fees to ACM.  Homm, as a principal shareholder of ACM, benefited from the payment of these inflated fees as set forth below.

31

G.     **Benefits to Homm and Co-Conspirators from the Fraudulent Scheme**

74.     The Penny Stock Scheme benefited Homm and his co-conspirators in many different ways.

75.     Homm, Ficeto, and Hunter charged millions in fees and commissions on the Funds' loans to, subscriptions in, and other purchases of shares in the Penny Stock Companies.  Homm, Ficeto, and Hunter also issued stock purchase warrants to themselves and those affiliated or acting in concert with them in connection with those transactions, including CIC.  Many of these subscription purchases occurred after the share prices had been drastically inflated by the conspirators.

76.     After manipulating the prices of the Penny Stocks to drastically inflated levels, Homm, Ficeto, Hunter, Colin Heatherington, Craig Heatherington, and CIC caused the Funds to buy from them shares of the Penny Stocks that they owned and had acquired for pennies (or less).

77.     The Trading Conspirators caused the Funds to trade the Penny Stocks between and among each other (and with others as described above), and Hunter charged outrageously high commissions for these trades, which served no purpose other than to inflate the prices of the Penny Stocks and generate commissions.

78.     Homm and Ficeto also benefited from causing the Funds to invest in The Hunter Fund.

79.     As a result of the fact that the market values of the Penny Stocks were grossly inflated by means of the manipulation described herein, the NAVs of the Funds increased significantly in the years 2006 and 2007, thereby inflating the amount of the 2% management

32

fee the Funds paid to ACM and causing enormous performance fees to be paid to ACM, thereby increasing the dividends and share value for ACM shareholders.

80.     CSI – the beneficiaries of which were, at various times, Devine, Homm, and/or the Homm children – profited from the fraud in at least two ways.  First, it profited through substantial sales of its holdings in ACM.  CSI collected at least £22,103,156 and €6,272,357 in proceeds from the sale of ACM shares between in or about February 2006 and September 18, 2007 (including proceeds from the sales during that period of ACM shares transferred by CSI to Brand, for the benefit of Devine, in August 2007).

81.     Second, CSI profited from the fraud through substantial dividends on ACM shareholdings.  According to the Swiss Report, CSI was paid £10,431,287 and €8,160,852 in dividends on its FM/ACM shareholdings between in or about December 2005 and September 2007.

82.     Additionally, Homm benefited through investments in various of the Funds, which he redeemed for profits.  Because Homm frequently invested in the Funds through unknown vehicles, the amount and timing of his investments and redemptions are known only to Homm and his co-conspirators, not to the Funds.  However, as of 2006, it is clear that Homm had at least $4,000,000 invested in the Funds.  On information and belief, Homm redeemed Fund positions he held at a profit before his resignation from ACM.

83.     The Swiss authorities have estimated that Homm made more than $115 million from the Penny Stock Scheme.

84.     The amount of money that CSI, Homm, and Devine obtained through ACM share sales, dividends, and Fund redemptions is calculated based on a review of the currently

available evidence.  The amounts set forth in this Complaint are approximate, and the final calculations may differ depending on the exact date of the transactions, whether there were any additional transactions not currently known to the Funds, and the applicable conversion rates.

### VII.  Email Detailing Aspects of the Fraud

85.     On April 28, 2006, a former employee of FM and ACM (the "**Former Employee**") sent an email under the pseudonym "Joseph Arness," recommending that an investor redeem his shares in Absolute funds because Homm had "committed many unethical practices with the funds," including "NAV manipulation and self-dealing."

86.     On May 4, 2006, the Former Employee, again using the pseudonym "Joseph Arness," sent a much longer email (the "**Arness Email**"), which provided a detailed description of certain elements of the Penny Stock Scheme in which Homm and his co-conspirators were engaging, based on the Former Employee's own first-hand observations of the fraud.  The Former Employee sent the Arness Email to various financial institutions and individuals, including an American based in New York, New York and several media outlets. As set forth in detail below, among other things, the Former Employee described how Homm manipulated the prices of penny stocks with the goal of artificially inflating the Funds' NAVs and increasing performance fees, and how Homm engaged in self-dealing by selling his own shares of penny stocks to the Funds for a profit and through his 50% ownership interest in Hunter.

87.     The Arness Email began by stating:  "I was an employee at ACM and want to alert you to cases of NAV manipulation and self dealing that I witnessed directly and those

that other colleagues with firsthand knowledge told me about." The Arness Email set forth a

detailed description of the fraud that read in part as follows:

> Homm's violation with the funds is not as flagrant as simply wiring cash from the funds to his account. He does it more subtly. I directly witnessed the following: Homm has the funds buy new shares of listed small caps (biotech, tech) at discounts to market price and also receives shares for free as kickback or buys the shares in the small cap at bigger discounts. This way, the fund recognizes an automatic but unrealisable profit for the NAV, and he sells his own shares in the small cap to the funds below market price but still at a profit. Because the shares are illiquid, he used month-end window dressing to bid up the shares. So Homm not only makes money on self-dealing (selling his own shares of the small cap to the fund), but also as majority shareholder he receives monthly asset and performance fees for turning in a faked positive performance for the month. The unrealised profits cannot be realised at market prices, because the small cap is overvalued and there are no real buyers at those levels. Real profits are made from time to time in other much more liquid stocks, but those gains come and go – the real explanation for the positive performance month after month comes from manipulating the prices of small cap stocks (mostly US). When launching a new fund, the strategy I saw executed was to make outstanding returns for the first few months by buying illiquid and therefore manageable stocks at steep discounts. The fund automatically shows a huge performance. This was done for almost all the funds. The most striking example of this is the Octane Fund. The two owners, Homm and Ewing, initially invest their money in the new fund. Other investors come in, attracted by the phenomenal returns. The new investor money dilutes the effect of the NAV that consists of unrealisable profit. Meanwhile, Homm and Ewing are redeeming their own shares of the fund, getting the cash from the new fund investors. Fund administrators and auditors are more compliant than you would think. I can go into much more detail with actual stocks and schemes.

> I have copies of the Absolute Return Europe Fund's and European Catalyst Fund's monthly portfolios from the fund administrator for many months. You can see the stocks, like Duravest (DUVT.OB) and Berman Center Inc. (BRMC.PK), which contain large unrealised profits. Duravest is a classic example of self dealing and NAV manipulation, which I witnessed directly. The additional offense is Homm violated SEC rules of not declaring that his funds owned well over 50% of the company which would have severely limited his ability to trade the stock; the full disclosure of ownership was hidden via other external vehicles (the Hunter Fund) and agreements (Navigator in London). Regarding Berman Center, I witnessed directly that Homm personally received for free shares and options of Berman Center from

the brokerage that brought it to the funds for investment.  I learned from colleagues with firsthand knowledge that Homm sold at least 700,000 of those shares for one dollar per share ("market priced" at two dollars) to the ARE fund.  Berman Center was an example of Homm simply telling the fund administrator and auditors at what price the funds were pricing the stock (based on a flimsy argument of that's where market makers were bidding for the stock) and they accepted the price with little argument.  Other stocks were commonly bid up at the last minutes of trade for the month, which I witnessed directly, like UCAP (in the US, now bankrupt and delisted), Passport Restaurants (PSPR.PK), Fortune AG (FMI1.DE, formerly known as Comtelco and which he has an interest), Spuetz AG (SPZ.DE), Catoosee AG (COO.DE), Teleplan AG (TPL.DE), Impera Total Return AG (I believe Homm had partial ownership as well), and Comtrade AG (CTB.DE).  As some legitimate profits or artificially priced stocks were found elsewhere, Homm bid down some of these stocks only to bid them up another month when needed because of a loss.  Some stocks like UCAP and Passport were let go when other more defensible illiquid stocks were found that could 'plug' holes in the NAV.  Almost the entire ACM staff is aware of Homm's manipulation and self dealing, some know more details than others.  The head executing trader, Guillermo Hernandez, is intimately involved with all these trades for Homm.  Regarding the Octane Fund, I learned from colleagues that Homm transferred blocks of shares in techs and biotechs (ex., Psivida in Australia and Duravest in Canada, traded in the US) from the larger funds (ARE and ECF) to the Octane Fund to get a low cost base, again giving the impression that superb investments were made during its launch month.

There is another malpractice Homm engages in.  He owns a 50% stake in a US brokerage, Hunter World Markets in Los Angeles, California, to which he gives trade orders and which brought him these micro/small caps like Berman Center that needed financing, had artificially high market values and where he could get shares personally.  (Another recent huge example, according to colleagues with firsthand knowledge at ACM, is MicroMed Cardiovascular Inc, MMCV.OB).  This brokerage ownership is a disadvantage to fund investors as Homm is incentivised to conduct fund business with his own brokerage rather than a brokerage that could provide better services and commissions for the fund investors' benefit.  And obviously he is using investor money to get kickbacks.  You will never see Homm as the direct counterparty to self-dealing.  To my knowledge, he uses primarily two vehicles, CSI in Lichtenstein [sic] (stands for C[ ], Susan, I[ ], his son, wife, and daughter, respectively) which is also used as his vehicle of ownership of ACMH.L stock.  Also, he uses Swiss-based CEA (Corporate European Advisors) [referring to another of Homm's fraudulent investment vehicles] which self dealt for him on Duravest.  He also used CEA to self deal in

Amadeus options at the end of 2004, to the ARE Fund's loss and his personal gain.

88.     The Arness Email went on to state:

In my opinion, Ewing was quite aware of all this and much of Homm's self dealing before he became shareholder and CEO of ACM.  I believe his strategy is to dilute the effect of the holes in NAV with more investor money and use the grossly overpriced ACMH.L stock as acquisition currency for other asset management companies.  In my view, Homm will continue to use this year to artificially pump up NAV 'performance' and therefore ACMH.L stock price as he's selling his shares.

89.     On May 4, 2006, Ewing obtained a copy of the shorter April 28, 2006 email, which a Fund investor forwarded to him.  Ewing in turn forwarded it to Homm, expressing alarm not at the substance of the allegations, but at the possible financial effect of the email: "He is asking [the investor] to redeem shares in the Funds!"

90.     On May 5, 2006, Ewing received a copy of the longer Arness Email originally circulated on May 4, which he then immediately forwarded to Homm.

91.     Ewing and Homm immediately began to collaborate on how to identify the person who wrote the email in order to mitigate the possibly catastrophic effects of the fraudulent scheme's coming to light.  Ewing and Homm retained outside counsel to help them draft a letter to the writer of the Arness Email threatening a defamation suit against that person.  At no time did Ewing or Homm conduct an internal investigation (either with or without the assistance of counsel) because they knew the allegations were true.

92.     By May 12, 2006, through the use of an outside investigative firm that tracked the Internet Protocol address of the sender of the Arness Email to the region in the United States where the Former Employee lived, Ewing had identified "Joseph Arness" as the Former Employee.

93.     Ewing and Homm contacted the Former Employee by telephone and angrily demanded a retraction.  The Former Employee reasonably feared for his safety; in a prior discussion, Homm had warned the Former Employee that if he ever betrayed Homm, Homm would have him killed, citing his alleged ties to a mob family in Frankfurt, Germany.  In a series of telephone conversations between May 12 and 15, 2006, Ewing dictated what the Former Employee's retraction would say.  When the Former Employee provided to Ewing a draft of what he would say in the "letter of apology," Ewing emailed Homm on May 12, forwarding "His Draft Apology letter which needs amending but is very 'apologetic'!" Ewing again emailed Homm on May 15, noting that the Former Employee "states that the allegations were his 'perceptions' which can not be accepted[.]"  In an email to the Former Employee on May 15, Ewing provided wording for the letter of apology, saying "this needs to be from you and 'of your own free will.'"  In fact, as Ewing well knew, the retraction was not of the employee's own free will; over the telephone, Ewing had dictated to the Former Employee what the retraction letter would say, line by line.

94.     In an email to Ewing on May 15, 2006, the Former Employee said that he did not "agree with the language you dictated," but in order to avoid additional repercussions, he agreed to send the letter anyway.  In accordance with Ewing's specific instructions, the Former Employee wrote that he made the allegations because "I wanted to carry out personal revenge against Mr. Homm and his wife.  In carrying out my revenge, I also included Mr. Ewing, ACM and the funds."

## VIII.  The Origins of the Money Laundering Enterprise

95.     Although he and Ewing succeeded in suppressing the Arness Email, Homm recognized that the Penny Stock Scheme could soon be exposed.  On information and belief, it was at this point, at the latest, that Devine and Homm established the Money Laundering Enterprise.  As pleaded in more detail herein, Devine, Homm, and their co-conspirators engaged in myriad, often complex activities, but the aim of the Money Laundering Enterprise was simple:  to conceal and preserve the ill-gotten gains as a "multigenerational fortune" for the Devine-Homm family in the face of the likely eventual discovery of Homm's fraud.

### A.     Concealment of Art and Furniture

96.     Shortly after the Arness Email, Devine took steps to conceal valuable art and furniture located at her and Homm's home in Mallorca, Spain.  According to the Meisterhans Indictment, between on or about May 18 and May 23, 2006, Devine created an inventory of art and furniture with an estimated value exceeding €2,200,000.  Andreas Schaer ("**Schaer**"), a personal assistant to Homm and Devine, emailed this inventory to Meisterhans on May 23, 2006.

97.     The same day, Meisterhans emailed Schaer a fraudulent loan agreement, backdated for May 10, 2004 and signed by Meisterhans on behalf of New York Art Trading Ltd. ("**New York Art Trading**") (with a mailing address "c/o" Sinitus AG, Meisterhans's company), to be signed by Devine.  By means of this agreement, New York Art Trading purported to lend Devine art and furniture with an estimated value of €2,000,000, itemized on an "inventory list to be updated on a regular basis."  Devine signed the backdated

agreement, which gave the false appearance that the valuable property inventoried by Devine was lent to her, rather than owned by her and Homm.

98.    Then, according to the Meisterhans Indictment, in or around September 2007, Devine directed Meisterhans to transport the art and furniture previously inventoried by her from Mallorca to Switzerland.  This property was stored in Switzerland until on or about June 2008, when Devine directed Meisterhans to move it back to Mallorca.

## B.    Homm's False Passport

99.    In mid-2006, Homm ordered a false Irish passport to be made in the name of one of his aliases, "Colin Trainor."  Kapleta offered to procure this passport for him and eventually did so.

## C.    Strategic Divorce

100.    In August 2006, Devine and Homm initiated a strategic divorce.  The divorce gave Devine a legal pretext to obtain control of certain proceeds of the Penny Stock Scheme while ostensibly distancing her from the criminal activity revealed in the Arness Email.  The divorce also provided the pretext for Devine and Homm repeatedly to change the beneficiary structure of CSI, allowing the couple, when it suited their purposes, (a) to hide the tainted proceeds behind an entity purporting to benefit Devine and their children, and (b) to distance Homm from CSI while CSI sold off ACM shares.

101.    In reality, throughout the divorce proceedings and thereafter, Devine and Homm continued to interact as spouses – sending each other personal and intimate emails, purchasing a home together, living together, traveling together, and moving money between each other.

### 1.    *Petition for Divorce and Related Documentation*

102.    To effectuate the divorce, Devine and Homm filed fraudulent paperwork with a state court in Florida, fraudulently identifying only a small fraction of their actual assets and falsely presenting a modest financial settlement as final.

103.    On August 7, 2006, Devine and Homm petitioned for divorce in the Circuit Court of the Twentieth Judicial District of Florida ("**Florida Circuit Court**").  With their petition for divorce, Devine and Homm were required to file a Family Law Financial Affidavit stating the value of their assets, owned both individually and jointly.  Devine and Homm fraudulently stated in that affidavit that their "total assets" amounted to just $1,640,000.  This was a brazen lie.  Devine and Homm omitted tens of millions of dollars of assets owned in bank accounts all over the world and in the form of ACM shares.  Indeed, on August 7, 2006 – the same day as the petition – Meisterhans wrote to Devine and Homm to confirm that New York Art Trading (the same company that Meisterhans and Devine used to enter the backdated "loan" agreement in May 2006) had received wire transfers totaling €16,600,000 and $2,050,000, which "we are managing and holding on your behalf."  Devine later testified before Swiss authorities that, at the time, Homm was worth roughly $200,000,000.  In addition, Devine and Homm did not identify any real estate holdings on the affidavit, although at the time they owned real property worth millions of dollars in, at least, Spain, France, Luxembourg, and London.

104.    On September 18, 2006, Devine and Homm entered into a Marital Settlement Agreement, the stated purpose of which was to "settle [between Devine and Homm], now and forever, their respective rights, duties, and obligations regarding property, liabilities, and

children." However, the agreement did not address the division of most of the couple's assets. Further, although Devine was not employed and the Homm children were just 8 and 11 years old at the time, the agreement did not provide for any payments of alimony or child support.

105.    Pursuant to the Marital Settlement Agreement, Homm made an "equalizing payment" of $1,500,000 to Devine on August 1, 2006. This payment was said to constitute the final "equitable division of marital assets and liabilities between the parties." The money used to make this payment came directly from Hunter and was wired to an account controlled by Devine at Deutsche Bank Alex.Brown in the United States. (On February 28, 2014, a federal seizure warrant issued for all funds and securities on deposit in this account.)

106.    On May 21, 2007, a Final Judgment of Dissolution of Marriage (the "**Divorce Judgment**") was filed in the Florida Circuit Court. This document incorporated the September 18, 2006 Marital Settlement Agreement, and Devine and Homm were ordered to comply with the terms of that agreement by the Florida Circuit Court. By causing the filing of this public document declaring that she was no longer Homm's spouse and that all financial issues had been settled, Devine was able to conceal and facilitate the laundering of Penny Stock Scheme proceeds, avoiding the scrutiny that would ultimately be trained on Homm.

### 2.    *Modifications to CSI's Beneficiary Structure*

107.    Devine and Homm's strategic divorce also provided the pretext for Devine and Homm repeatedly to alter the beneficiary structure of CSI in order to mask Homm's

42

control over CSI, facilitate CSI's massive sell-off of ACM shares, and distribute the proceeds of such sales between themselves before the Penny Stock Scheme would be discovered.

108.     As noted above, CSI held the ACM shares owned by Homm.  In 2001, CSI held 60% of the shares of FM (ACM's predecessor entity) for the benefit of Homm.  After ACM went public by listing on AIM, a London Stock Exchange market, in March 2006, CSI remained ACM's majority shareholder, controlling more than 54% of the issued share capital.

109.     CSI entered into a "lock-in" deed (the "**Lock-In Deed**") in connection with ACM's listing on AIM, a standard arrangement when a company is initially listing on a stock market.  Pursuant to the Lock-In Deed, CSI agreed to refrain from selling ACM shares without prior written agreement from the nominated advisor, the broker, and the chairman of the ACM board of directors (Ewing) for a 12-month period ending March 3, 2007.  For an additional 12-month period ending March 3, 2008, certain "orderly market" provisions applied, and CSI and persons connected to CSI were prohibited from selling ACM shares without notifying and consulting with the same three counterparties.  The restrictions memorialized in the Lock-In Deed were intended to prevent Homm from using CSI to sell shares of a company for which he was the controlling shareholder and a key employee. These restrictions were essential to protect ACM as it went public because any precipitous sales by CSI, by far its largest shareholder, would have had a dramatic impact on the trading price of ACM shares.  The document admitting ACM to the AIM cited the Lock-In Deed.

110.     Devine and Homm used their divorce to shuffle the beneficiaries of CSI in an effort to circumvent the restrictions of the Lock-In Deed.

111.    At the time the divorce was finalized on May 21, 2007, Homm was the sole beneficiary of CSI and had been designated as such since July 31, 2006.

112.    In March 2007, immediately after the first set of restrictions in the Lock-In Deed had been lifted but while the "orderly market" provisions were in effect, CSI began to liquidate its ACM shares without providing the notice required by the Lock-In Deed, thereby capitalizing on ACM's inflated share price.  Between in or about March 2007 and September 18, 2007, the date Homm fled, CSI sold or transferred approximately 12,127,667 ACM shares for proceeds of at least £20,161,668.  In the days immediately after Homm's flight, CSI unloaded another 13,200,000 ACM shares.

113.    CSI's liquidation of ACM shares raised concerns among others at ACM when they learned of certain sales after the fact.  To address those concerns, Devine and Homm spun the false narrative that CSI was no longer in Homm's control after their separation and divorce.

(a)     On May 29, 2007, Ewing, who stood to lose value in his own ACM stock if CSI's liquidations devalued the share price, emailed Homm about the CSI sales, noting that Homm had "confirmed certain sales and transfers by his family arrangement" and claiming that these transfers were "a breach of the Lock-in/orderly market arrangement entered into by Florian."  On May 30, 2007, Homm responded, describing CSI as the "family trust for Susan."  He stated that he and Devine had been separated for nine months and were recently divorced, and that, accordingly, "Susan/CSI is now handled independently of [Homm's] personal affairs."  Ewing replied:  "This is indeed

news to all considering you and Susan were buying a yacht 3 weeks ago?" Intent on preserving his own ability to maximize his profits from the Penny Stock Scheme, Ewing emphasized to Homm that "the CSI holding is your family arrangement and bound by," among other things, the admission document to the London Stock Exchange, which reflects the Lock-In Deed.

(b)     On June 4, 2007, Schaer, who was the uncle of Frei, childhood friend of Eichmann, personal assistant to Devine and Homm, and purportedly Devine's "family officer" responsible for "taking care of the CSI business," informed ACM that Adam Kravitz ("**Kravitz**") – a Florida attorney who is Homm's longtime friend and who at various times has served as counsel to both Homm and Devine – was representing CSI with regard to the sale of ACM shares. In a letter to ACM the next day, however, Kravitz stated that he represented Homm only, insisting that he "[did] not represent CSI, which is, of course, a separate and non-affiliated entity from Mr. Homm." In the letter, Kravitz represented that Homm "does not and has not exercised control over CSI in any manner" – an assertion that both Devine and Homm separately admitted in their testimony before the Swiss Prosecutor's Office was "ridiculous" since Homm "was the one who took care of and managed the CSI account" and Homm "had been administering the CSI assets for many years." Kravitz falsely claimed that the beneficiary of CSI "is and always has been [Homm's] ex-wife, Susan Devine and their two children" and that "CSI is unconnected with Mr. Homm." He stated that because the divorce "sever[ed] Mr. Homm's

relationship with CSI," Homm was no longer connected to CSI and, accordingly, the sales did not trigger regulatory concerns.

(c)     To shore up this false account, Kravitz emailed Homm on June 11, 2007, instructing him to inform CSI director Beat Kranz that, if anyone other than Homm himself called, his office should reply that "they take instructions from Susan," as the supposed beneficiary of CSI.

114.     But there was a serious flaw in this narrative:  as noted above, Homm had been the sole beneficiary of CSI since July 2006.  Devine and Homm temporarily resolved this problem by executing two agreements in quick succession in June 2007 – after their divorce – switching the beneficiaries of CSI and backdating these changes to 2006:

(a)     On June 14, 2007, less than one month after the divorce was finalized – and after the Marital Settlement Agreement had supposedly resolved Devine's and Homm's respective interests once and for all – Homm designated Devine as the primary beneficiary of CSI, providing her with a 60% interest and each of their children with a 20% interest.

(b)     Five days later, in a superseding agreement dated June 19, 2007, Devine and Homm agreed to change the beneficial interests in CSI again, such that Devine would receive a 98% interest and each child would receive a 1% interest.  This agreement purported to be retroactive, effective as of July 21, 2006.

115.    By means of this backdated arrangement, Devine and Homm attempted to establish Devine as the face of CSI from 2006, thereby concocting a basis for ignoring the constraints of the Lock-In Deed while they unloaded their soon-to-be-worthless ACM stock.

116.    Then, on July 9, 2007, Devine, Homm, Kravitz, and Meisterhans orchestrated an option agreement between CSI and Stellar Asset Management Ltd. ("**Stellar**"), giving Stellar – a company controlled by Meisterhans – an option for the purchase of over 20,000,000 shares of ACM from CSI for just 10% of the market value of the shares. Although Homm would later testify before the Swiss Prosecutor's Office that he was generally attempting to protect his assets from the "greed" of his wife, communications about the option agreement demonstrate that, in fact, Devine was closely involved in the execution of this agreement.  Schaer, Homm's personal assistant at the time, testified to Swiss authorities that this option agreement was "related to the fact that [Homm] was trying to find a way to circumvent the prohibition on the sale of ACMH shares" by CSI, "where most of the fortune was concentrated at the time."

117.    Also in or about July 2007, the director of CSI, Beat Kranz, requested a legal opinion from the Liechtenstein law firm Walch & Schurti concerning, in part, the beneficiary changes to CSI.  Walch & Schurti provided that legal opinion, as well as a cover letter identifying the revisions embodied in the final transmitted opinion.  The cover letter states, in German, that the opinion originally contained a reference to the Homms' *Schein-scheidung* – their "sham divorce."  However, after a telephone call with Kranz, Walch & Schurti struck this reference from the final opinion.  When confronted by Swiss authorities with this

47

reference in the cover letter to a "sham divorce," Kranz acknowledged that he "once heard"
that "the couple want[ed] to divide the assets without actually being separated."

118.    The Walch & Schurti opinion:  (a) concluded that certain sales of ACM shares
by CSI likely violated the Lock-In Deed; (b) stated that the purpose of presenting Devine as
the person in control of CSI was to avoid running afoul of London Stock Exchange
requirements; (c) expressed concerns about the July 9, 2007 option agreement with Stellar,
noting that such an agreement was plausible only if Stellar was under Homm's influence; and
(d) cautioned Kranz not to sign any "false confirmation," specifically citing Kravitz's untrue
statement "according to which Mr. Homm never had any manner of control of CSI."  Homm
subsequently asked Kranz to resign from his board position at CSI, and Kranz's company
ceased administering CSI on or around September 24, 2007.

119.    In the same period, Devine and Homm negotiated a resolution with ACM
regarding the initial ACM share transfers, in which CSI agreed to transfer shares to ACM in
exchange for consideration, in order to alleviate some of the damage done to the value of
ACM shares as a result of CSI's earlier sales.  Devine was represented by Kravitz for these
negotiations.

120.    Evidently satisfied that their backdated arrangement had served its purpose,
Devine and Homm next entered into a new Property Settlement Agreement on August 21,
2007 that upended the previously negotiated divorce terms and once again changed the
beneficiary status of CSI.  On information and belief, Kravitz represented both Devine and
Homm in connection with this agreement.  The agreement, which was governed by Florida
law, canceled the June 19, 2007 agreement and restored Homm's status as the "sole

beneficiary of CSI," rather than Devine or their children.  Homm agreed to transfer to Devine €3,100,000 from CSI's assets and 4,000,000 ACM shares.  On August 22, 2007, Devine wrote to Kranz to confirm the terms of the new agreement and asked him to instruct Marcel Eichmann regarding the changes.

121.     On or about August 30, 2007 and September 7, 2007, a total of €3,100,000 was transferred from CSI's account at CBH to the account at CBH in the name of Jürg Brand, ostensibly one of Devine's divorce lawyers arranged by Eichmann.  Although this account was in Brand's name, Eichmann regularly accepted instructions on this account directly from Devine – evidence that Devine's use of Brand as her supposed divorce lawyer was simply another element of the staged divorce.  On or about August 24, 2007, Homm transferred 4,000,000 ACM shares to the Brand account.  Bank records indicate that these transfers were identified as relating to the Property Settlement Agreement.  Then, on or about September 26, 2007, Homm transferred to the Brand account an additional 1,200,000 ACM shares *not* required by the Property Settlement Agreement.  Between in or about August 2007 and February 2008, all of those ACM shares were sold for a total of £4,112,013 and €754,252, and the proceeds were transferred to Devine's account at PHZ.

122.     In testimony before the Swiss Prosecutor's Office, Devine attributed the multiple changes in the identity of CSI's beneficiaries to a financial dispute stemming from the divorce, explaining that she wanted a portion of the shares of ACM so that she could receive future profits.  Devine's explanation, however, is flatly inconsistent with:  (a) the designation of Homm as economic beneficiary of CSI in July 2006, just one month before the divorce petition; (b) the couple's claim in their divorce papers that all financial matters were

settled by the Marital Settlement Agreement; and (c) the final terms of the Property

Settlement Agreement.

### 3.     *Evidence That Devine and Homm*
###        *Remained Close After Their Sham Divorce*

123.    Additional documents show that Devine and Homm remained extremely close

after their formal divorce, both financially and in their shared personal life, and never

intended to alter their relationship beyond the paperwork dissolving its legal status and

establishing the facade of asset separation.

124.    On August 1, 2006, just six days before the divorce petition was filed, Devine

addressed Homm as "Gorgeous" in an email and signed off, "A big big hug.  I love you."

125.    On September 5, 2006, one month after the divorce petition, Devine emailed

Homm:  "Hi Gorgeous, I have to be very reserved when I reply to your e-mails.  Can I be a

little bit soppy???  No I shall resist."

126.    After the Marital Settlement Agreement was executed on September 18, 2006,

the spouses continued to contemplate joint financial investments.  For example:

(a)     From on or about January 4, 2007 to November 19, 2010, Devine transferred

approximately €240,000 to Homm for expenses related to a property in

Burgundy, France.

(b)     In February 2007, Devine and Homm shopped together for a property in

Marbella, Spain, which they eventually purchased.  *See* Paragraph 189 below.

In an email to Homm dated February 24, 2007, a real estate broker in

Marbella noted that he had shown properties to "you and your wife Susan,"

and Homm responded in part, "Red house, too dark for susan, off list."  In

connection with the purchase of the Marbella property, Devine sent wire instructions to her bank in March 2007 on "Susan Devine Homm" stationery and signed the instructions "Susan Devine Homm."

(c)     On April 23, 2007, Homm received an email advising him that a painting by the Norwegian artist Hans Dahl was available for purchase for £52,000. Homm forwarded that email to Devine, noting that he was "[p]assing this on to my wife."

127.    As discussed in more detail herein, between the divorce petition and the finalization of the divorce, Homm transferred over €15,000,000 from his accounts holding Penny Stock Scheme proceeds to accounts for which Devine was the economic beneficiary.

128.    On July 12, 2007, less than two months after the Divorce Judgment, Homm executed a will devising half of his estate to Devine.  The same day, Devine executed a will devising her estate exclusively to her children; on information and belief, she did so out of a concern that any assets inherited by Homm would be subject to legal proceedings. According to the Meisterhans Indictment, copies of both wills were found in Meisterhans's office.

129.    The divorce also caused no change in ownership of Devine and Homm's jointly-owned property in London, an asset that is not mentioned in any of the divorce filings.  As of April 2015, that property was still owned jointly by Devine and Homm.

130.    On information and belief, neither Devine nor Homm has re-married.  When Homm was arrested in Florence, Italy on March 8, 2013, he was with Devine and their son, exploring the Uffizi Gallery.

**D.**     **Homm's Promise to Devine of a "Multigenerational Fortune"**

131.     After the divorce was finalized and Homm had again become the sole beneficiary of CSI, he prepared to escape and bury the Penny Stock Scheme proceeds for use by himself and his family well into the future.  At that time, he wrote two revelatory emails to Devine, assuring her that she and their children would always be well taken care of.

132.     On August 28, 2007, Homm promised Devine in an email:  "If I can succeed the children and you will sit on a multigenerational fortune."  In the same email, he assured her that, even if he were not successful, she was "fantastically protected already, the optimal outcome has been achieved in that regard."

133.     The same day, Homm wrote to Devine separately informing her that he had "sold a good part of [his] soul and health to protect you and our children under the most extreme business and lifestyle duress for 18 months."

134.     Homm would resign from ACM and go into hiding less than a month later.

**E.**     **Homm's Resignation**

135.     On July 9, 2007, Ewing wrote an ACM news release hailing the Funds' "significant organic growth" during the prior six months and stating that the Funds continued to meet investor demand for "consistent, low volatile absolute returns."  Shortly thereafter, however, ACM announced that Ewing would be replaced as CEO, although Ewing agreed to continue as Chairman.

136.     Meanwhile, Homm struggled to manage the substantial illiquid positions in the Penny Stock Companies that had swelled over the course of the scheme.  By August

2007, holdings in illiquid securities (including Penny Stocks and The Hunter Fund) constituted over 45% of certain Funds' portfolios.

137.    Knowing that a collapse in ACM's share value was imminent, Homm worked to buy more time.

138.    In August 2007, citing trading losses resulting from volatile markets at the onset of the credit crisis, Homm and Ewing proposed that Homm gift 5,000,000 of his own shares of ACM to three of the Funds to offset market losses that were to be announced in mid-September.  The ACM Board and the Funds' Directors insisted that this gift be disclosed with the August monthly NAV report (typically issued the third week of the following month) as a condition of its acceptance by the Funds.  Effective August 31, 2007, Homm gifted the shares, and the Funds' NAV detail showed no material losses.

139.    Homm's "gift" helped temporarily prop up the NAVs of the Funds and, consequently, the value of ACM shares.

140.    Meanwhile, on August 21, 2007, citing personal matters, Ewing unexpectedly resigned as Chairman of ACM (effective August 24, 2007) rather than, as promised, carrying on in that position.

141.    Just as the disclosure of Homm's "gift" of ACM shares to ACM was scheduled to occur, on September 18, 2007, Homm announced his resignation in an open letter distributed by his personal lawyer Kravitz via PR Newswire and disappeared. According to Homm's 2012 memoir – originally published in German as *Kopf Geld Jagd* ("Head Money Hunt") and published later in English as *Rogue Financier: The Adventures of an Estranged Capitalist* – Homm escaped first to mainland Spain and then Colombia in a

private plane with $500,000 in cash stuffed in his underwear, a briefcase, and a cigar box and
with another $700,000 in cash squirreled away by Homm's "mule and friend" who
accompanied him.  Homm would stay in hiding for the next five years – assuming false
identities and secretly traveling the world – until November 2012, when he began to give
interviews with certain media outlets ahead of the publication of his memoir.

142.    The Plaintiff Funds were ultimately able to recover only a minuscule fraction
of their investments in the Penny Stock Companies.  As discussed in Paragraphs 72 and 73
above, the Funds ultimately suffered more than $200,000,000 in losses as a result of the
Penny Stock Scheme.

## IX.  Devine's Use, Transfer, and Concealment of Proceeds of the Penny Stock Scheme

143.    In collaboration with Homm and her other co-conspirators, Devine steered a
breathtaking amount of Penny Stock Scheme proceeds into at least 20 bank accounts under
her control around the world, from Florida to Switzerland to Uruguay to Singapore, and used
certain of those proceeds to purchase real property, gold, and other valuable assets.  Although
Devine testified before the Swiss Prosecutor's Office that she has not done any paid work
since 1989, a "balance sheet" Devine prepared for U.S. accountants at the end of 2010
showed that she had amassed assets exceeding $63,000,000 – most of which constituted, or
were purchased with, proceeds of the Penny Stock Scheme.

### A.    Summary of Devine's Bank Accounts

144.    During the Relevant Period, Devine was the economic beneficiary of
numerous bank accounts held all over the world, including the United States.  At least the
following accounts were used by Devine to carry out the Money Laundering Enterprise:

(a)     Brek Stiftung (CBH, Switzerland).  Devine is the beneficiary of this account, which was opened on July 23, 2004.  Brek Stiftung ("**Brek**") is a Liechtenstein foundation that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.  Over €15,000,000 in proceeds of the Penny Stock Scheme were transferred into this account from Homm's accounts at CBH before being further distributed.  *See* Paragraphs 153-54 below.

(b)     Loyr Stiftung (CBH, Switzerland).  Devine is the beneficiary of this account, which was opened on April 10, 2003.  Loyr Stiftung ("**Loyr**") is a Liechtenstein foundation that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.

(c)     Susan Devine (CBH, Switzerland).  Devine had two accounts in her name at CBH during the Relevant Period:  the first was opened in 2002 and closed in 2006, and the second was opened on August 15, 2007 and closed on December 7, 2009.

(d)     Jürg Brand (CBH, Switzerland).  Devine is the beneficiary of this account, which was opened on August 16, 2007 in the name of the lawyer introduced to Devine by Eichmann.  Even though this account was in Brand's name, and only he was authorized to give instructions, Eichmann accepted instructions for the account directly from Devine, resulting in unauthorized transactions on the account.  Under the guise of the divorce, €3,100,000 and 5,200,000 shares of ACM, consisting of proceeds of the Penny Stock Scheme, were transferred

from CSI's account at CBH to this account in late 2007 and early 2008, before being further distributed.  *See* Paragraph 155 below.

(e)    <u>Levanne Stiftung (CBH, Switzerland)</u>.  Devine is the beneficiary of this account, which was opened on August 20, 2007.  Levanne Stiftung ("**Levanne**") is a Liechtenstein foundation that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.  This account was funded by money withdrawn from Devine's Brek account at CBH in August 2007, in transactions falsely recorded as cash transactions in order to be untraceable.  Devine then used funds in this account to purchase approximately CHF 1,380,000 in gold coins, in cash transactions.  *See* Paragraphs 171-74 below.

(f)    <u>Susan Devine (PHZ, Switzerland)</u>.  Devine opened an account in her name at PHZ on August 15, 2008 after her banker at CBH, Marcel Eichmann, formed PHZ.  Devine owned shares in PHZ, and she testified that she believed that Homm also owned shares in PHZ.  The funds in Devine's PHZ account originated at least in part from the Brand account at CBH and her own account at CBH, and consisted of Penny Stock Scheme proceeds, specifically dividends from ACM and proceeds of the sale of ACM shares.  *See* Paragraph 207 below.  Swiss authorities froze this account on January 13, 2012.

(g)    <u>Brek Stiftung (PHZ, Switzerland)</u>.  Devine is the beneficiary of this account, which was opened on August 18, 2009.  Devine transferred over €8,000,000 in securities and money from the Brek account at CBH to this account, before

further distributing those funds.  *See* Paragraph 202(a)-(c) below.  Swiss authorities froze this account on January 13, 2012.

(h)     Hosifa Stiftung (PHZ, Switzerland).  This account was opened on April 30, 2009.  Hosifa Stiftung ("**Hosifa**") is a Liechtenstein foundation that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.  Despite the fact that the two Homm children are the stated beneficiaries of the Hosifa account, Devine has used the account for her own benefit, including to transfer funds to Brand's account at UBS AG ("**UBS**") and to pay for "legal assistance."  As discussed herein, this account was used to launder €1,400,000 originally deposited in cash by CSI in another Hosifa account less than one month after the Arness Email.  On or about December 30, 2009, Devine transferred €1,488,328.11 to Hosifa's PHZ account, before further distributing most of those funds prior to the freezing of the account. *See* Paragraphs 212-16 below.  Swiss authorities froze this account on January 14, 2014.

(i)     Malon Consulting AG (PHZ, Switzerland).  Devine is the beneficial owner of this account, which was opened on January 5, 2011.  Malon Consulting AG ("**Malon**") is a Swiss company that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.  Devine transferred proceeds of the Penny Stock Scheme to this account in 2007 to purchase real estate in Mallorca, Spain.  *See* Paragraphs 190-91 below.  Swiss authorities froze this account on November 6, 2014.

(j)    <u>Floma (EFG Bank, Singapore)</u>.  This account was opened on or about January 16, 2008.  Floma is a Panama foundation that, on information and belief, serves the sole purpose of holding and transferring Devine's assets.  Floma's account at EFG Bank ("**EFG**") was funded with €3,900,000 from Meisterhans's Sinitus account at Investec in Australia.  That money is, in turn, traceable to a transfer in 2006 of €4,000,000 from Devine's Brek account at CBH to Sinitus – for which Devine signed the transfer order – and consists at least in part of Penny Stock Scheme proceeds, including proceeds of sales of ACM stock and shares in Plaintiff Absolute Octane Fund Limited.  Despite the fact that the two Homm children are the stated beneficiaries of this account, Devine has regularly used the account for her own benefit, including to transfer money to be hidden in a lawyer's "vault" and to make purported investments in real estate and metals.

(k)    <u>Susan Devine (Bank of America, United States)</u>.  Devine transferred proceeds of the Penny Stock Scheme to this account from on or about May 8, 2008 to January 10, 2012.  *See* Paragraphs 184, 195, 204(d), and 209 below.

(l)    <u>Susan Devine (Caja de Ahorros, Spain)</u>.  Devine transferred proceeds of the Penny Stock Scheme to this account from on or about December 11, 2009 to November 25, 2011.  *See* Paragraphs 193, 205(f), and 211(a) below.

(m)    <u>Long Life Services PTE Ltd. (Standard Chartered, Singapore)</u>.  Devine transferred proceeds of the Penny Stock Scheme to this account from on or

about November 4, 2010 to November 25, 2011. *See* Paragraphs 194, 205(e), and 211(e) below.

(n)     Susan Devine (Lloyd's TSB Bank, Uruguay). Devine transferred proceeds of the Penny Stock Scheme to this account between on or about March 25, 2011 and November 25, 2011. *See* Paragraphs 205(g) and 211(c) below.

(o)     Susan Devine (C.D. de Bourgogne, France). Devine had at least one account at C.D. de Bourgogne in France. Devine transferred proceeds of the Penny Stock Scheme to this account from in or about June 2011 through November 2011. *See* Paragraph 205(b) below.

(p)     Susan Devine (Pershing LLC, Bank of New York, United States). Devine had at least three accounts or sub-accounts with Pershing LLC at Bank of New York in New York – one for herself and two nominally for the benefit of each of her children. She transferred proceeds of the Penny Stock Scheme to these accounts between on or about August 5, 2011 and November 3, 2011. *See* Paragraph 204(a)-(c) below.

(q)     Susan Devine (Banca March, Spain). Devine transferred proceeds of the Penny Stock Scheme to this account on or about August 24, 2011 and November 25, 2011. *See* Paragraph 205(d) and 211(b) below.

(r)     Susan Devine (Banco Bradesco, Brazil). Devine transferred proceeds of the Penny Stock Scheme to this account on or about September 16, 2011, purportedly to purchase land in Brazil. *See* Paragraph 211(d) below.

(s) <u>Susan Devine (Pershing LLC, Citibank, England)</u>.  Devine had at least two accounts or sub-accounts with Pershing LLC at Citibank in England, nominally for the benefit of each of her children.  She transferred proceeds of the Penny Stock Scheme to accounts held for the benefit of each of her children on or about April 19, 2012.  *See* Paragraph 215(d) below.

(t) <u>Susan E. Devine Homm Revocable Trust (Deutsche Bank Alex.Brown, United States)</u>.  Homm made a payment of $1,500,000 directly from Hunter into this account pursuant to the Marital Settlement Agreement.  On February 28, 2014, a federal seizure warrant issued for all funds and securities on deposit in this account.  *See* Paragraph 105 above.

145.    In addition to the accounts listed above, during the Relevant Period, Devine transferred proceeds of the Penny Stock Scheme to Homm; to accounts facilitating various real estate purchases; to Klueger & Stein LLP ("**Klueger & Stein**"), an asset protection law firm in Los Angeles, California; and to other transferees.

146.    On information and belief, Devine directed these transactions while residing in Naples, Florida.  She frequently directed money transfers using various email accounts, including under an alias "Julia Brown."

**B.**    **Devine's Knowledge of the Penny Stock Scheme**

147.    Throughout the Relevant Period, on information and belief, Devine knew that the transactions at issue were designed in whole or in part to conceal and disguise the nature, location, ownership, and control of proceeds of unlawful activity.

148.    Devine was repeatedly put on notice of Homm's wrongdoing.  On information and belief, no later than in or around May 2006, Devine understood that Homm was engaged in fraudulent activities, and she took the steps described in this Complaint, among others, to disperse and conceal the proceeds of the fraud.  Evidence of Devine's conduct in May 2006 and thereafter, leading up to Homm's resignation from ACM on September 18, 2007, demonstrates her knowledge of Homm's wrongdoing.  For example:

(a)    Just weeks after Homm learned of the Arness Email on May 5, 2006, Devine inventoried valuable art and furniture in the couple's Mallorca home and executed a fraudulent, backdated "loan" contract to give the false appearance that Homm did not own this property.

(b)    As discussed further in Paragraph 152 below, also in May 2006, Devine and Homm directed a transfer of approximately €8,000,000 from an account controlled by Devine to Singapore, falsely justifying the transfer as payment for a hotel that neither Devine nor Homm ever purchased.

(c)    On August 7, 2006, Devine and Homm initiated their strategic divorce and filed fraudulent papers with the Florida Circuit Court drastically understating their assets.

(d)    Also on August 7, 2006, Meisterhans wrote to Devine and Homm to confirm that New York Art Trading had received wire transfers totaling €16,600,000 and $2,050,000, which "we are managing and holding on your behalf."

(e)     On August 28, 2007, Homm admitted in an email to Devine that he had "sold [his] soul" over the previous 18 months for the sake of Devine and their children.

(f)     In or around September 2007, Devine directed Meisterhans to transport the art and furniture previously inventoried by her from Mallorca to storage in Switzerland.  On September 17, 2007, the day before Homm resigned and went into hiding, Devine made final arrangements by email for the transport of her "belongings" to Switzerland.  It is a reasonable inference that Devine knew of Homm's plan to flee, understood that he was fleeing because of his role in the Penny Stock Scheme, and believed her valuables in Mallorca to be at risk of seizure once Homm's activities at ACM came under scrutiny.

(g)     Just before his departure from ACM, Homm directed Schaer to hide for several months in a faraway country while remaining available to Devine in the event she needed his assistance.  Before taking Homm's advice and fleeing to Cambodia, Schaer sent a hard disk to Homm and a USB drive to Devine, both containing identical data relating to all asset transfers made in 2006 and 2007.

149.    Further, after Homm's departure from ACM, Devine became aware of criminal and civil proceedings stemming from the Penny Stock Scheme and Homm's role in that fraud, and she knew that the Funds, as victims of the fraud, as well as various governmental bodies in the United States and abroad, were seeking to hold Homm responsible for his role in the Penny Stock Scheme.  In particular:

(a)      On December 10, 2009, Devine was contacted at her home in Naples, Florida

by a private investigator on behalf of the Funds.  The investigator asked

Devine whether she knew of Homm's whereabouts.  He also informed her of

the SDNY Action and described the Funds' allegations.  The investigator also

provided Devine with a copy of the complaint in the SDNY Action, which set

forth in detail how the Funds were defrauded by Homm and his co-

conspirators, and how Homm profited from the Penny Stock Scheme.

(b)      On February 16, 2010, counsel for the Funds contacted Devine in an effort to

seek her help in locating Homm.

(c)      On February 24, 2011, the SEC sued Homm and others in the U.S. District

Court for the Central District of California, alleging that the defendants

participated in the Penny Stock Scheme.  The next day, the SEC issued a

release explaining the allegations.  *See* Litigation Release No. 21,865, *SEC*

*Charges Securities Professionals and Traders in International Hedge Fund*

*Portfolio Pumping Scheme*, at www.sec.gov/litigation/litreleases/2011/

lr21865.htm.

(d)      Beginning on January 13, 2012, certain of Devine's own bank accounts in

Switzerland were frozen by Swiss authorities on the suspicion that they

contained proceeds of crime.

(e)      On May 29 and 30, 2012, Devine provided testimony in Switzerland in

connection with the Swiss Money Laundering Investigation.  She was

specifically informed during her testimony that criminal proceedings were

pending in Switzerland against Homm, as well as his co-conspirators

Meisterhans and Kapleta.

(f)     Devine and her son were with Homm when he was arrested at the Uffizi

Gallery in Florence, Italy on March 8, 2013.

(g)     Homm's indictment on March 19, 2013 was the subject of numerous press

reports.  *See, e.g.*, Jonathan Stempel, *'Rogue Financier' Homm Indicted in*

*U.S. in $200 mln Fraud*, Reuters (Mar. 20, 2013); Joel Rosenblatt & Edvard

Pettersson, *Absolute Capital's Homm Is Charged with Securities Fraud*,

Bloomberg (Mar. 20, 2013).

150.    Throughout this period and after, Devine continued to transfer and attempt to

conceal the proceeds of the very fraud at issue in the civil and criminal actions against Homm

and his co-conspirators.

### C.      Transfers from Homm to Devine

151.    The Arness Email triggered an urgent need for Devine and Homm to begin

liquidating their ACM shares and laundering the proceeds of the then-ongoing Penny Stock

Scheme.  A critical aspect of the Money Laundering Enterprise was a massive transfer of

assets from Homm to Devine after the Arness Email, totaling at least €25,000,000 and

5,200,000 ACM shares.  Notably, Homm transferred over €18,000,000 and all 5,200,000

ACM shares to Devine *after* September 18, 2006, when they executed the Marital Settlement

Agreement purporting to be the final word on the financial aspects of the divorce.

152.    On or about May 9, 2006 – just days after the distribution of the Arness Email

and before Homm and Ewing were able to identify the email's author – Homm transferred

€6,200,000 from the account of Ridgeville Investment Inc. ("**Ridgeville**") at CBH (for which he was the beneficiary) to the account of Loyr at CBH (for which Devine was the beneficiary).  Prior to that transfer, the Ridgeville account at CBH held at least €8,000,000 that had been sent from an account of CSI at VP Bank in Lichtenstein,  which held dividends from ACM and proceeds from sales of ACM shares.  On May 22, 2006, Meisterhans sent an email to Devine with bank details to an account in the name of Ocean Offshore Bank SA ("**Ocean Offshore**") at Commerzbank (South East Asia) Ltd. in Singapore.  Two days later, Devine and Homm transferred the entirety of the assets of the Loyr account at CBH (approximately €8,000,000) to the Ocean Offshore account, ostensibly for the purpose of purchasing a hotel.  In an internal memorandum to file, Beat Kranz of CSI noted his discussion of this transfer and its supposed purpose during a telephone call with Homm and Devine.  However, no records of any such purchase have ever been identified.  Further, both Homm and Devine denied knowledge of the Singapore hotel investment in their Swiss testimony.

153.    On or about August 25, 2006, Homm transferred €500,000 from his account at CBH to Devine's Brek account at CBH.  The funds in Homm's CBH account constituted proceeds of the Penny Stock Scheme, including over $13,000,000 from an account of Hunter in 2007 and nearly $4,000,000 from CSI's account at CBH in 2006 and 2007.

154.    In a flurry of transactions between the Marital Settlement Agreement on September 18, 2006 and the finalization of the divorce on May 21, 2007, Homm transferred approximately an additional €15,199,000 in Penny Stock Scheme proceeds from various

bank accounts at CBH under his control (in the names of Homm, CSI, and Ridgeville) to Devine's Brek account at CBH.

155.    As discussed in Paragraph 121 above, pursuant to the post-divorce Property Settlement Agreement, on or about August 24, 2007, Homm transferred 4,000,000 ACM shares to the Brand account at CBH, and on or about August 30, 2007 and September 7, 2007, Homm transferred a total of €3,100,000 from CSI's account at CBH to the Brand account.  Then, on or about September 26, 2007, Homm transferred to the Brand account an additional 1,200,000 ACM shares *not* required by the Property Settlement Agreement. Between in or about August 2007 and February 2008, all of those ACM shares were sold for a total of £4,112,013 and €754,252, and the proceeds were transferred to Devine's account at PHZ.

**D.      Additional Money Laundering Transactions
         in the Immediate Wake of the Arness Email**

156.    In the weeks following the identification of the author of the Arness Email, in addition to beginning the transfers of assets described above, Devine and Homm initiated at least two more transactions with the purpose of laundering Penny Stock Scheme proceeds.

157.    On or about May 16, 2006 – less than two weeks after the Arness Email – Hosifa was formed.  On June 1, 2006, CSI transferred €1,400,000 in cash from its account at VP Bank in Liechtenstein to an account in the name of Hosifa at EFG Bank von Ernst in Liechtenstein, pursuant to a payment order signed by Homm.  This money constituted the Penny Stock Scheme proceeds, specifically proceeds from sales of ACM shares between on or about February 23, 2006 and May 4, 2006.  It would later be transferred to Hosifa's

account at PHZ and used for the benefit of Devine, notwithstanding the fact that the stated beneficiaries of that account were the Homm children. *See* Paragraphs 213 and 215 below.

158.    On or about June 20, 2006, Devine transferred €4,000,000 from the Brek account at CBH to Sinitus's Investec account in Australia. These funds consist at least in part of Penny Stock Scheme proceeds. On or about January 21, 2008, Meisterhans wired €3,900,000 from that Investec account to Floma's account at EFG in Singapore, which was controlled by Devine. On information and belief, the remaining €100,000 was kept by Meisterhans as a commission. *See* Paragraph 164 below.

### E.    Continued Money Laundering Activity After the Sham Divorce

159.    Following the Divorce Judgment on May 21, 2007, Devine, acting in concert with Homm, Meisterhans, Eichmann, Meyer, and others, continued to launder funds throughout the world, including in transactions disguised as purchases of residential property and by converting her assets into gold and other metals. And after Homm resigned from ACM on September 18, 2007, the continued success of the Money Laundering Enterprise turned in even greater part on Devine's efforts, since Homm had assumed false identities and was moving clandestinely from country to country in an effort to evade private detectives and government authorities alike.

### 1.    *Floma*

160.    In August 2007, Devine established Floma, a Panama entity that she used to launder Penny Stock Scheme proceeds. On information and belief, "Floma" stands for "Florida and Mallorca," two locations from which Devine and Homm directed their money laundering activities. Atica Nominees S.A. ("**Atica**"), a British Virgin Islands company

operated by Phillipe Meyer and his law partner, served as the foundation council member of Floma.

161.    Originally, Meisterhans was to assist Devine with Floma, but much of the work was done by Meyer, at Meisterhans's suggestion.  At least through and including January 2008, Meyer coordinated closely with Meisterhans to transfer funds to Floma's Singapore account.

162.    In testimony before the Swiss Prosecutor's Office in May 2012, Devine also falsely represented that she opened Floma with herself as a supervisor and her and Homm's children as beneficiaries.  On August 9, 2007, a fiduciary agreement was executed between Meyer, on the one hand, and the Homm children "represented by their mother Susan Devine Homm," on the other.  However, a letter from Meyer to an associate dated November 10, 2009 indicates that Devine was a beneficial owner of Floma.  Similarly, Devine has explained to her U.S. accountants that she is the "final owner" of Floma.

163.    Devine met with Meisterhans and Meyer in Zurich on or about September 19, 2007.  On November 5, 2007, Atica passed a resolution to open an account in Singapore on Floma's behalf.  On or around January 16, 2008, the account was opened.

164.    Money was subsequently transferred to Floma's account from Devine's Brek account at CBH, a hotbed of money laundering by Devine and her co-conspirators through at least 2011.  As noted, on or about June 20, 2006, €4,000,000 had been transferred from Devine's Brek account to Sinitus's Investec account in Australia.  Those funds consisted at least in part of proceeds of sales of ACM stock after the Arness Email.  On or about January 21, 2008, Meisterhans wired €3,900,000 from that Investec account to Floma's account at

EFG in Singapore.  On information and belief, the remaining €100,000 was kept by Meisterhans as a commission.

165.    Throughout the Relevant Period, Devine maintained complete control over Floma's assets, instructing Meyer and his colleagues from an email address using the alias "Julia Brown."  Meyer cautioned Devine, however, that email was "too open" to conduct certain aspects of Floma's financial transactions.

166.    On or about September 17, 2008, Devine wired €170,900 to Meyer's firm from her Floma account at EFG and, using the "Julia Brown" email account, instructed Meyer to "[k]eep the money in a vault for me until I know what to do with it."

167.    On June 29, 2009, Devine, using the "Julia Brown" email account, advised Meyer that she was "making a large investment" and directed him to wire €1,000,000 from the Floma account to an account purportedly in the name of DC Fragments at HSBC in Germany.  That money was wired on or about July 2, 2009.  Following a query from one of EFG's compliance officers, Meyer informed Devine that "[i]t is not sufficient to say it is for Metal Investment" and that she should "give as much as possible details," and Devine responded tersely, "I will give details."  She then forwarded an email purportedly sent by a company alternately referred to in the email as "Mesto Zapad Sluzby Limited" and "Metal Zapad Sluzby Ltd.," which explained:  "We are dealers in metals of all kinds and engage in trade on a world wide basis."

168.    In August 2009, Devine parked money with another purported dealer in "precious metals."  On August 28, 2009, Devine, using the "Julia Brown" email account, directed Meyer to wire €1,000,000 from Floma to the account of Check Republis at Unicredit

Bank in the Czech Republic.  Meyer sent the payment order on or about August 31, 2009.

The same day, Meyer emailed Devine:  "Please give us also details, for what the funds are

used.  We need to have explanation due to the banking rules."  Devine responded:  "I gave a

message to your assistant saying that the funds are for an investment.  Metals to be exact."

On or about September 8, 2009, €1,000,000 was wired from Floma's account to the account

of Check Republis at Unicredit Bank.

169.    On November 5, 2009, Devine, using the "Julia Brown" email account,

instructed Meyer to close out Floma's EFG account:  "I am purchasing a property and will be

needing the remainder of the money from my account [*i.e.*, Floma]."  EFG subsequently

transferred €1,876,769.43 to the same Check Republis account to which Devine had sent

funds for a "metals" investment two months earlier.  In emails to Meyer concerning the bank

transfer, Devine persisted in falsely maintaining that this money was to be used to purchase

real property in London, yet property records confirm that Devine never purchased that

property.

170.    Subsequent tracing information regarding the assets transferred from Floma is

unavailable to the Funds.  In a "balance sheet" as of December 31, 2010 that Devine prepared

for U.S. accountants, she listed a "Panama Account" that held $4,000,000, approximately the

same amount that was initially transferred to Floma's EFG account in 2008.  In a January 23,

2012 email to the same accountants, she stated that she had approximately $1,000,000 in "a

Bank in Panama."

## 2.     *Gold Purchases Through Marius Grossenbacher*

171.     Bank records indicate that on August 21, 2007, €6,150,000 and CHF 1,470,000 were withdrawn in cash from Devine's Brek account at CBH, in Zurich, and deposited in cash the same day in the account at CBH in the name of Levanne, for which Devine was the beneficiary.  The two cash withdrawal forms were signed by Devine.  However, these bank records were falsified by Devine and Eichmann, her banker at CBH, in an effort to conceal the origin of the funds.  A CBH compliance officer explained to the Swiss Prosecutor's Office that the treasury of the Zurich branch of CBH did not have this amount in cash and that such simulated cash transactions, which were invisible to the bank's headquarters in Geneva, would have been possible only if the counterparts had accounts at CBH.  Devine testified before the Swiss Prosecutor's Office in May 2012 that she engaged in these cash transactions on Eichmann's recommendation.  These and other simulated cash transactions are a basis for a separate Swiss criminal money laundering investigation targeting Eichmann and Frei.

172.     Thereafter, between in or about October 2007 and March 2008, through Levanne, Devine made six deposits totaling more than CHF 1,400,000 into the UBS account of Marius Grossenbacher, who on information and belief is an attorney in Switzerland.  Eichmann received a commission from Levanne for each of these transfers.  Around the same time, Grossenbacher purchased approximately CHF 1,380,000 in gold coins, in cash transactions.

173.     In a letter to Swiss authorities dated April 4, 2012, Grossenbacher explained: "I sold these coins to Mr. Marcel Eichmann at SCS Alliance . . . and handed them over to

him in person as soon as I received the antecedent payments from SCS Alliance. For whom the bank purchased these coins I do not know. He only went so far as to say that the bank recommended the customer buy gold coins and organized the purchase on their behalf."

174. Devine testified before the Swiss Prosecutor's Office in May 2012 that the gold coins were placed in a safe deposit box outside of Switzerland. Subsequent tracing information regarding the gold coins is unavailable to the Funds.

### 3. *Cash Withdrawals from Accounts Managed by Eichmann*

175. Shortly before Homm left ACM and thereafter, Devine and Homm conspired to execute a number of transfers by either (a) withdrawing cash and immediately re-depositing it into another account (rather than simply executing an ordinary account-to-account transfer), or (b) conspiring to falsify bank records to create the appearance of such cash transactions. CBH advised the Swiss Prosecutor's Office: "[C]ertain clients prefer (rarely) to make a [cash] withdrawal/payment as opposed to an internal transfer, believing that their anonymity is guaranteed, in spite of our explanations concerning our obligations to keep the 'paper-t[r]ail' for all the transactions we process [. . .]. Obviously, we do not encourage this type of operation."

176. Between August 9, 2007 and August 13, 2009, total amounts of approximately $1,190,540, CHF 1,620,000, and over €1,000,000 in cash were withdrawn from accounts at CBH controlled by Devine and Homm.

177. Several of these transfers involved accounts for which Devine was the beneficiary and Marcel Eichmann was the responsible bank manager, as follows:

(a)     On or about August 9, 2007, €120,000 in cash was withdrawn from Devine's
        Brek account at CBH.  The bank's withdrawal report indicates that the
        withdrawal was made pursuant to a "telephone with client [Devine]," and a
        "cash withdrawal" form is signed by Devine.

(b)     According to the Swiss Report, on or about August 17, 2007, €500,000 was
        withdrawn in cash from Devine's Brek account at CBH, then deposited into
        Devine's account at CBH and transferred to Devine's account at PHZ.  On
        information and belief, Devine authorized this withdrawal and deposit.

(c)     As discussed in Paragraphs 171 above, on or about August 21, 2007, the
        amounts of €6,150,000 and CHF 1,470,000 were withdrawn from Devine's
        Brek account at CBH and deposited the same day into Levanne's account at
        CBH.  These transactions were falsely recorded as cash transactions.  Of these
        funds, approximately CHF 1,380,000 was used to purchase Swiss gold coins.

(d)     On or about August 27, 2007, Devine and Eichmann used cash transfers to
        move $70,000 out of the Levanne account into Devine's hands.  First, $70,000
        was withdrawn in cash from the Levanne account.  On information and belief,
        Devine authorized this transaction and executed it with Eichmann's
        assistance.  The same day, Eichmann deposited $70,000 in cash into Devine's
        Brek account at CBH,  and Devine withdrew $70,000 in cash from that
        account.  Devine signed the form authorizing the withdrawal from the Brek
        account.

(e)     On or about October 5, 2007, €92,000 was withdrawn in cash from the

Levanne account at CBH and deposited into Devine's Brek account at CBH.

On information and belief, Devine authorized this transaction and executed it

with Eichmann's assistance.

(f)     On or about March 13, 2008, €117,900 was withdrawn in cash from the CSI

account at CBH and deposited in the Brand account at CBH, of which Devine

was the beneficiary.

(g)     In what appears to be another simulated cash transaction, on or about April

30, 2008, approximately €5,070,000 was transferred from the Levanne

account at CBH back to Devine's Brek account at CBH.  On information and

belief, Devine authorized this transaction and executed it with Eichmann's

assistance.

(h)     On or about August 5, 2009, the administrator of Brek wrote to CBH and

requested that the bank send €50,000 to Eichmann from Brek's account at

CBH.  Eichmann signed the withdrawal form, which indicates that €50,000

was withdrawn on August 13, 2009.  On information and belief, Devine

authorized this transaction and executed it with Eichmann's assistance.

178.    Devine was direct with Eichmann in explaining her willingness to use

deceptive means to cover her trail.  For example, in a December 3, 2007 email regarding a

proposed transfer of €25,000, she explained:  "I do not want it to come directly from my

Brek account.  Originally, it used to come from the Hlmes acct.  I do not want to have the

Spanish authorities get greedy and want a piece of my money.  How can we send the money

without making problems[?]  At first I thought to transfer the money to Hlms acct. and

wiring it out of there but does it still exist?"  Devine was referring to Homm's account at

CBH labeled "Holmes."  Notably, she was considering using Homm's account to conceal her

activities even though their divorce had been finalized more than six months earlier.

### 4.    *Purchase and Improvement of Naples Property*

179.    In April 2008, Devine purchased a waterfront property in Naples, Florida for

approximately $2,200,000 (the "**Naples Property**").

180.    Bank records reflect that the Naples Property was paid for through two

transfers from the Jürg Brand account at CBH.

181.    As discussed above, the Brand account at CBH was opened on August 16,

2007, and Devine was the beneficiary of that account.  The funds in the Brand account were

transferred from CSI's bank account at CBH and consisted of dividends paid by ACM and

proceeds from sales of ACM stock.  Between on or about August 24 and September 26,

2007, 5,200,000 ACM shares were transferred from the CSI account at CBH to the Brand

account at CBH.  As detailed in the Swiss Report, between on or about August 28, 2007 and

February 15, 2008, the ACM shares in the Brand account were sold for the total amounts of

£4,112,013 and €754,252.

182.    On or about March 26, 2008, $170,000 was wired from the Brand account to

an account with Citibank N.A. in New York, New York in the name of First Title of Naples,

Inc. ("**First Title**"), a title insurance company located in Naples, Florida.  A memorandum

line in the bank records cites the address of the Naples Property.

183.    On or about April 4, 2008, $1,982,000 was transferred from the Brand account to First Title's Citibank account in New York.  A memorandum line in the bank records cites the address of the Naples Property.

184.    Devine thereafter directed Eichmann to make additional transfers from the Brand account, purportedly for the purpose of renovating and furnishing the Naples Property, as follows:

(a)    On May 8, 2008, Devine requested by email that $250,000 be wired to her Bank of America account in Naples, Florida "for renovation and furniture purchase of the house [she] just purchased."

(b)    On September 1, 2008, Devine confirmed by email a request for $150,000 to be wired to her Bank of America account.  A handwritten note on this email indicates that the stated reason for this wire was to pay for property renovations.

(c)    On June 4, 2009, Devine requested by email that $60,000 be wired to her Bank of America account in order to pay for a "[n]ew roof and other expenses."

185.    In total, if the stated purposes for the wires are to be believed, Devine spent nearly $3,000,000 of Penny Stock Scheme proceeds on the Naples Property from 2008 to 2009.

186.    These transfers and purchases were designed to conceal the proceeds of the Penny Stock Scheme and further launder those proceeds by hiding them in real property in Devine's name.

76

187.     Devine continues to own the Naples Property.

### 5.     Purchase of Properties in Spain

188.     Devine also used Penny Stock Scheme proceeds to purchase two properties in Spain, in both instances through corporate entities that helped conceal her involvement.

189.      On or about March 21 and 22, 2007, Devine transferred a total of approximately €5,086,600 from the Brek account at CBH to an account at Banco de Andalucia in the name of Leo Propiedades S.L.  Leo Propiedades S.L. was owned by Benley International S.A., a Panama company controlled by Homm.  The memorandum lines on the bank records state that the purpose of the wired money is buying property.  These funds – along with an additional €1,300,000 from Homm's account at CBH – were used to purchase a large seaside villa in Marbella, on the Southern coast of Spain.  As discussed in Paragraph 126(b) above, Devine and Homm shopped for this property together even as their supposed divorce was being finalized.

190.     Around the same time, Devine used another entity to buy a property in Mallorca, Spain.  Malon, a Swiss company registered on November 22, 2006, opened an account with UBS in Switzerland on May 23, 2007, just two days after the Divorce Judgment.  According to the Swiss Report, Devine is the beneficial owner of this account.

191.     On or about May 24, 2007, less than a week after Malon's UBS account was opened, Devine transferred €3,200,000 from the Brek account at CBH to Malon's UBS account.  The payment order, signed by Devine, indicates that the purpose of the transfer was to purchase real estate in Mallorca, next to the Homm home.  The €3,200,000 originated from transfers from CSI's account with CBH to Brek's account with CBH.  From that

amount, €3,100,000 was transferred shortly thereafter from Malon's UBS account to the account of Vatulele S.L. at Caja de Ahorros Bank in order to purchase the Mallorca property.

### 6.  *Global Trade Group*

192.    On or about March 6, 2007, €1,000,000 was transferred from an account in the name of Global Trade Group Ltd. at UBS to Devine's Brek account at CBH, following a March 1, 2007 payment order signed by Meisterhans on behalf of Global Trade Group Ltd.

### 7.  *Additional Money Laundering Transactions*

193.    From on or about December 11, 2009 to November 16, 2010, Devine transferred €120,000 from her account at PHZ to her account at Caja de Ahorros Bank in Spain.

194.    From on or about November 4, 2010 to January 14, 2011, Devine transferred a total of €350,000 from the Brek account at PHZ to an account in the name of Long Life Services PTE Ltd. ("**Long Life Services**"), a Singapore company, at Standard Chartered Bank in Singapore.

195.    From late 2009 through May 2011, Devine transferred over $736,000 from her account at PHZ to her account at Bank of America in Naples, Florida.  Those transfers occurred on or about the following dates, in the following amounts:

    (a)       October 5, 2009:  $50,000;

    (b)       December 16, 2009:  $50,000;

    (c)       February 10, 2010:  $50,000;

    (d)       February 22, 2010:  $250,000;

    (e)       November 1, 2010:  $50,000;

(f)  November 22, 2010:  $50,000;

(g)  December 20, 2010:  $50,000;

(h)  January 19, 2011:  $50,000;

(i)  February 15, 2011:  $50,000;

(j)  March 16, 2011:  $36,146.29; and

(k)  May 31, 2011:  $50,000.

196.  Devine also transferred $160,000 from the Brand account at CBH to her Bank of America account, as follows:

(a)  October 9, 2008:  $60,000; and

(b)  April 15, 2009:  $100,000.

197.  Subsequent tracing information regarding the assets in the foregoing accounts is unavailable to the Funds.

**F.  <u>Transfers to Avoid Swiss Freeze Orders</u>**

198.  Beginning in May 2011, the Swiss Prosecutor's Office sent PHZ certain requests for information.  Beginning in January 2012, the Swiss Prosecutor's Office issued freeze orders relating to numerous bank accounts in Switzerland, including the following five accounts in Devine's name or for which Devine or her children are the stated beneficiaries:

(a)  The Brek account at PHZ;

(b)  Devine's account at PHZ;

(c)  The Hosifa account at PHZ;

(d)  The Malon account at PHZ; and

(e)  Devine's account at Trafina Bank, for which Homm is the beneficial owner.

199.     According to the Swiss Report, the Swiss authorities learned upon further investigation that, between their initial requests for information from PHZ and the freeze orders, Devine directed multiple transfers of millions of dollars out of three of the PHZ accounts (in the names of Brek, herself, and Hosifa) to other accounts (most of which were under her control and located outside Switzerland), effectively placing those funds beyond the reach of the freeze.  Almost all of those transfers were to accounts outside of Switzerland, including the United States, and most of the recipient accounts were opened after the Swiss authorities sent PHZ the initial requests for information.

200.     Devine testified that she was not notified of the Swiss requests for information regarding her bank accounts until October 2011.  However, on information and belief, she was tipped off about the confidential investigation much earlier.

### 1.     *Brek Account at PHZ*

201.     According to the Swiss Report, on May 31, 2011, the Swiss Prosecutor's Office sent PHZ an initial request for information.  On January 13, 2012, after the Swiss Prosecutor's Office had analyzed the origin of the assets on the account, a freeze order was issued for the Brek account at PHZ, resulting in a freeze of €7,581,770, valued as of June 2014.

202.     The funds in the Brek account at PHZ consisted at least in substantial part of proceeds of the Penny Stock Scheme, including dividends from ACM and proceeds of sales of ACM shares.  Specifically, in 2006 and 2007, there was a series of transfers from the CSI account at CBH into the Brek account at CBH, including, but not limited to, €510,000 on or about October 6, 2006; €8,386,000 on or about March 30, 2007 (traceable to sales of ACM

shares); and €5,308,000 on or about May 10, 2007 (traceable to dividends from ACM).  In turn, beginning in or about September 2009, Devine made multiple transfers from the Brek account at CBH to the Brek account at PHZ, including, but not limited to:

(a)     On or about September 15, 2009, Devine transferred $887,678 from the Brek account at CBH to the Brek account at PHZ.

(b)     Between on or about September 21, 2009 and November 3, 2009, Devine transferred approximately €8,000,000 in securities from the Brek account at CBH to the Brek account at PHZ.

(c)     On or about September 21, 2009, Devine transferred €390,000 from the Brek account at CBH to the Brek account at PHZ.

203.    Between May 31, 2011 (the date of the Swiss authorities' first request to PHZ) and January 13, 2012 (the date of the freeze order), Devine directed at least 14 transfers from the Brek account at PHZ, totaling over $5,000,000.  Devine emailed the instructions for these transfers to Eichmann's personal email account.

204.    These transfers included the four following wires into the United States totaling $4,550,000:

(a)     On or about August 5, 2011, Devine transferred $450,000 from the Brek account at PHZ to a Pershing LLC account held for the benefit of her son at Bank of New York in New York.

(b)     On or about August 5, 2011, Devine transferred $450,000 from the Brek account at PHZ to a Pershing LLC account held for the benefit of her daughter at Bank of New York in New York.

(c)     On or about November 3, 2011, Devine transferred $3,500,000 from the Brek account at PHZ to her Pershing LLC account at Bank of New York in New York.  Bank records indicate that Devine's stated purpose for this wire was to purchase a new house in the United States.  However, on information and belief, Devine did not make such a purchase.

(d)     On or about January 10, 2012, Devine transferred $150,000 from the Brek account at PHZ to her Bank of America account in Naples, Florida.

205.    Other transfers from the Brek account at PHZ were made to accounts outside of the United States, as follows:

(a)     On or about June 1, 2011, Devine transferred €40,000 from the Brek account at PHZ to an account in the name of Liberia Renaissance Foundation at PHZ. According to the Swiss Report, the Liberia Renaissance Foundation was founded by Homm in 2006; the current address of the foundation is the same as the current address of PHZ; and Devine is currently the president of the foundation's board, Marcel Eichmann is the administrator, and Pascal Frei is a member of the board.

(b)     From in or about June 2011 through November 2011, Devine made four transfers totaling €200,000 from the Brek account at PHZ to her account at C.D. de Bourgogne in France.

(c)     On or about June 27, 2011, €75,000 in cash was withdrawn from the Brek account at PHZ.

(d)     On or about November 25, 2011, Devine transferred €100,000 from the Brek account at PHZ to an account in her name at Banca March in Spain.

(e)     On or about November 25, 2011, Devine transferred €200,000 from the Brek account at PHZ to Long Life Services' account at Standard Chartered Bank in Singapore.

(f)     On or about October 28, 2011 and November 25, 2011, Devine transferred a total of €100,000 from the Brek account at PHZ to an account in her name at Caja de Ahorros Bank in Spain.

(g)     On or about November 25, 2011, Devine transferred €100,000 from the Brek account at PHZ to an account in her name at Lloyds TSB Bank in Uruguay.

### 2.     *Devine Account at PHZ*

206.     According to the Swiss Report, PHZ provided the Swiss Prosecutor's Office with information regarding an account at PHZ in Devine's name on June 14, 2011.  On January 13, 2012, after the Swiss Prosecutor's Office had analyzed the origin of the assets on the account, a freeze order was issued for that account, resulting in a freeze of €7,086,790, valued as of June 2014.

207.     The funds in Devine's PHZ account originated at least in part from the Brand account at CBH and her own account at CBH, and consisted of dividends from ACM and proceeds of the sale of ACM shares.

208.     Between June 14, 2011 (the date that PHZ provided information to the Swiss about Devine's PHZ account) and January 13, 2012 (the date of the freeze order), Devine directed at least 11 transfers out of her PHZ account, totaling $920,766 and €660,000.

209.   These transfers out of Devine's PHZ account included the five following wires to Devine's Bank of America account in Florida, totaling $250,000:

(a)   On June 20, 2011, Devine instructed that $50,000 be wired from her PHZ account to her "Bank of America account in Florida."

(b)   On August 4, 2011, Devine instructed that $50,000 be wired from her PHZ account to her "US account at the Bank of America in Florida."

(c)   On August 22, 2011, Devine instructed that $50,000 be wired from her PHZ account to her "account at the Bank of America in Florida" because she "just paid large school tuition bills."

(d)   On September 15, 2011, Devine instructed that $50,000 be wired from her PHZ account to her "Bank of America account in Florida" because she needed "new storm windows which will cost [her] over $30,000."

(e)   On October 10, 2011, Devine instructed that $50,000 be wired from her PHZ account to her "Bank of America account in Florida" because she was "having lots of expenses[,] from accountant bills to [expenses relating to] new windows in the house."

210.   On or about September 16, 2011, Devine transferred $140,000 from her PHZ account to Klueger & Stein, a Los Angeles law firm that touts its expertise in "[c]reative asset protection."  On its website, Klueger & Stein promotes its asset protection services for clients who are "faced with a lawsuit" or "pursued or investigated by a federal or state agency."  The website promises that "[w]ith proper advanced planning, your assets can be protected against potential claims and investigations of the government" and states that

"there is still a lot [clients] can do to protect their assets" even after "a lawsuit has been filed against them."

211.    Other transfers from Devine's PHZ account were made to accounts outside of the United States, as follows:

(a)     On or about June 16, 2011 and August 4, 2011, Devine transferred a total of €110,000 from her PHZ account to her account at Caja de Ahorros Bank in Spain.

(b)     On or about August 24, 2011, Devine transferred €150,000 from her PHZ account to her account at Banca March in Spain.

(c)     The same day, Devine transferred another €150,000 from her PHZ account to an account in her name at Lloyds TSB Bank in Uruguay.  (Previously, on or about March 25, 2011, Devine had transferred €100,000 from her PHZ account to her Lloyds TSB Bank account.)

(d)     On or about September 16, 2011, Devine transferred $530,766 from her PHZ account to her account at Banco Bradesco in Brazil.  The purpose of this transfer was stated to be a purchase of land in Brazil.  (Devine had previously transferred $37,500 from her PHZ account for the same purpose to the account of Viterbo Rodrigues Alonso at Banco Bradesco, before Swiss authorities received information about Devine's PHZ account.)

(e)     On or about August 24, 2011, Devine transferred €250,000 from her PHZ account to Long Life Services' account at Standard Chartered Bank in Singapore.  In an effort to conceal the destination of the funds, Devine asked

Eichmann to book the transfer as a cash withdrawal:  "This is a cash bezug

[withdrawal] from Brek and Brek does not need to hold anything and it can be

documented as so.  This investment remains in my name so no money is going

to a different person only to myself."

### 3.    *Hosifa Account at PHZ*

212.    As noted, the Swiss Prosecutor's Office issued freeze orders for the accounts

of Devine and Brek at PHZ (but not the Hosifa account) on January 13, 2012.  Very shortly

thereafter, Devine began to transfer funds out of the Hosifa account at PHZ.  According to

the Swiss Report, a freeze order was issued for the Hosifa account at PHZ on January 14,

2014, resulting in a freeze of €518,820, valued as of June 2014.

213.    The Hosifa account at PHZ contained proceeds of the Penny Stock Scheme.

On or about June 1, 2006, just weeks after the Arness Email, CSI transferred €1,400,000 in

cash to an account in the name of Hosifa at EFG Bank von Ernst.  Homm signed the payment

order.  This money constituted the proceeds of sales of ACM shares between on or about

February 23, 2006 and May 4, 2006.  Then, on or about October 1, 2009, approximately

€1,489,000 was transferred from the Hosifa account at EFG Bank von Ernst to the Hosifa

account at PHZ.  Additionally, on or about November 12, 2010 and December 13, 2010,

Sammy Kapleta transferred a total of approximately CHF 435,000 to the Hosifa account at

PHZ.  This money constituted the proceeds of shares in PHZ that Kapleta purportedly held

on behalf of the Homm children.

214.    In October 2011, the Swiss Prosecutor's Office learned that the Homm

children were beneficial owners of an account with PHZ in the name of Hosifa.  That month,

the Swiss Prosecutor's Office requested information from PHZ regarding that account.  After

learning that the source of the funds in that account was an account in the name of Hosifa at

EFG Bank von Ernst in Liechtenstein, the Swiss Prosecutor's Office sent a letter rogatory to

authorities in Liechtenstein asking for information on the source of the funds in the Hosifa

account at EFG Bank von Ernst.  Devine was informed of the letter rogatory and participated

in the mutual assistance procedure.  As a result, she learned of the Swiss inquiry into the

Hosifa account at PHZ, and knew that the Swiss would soon receive information allowing

them to trace the funds in that account to the Penny Stock Scheme.

215.   Between January 13, 2012 (the date on which the Swiss froze all PHZ

accounts for which Devine was listed as the account holder or beneficial owner, including the

Brek and Devine accounts) and January 14, 2014 (the date of the freeze order for the Hosifa

account), Devine directed multiple transfers out of the Hosifa account at PHZ, as follows:

(a)   On or about January 18, 2012, Devine transferred CHF 200,000 to an account

at UBS in the name of Jürg Brand.

(b)   Between on or about January 17, 2012 and May 2, 2013, Devine transferred

CHF 80,000 and €50,000 to a PHZ account in the name of Liberia

Renaissance Foundation.

(c)   Between on or about January 18, 2012 and April 2, 2013, Devine transferred

CHF 150,000 to an account at VP Bank AG in the name of Medipolan AG for

"legal assistance."

(d)   On or about April 19, 2012, Devine transferred a total of CHF 1,000,000 to

her accounts with Pershing LLC at Citibank in London nominally held for the

87

benefit of her children.  An entry in PHZ's system relating to these transfers states (in German):  "[C]lient [Devine] doesn't trust Switzerland regarding her lawsuit and, for this reason, wants to transfer a portion of her children's assets to the accounts of her children in London.  The children have an account set up with Pershing LLC."

216.     Although Devine and Homm's two children are the stated beneficiaries of the Hosifa account at PHZ, these transfers demonstrate that Devine used this account for her own benefit.

## X.  Devine Directed Money Laundering from Florida

217.     The Money Laundering Enterprise is firmly anchored in Florida.

218.     Throughout the Relevant Period, Devine resided and continues to reside in Naples, Florida.  Until May 2008, Devine resided at an apartment in Naples owned by her parents.  Then, in or about May 2008, she purchased the Naples Property.  As discussed above, the Naples Property was purchased, improved, and furnished with funds directly traceable to the Penny Stock Scheme.  On information and belief, Devine has resided at the Naples Property since purchasing that property.  In her testimony to the Swiss authorities in May 2012, Devine identified the Naples Property as her residence, and Collier County property records for 2014 (the most recent records available) state that Devine is the owner of the Naples Property.  As recently as November 26, 2014, Devine applied for a homestead exemption for the Naples Property, a tax exemption that is available to the owner of a property only if that property is the permanent residence of the owner or the owner's dependent.

219.    In addition to her residences, Devine had close family connections in Naples. At certain times during the Relevant Period, at least one of her children lived with Devine and attended school in Naples.  Additionally, on information and belief, her parents have resided in Naples (at the same apartment where Devine once resided) throughout the Relevant Period.

220.    Devine maintains at least one bank account in Florida, through which, as discussed above, she funneled at least $1,700,000 of the Penny Stock Scheme proceeds.

221.    Devine holds a Florida driver's license, and she is a registered voter in Florida.

## XI.  Devine's Fraudulent Concealment

222.    Devine took substantial steps and used fraudulent and deceptive means to wrongfully conceal from the Funds and others material facts relating to her wrongdoing – including, but not limited to, her involvement in the Money Laundering Enterprise, her possession and control of proceeds from the Penny Stock Scheme, and her unjust enrichment from those proceeds – in an effort to frustrate efforts at recovering the fraud proceeds and to prevent the Funds from discovering their causes of action against Devine.

223.    Devine's fraudulent concealment began no later than May 2006, when she entered into a false, backdated agreement in an effort to shield certain of Homm's assets, as set forth in Paragraph 97 above.

224.    Further, in connection with her sham divorce from Homm, Devine filed a fraudulent affidavit in a Florida court on August 7, 2006 that omitted tens of millions of dollars in assets and executed a false Marital Settlement Agreement on September 18, 2006

that stated that Devine and Homm had resolved the division of their wealth, as set forth in Paragraphs 103-04 above.

225.    Having publicly separated herself from her husband and misrepresented the assets in her possession, Devine authorized dozens of transfers of Penny Stock Scheme proceeds that were in her control from and to bank accounts all over the world, as set forth in Paragraphs 155-216 above.  These transactions were intended to conceal or disguise the nature, location, source, possession, and control of these Penny Stock Scheme proceeds.

226.    Devine also continued to make misrepresentations regarding her involvement in the Money Laundering Enterprise, her possession and control of proceeds from the Penny Stock Scheme, and her unjust enrichment from those proceeds, including, but not limited to:

(a)    Conspiring to falsify bank records to create the appearance that certain transactions were being conducted in cash, as set forth in Paragraphs 175-78 above;

(b)    Using the alias "Julia Brown" when exchanging emails regarding asset transfers, including, but not limited to, emails dated September 17, 2008; June 29, 2009; August 28, 2009; and November 5, 2009, as set forth in Paragraphs 165-69 above;

(c)    Misrepresenting the purpose of a €1,900,000 transfer as payment for a property in London that Devine never actually purchased, as set forth in Paragraph 169 above;

(d)     Misrepresenting the purpose of a €8,000,000 transfer as payment for a hotel in Singapore that Devine never actually purchased, as set forth in Paragraph 152 above; and

(e)     Misrepresenting the purpose of a $3,500,000 transfer as payment for a new house in the United States that Devine never actually purchased, as set forth in Paragraph 204(c) above.

227.    By using an alias and lying about material aspects of transactions involving proceeds of the Penny Stock Scheme, Devine sought to prevent law enforcement authorities and the Funds from tracing the proceeds to Devine.

228.    As set forth in Paragraphs 198-216 above, after the Swiss Prosecutor's Office began investigating certain of Devine's Swiss accounts but before they froze those accounts, Devine transferred millions of dollars from those accounts to accounts all over the world, effectively placing those funds beyond the reach of the freeze.  These transfers were intended to conceal and disguise the nature, location, source, possession, and control of certain proceeds from the Penny Stock Scheme.

229.    Devine also lied to the Swiss authorities in testimony provided on May 29 and May 30, 2012, including, but not limited to, the following material misrepresentations and omissions:

(a)     Devine claimed that she did not recall "having received any sums from CSI since [her] separation" from Homm.  In fact, Devine received over €18,000,000 from CSI after she and Homm separated,  as well 5,200,000 shares of ACM – facts that she could not have possibly forgotten.

(b)   Devine denied knowledge of the beneficiary changes to CSI made in June 2007, although she was a party to the two relevant agreements.

(c)   Devine claimed that Floma, her early money laundering vehicle, was founded for the benefit of her and Homm's two children, whereas bank records show that, in fact, she used Floma to benefit herself.

(d)   Devine denied any knowledge of many of the transactions on which the Swiss investigators focused, and with respect to those few transactions that she claimed to recall, she often gave contradictory testimony.  For example, Devine testified that, as of August 2, 2006, Homm no longer controlled the Brek account.  However, she attributed transfers of €6,150,000 and CHF 1,470,000 in August 2007 to the need to protect herself from her husband, who "had the power to move around [her] funds entirely to his own liking."  Without apparent prompting by the Swiss Prosecutor's Office, Devine acknowledged that her testimony regarding these transactions did not "seem to make much sense."  Similarly, Devine denied any familiarity with the €8,000,000 transfer in May 2006 from the Loyr account at CBH to the account of Ocean Offshore Bank in Singapore for the purpose of purchasing a hotel – even though Meisterhans provided Devine with the details of the Ocean Offshore Bank account and Kranz of CSI specifically noted discussing this transfer and its supposed purpose with Devine.

(e)   When questioned about multiple transfers from the Brek account at PHZ after Swiss authorities first requested information about this account on May 31,

2011, Devine explained:  "Opening up new bank accounts takes time, and it just so happened that I was able to finally open them up at this exact moment in time."  This was false.  At the very least, Devine's account at Bank of America (to which Devine transferred $150,000 out of the Brek account after the Swiss authorities' request) had been open since at least 2009.

(f)     Devine claimed during her testimony that she moved her art and furniture from her home in Mallorca in September 2007 because she feared that "things were turning nasty" with Homm.  However, as the Meisterhans Indictment makes clear, Devine was laying the groundwork with Meisterhans to transport and protect this property months earlier, shortly after the Arness Email.

(g)     Devine stated that she had no contact with Meisterhans since a single meeting in 2007.  In fact, Devine had ongoing email communications with Meisterhans in 2008 regarding the transport of art and furniture to and from Switzerland, addressing him in those emails on a first-name basis.  For example, on or about January 8, 2008, Devine emailed Meisterhans, addressing him as "Urs," to inform him that she had "arrived safely in Zurich" and to ask for "the customer number for the warehouse."

(h)     Devine insisted that "the financial world" was Homm's world, not her own.  This is belied by (i) her employment at a bank for at least four years prior to her marriage to Homm; (ii) her employment at Value Management & Research AG ("**VMR**"), Homm's first company, where she played key roles in fund accounting, operations, office management, and analysis and,

93

according to Homm in his memoir, "helped [him] build [VMR] into an international $500 million stock-exchange-listed capital markets group"; and (iii) her active participation in and direction of the Money Laundering Enterprise over many years.

230.    Devine's misrepresentations to the Swiss authorities were designed to distance herself from the Penny Stock Scheme and to obstruct any investigation into her laundering of Penny Stock Scheme proceeds and unjust enrichment from those proceeds.

231.    Devine's deliberate and willful misrepresentations of material facts concerning her involvement in the Money Laundering Enterprise, her possession and control of proceeds from the Penny Stock Scheme, and her unjust enrichment from those proceeds successfully prevented the Funds from discovering their causes of action against Devine at an earlier time, despite the Funds' diligence in investigating the facts.

232.    At great time and expense, the Funds have worked to determine the facts regarding Devine's activities.  The Funds did not become aware of the Swiss Money Laundering Investigation until late 2012; even then, the Funds knew very few details about the investigation.  On January 23, 2013, the Funds sought – and on May 31, 2013, were granted – formal recognition by the Swiss Prosecutor's Office of their status as victims of the crimes under investigation in Switzerland.  As a result, in or about June 2013, the Funds were permitted access to certain evidence in the enormous investigative file of the Swiss Prosecutor's Office, including bank records and transcripts of witnesses' testimony – key evidence to which the Funds would not have had access otherwise.  Many of these records were in foreign languages, and the Funds have spent tens of thousands of dollars in

professional translation services.  The 219-page Swiss Report – issued in French on December 16, 2014 but not fully translated into English by the Funds until the end of January 2015 – provided a roadmap to Devine's role in the Money Laundering Enterprise and pulled together all of the facts into a compelling presentation of her criminal activity.  The Funds have pored over the English translation of the Swiss Report; the supporting annexes, as they became available between January and March 2015; and the recently-issued Meisterhans Indictment.  Using all available evidence, the Funds have laboriously pieced together Devine's expansive and ongoing unlawful activities that are material to the claims set forth in this Complaint.

## COUNT I

(Violations of RICO, 18 U.S.C. § 1962(c))

233.    The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

234.    During the Relevant Period, each of Devine and the Funds was a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

### *The RICO Enterprise*

235.    Devine and Homm are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the Money Laundering Enterprise described in this Complaint – namely, to hide, launder, and otherwise wrongfully retain the proceeds of the Penny Stock Scheme.  Over the years they have adapted their scheme to changing circumstances, recruiting new conspirators to assist with their wrongful activities and altering the scope and nature of their activities as necessary to advance the

objectives of the Money Laundering Enterprise.  That enterprise has been structured to operate as a unit, and the participants in the enterprise operate it to accomplish its common purpose and goal of Devine and Homm's criminal scheme.

236.   Devine is associated with the Money Laundering Enterprise within the meaning of 18 U.S.C. § 1962(c).  Operating out of Florida, she is responsible for directing and managing the laundering, concealment, and wrongful retention of the proceeds of the Penny Stock Scheme.  At all relevant times, she knew that these proceeds were obtained through wrongful criminal conduct.  Devine directed bankers, lawyers, and other associates to facilitate her and Homm's money laundering activities.  She committed numerous criminal predicate acts in Florida, which served as the nerve center of the Money Laundering Enterprise and the *de facto* headquarters of its operations.

237.   Homm was one of the primary architects of and participants in the Penny Stock Scheme.  With Devine, Homm sought to preserve for himself, Devine, and their children a "multigenerational fortune" consisting of the proceeds from his criminal activity.  Homm directed bankers, lawyers, and other associates to facilitate his and Devine's money laundering activities.

238.   Devine and Homm constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

239.   During the Relevant Period, the Money Laundering Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

240.    Devine participated, directly and indirectly, in the conduct, management, or operation of the Money Laundering Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), as follows:

*Pattern of Racketeering Activity:  Money Laundering*
*in Violation of 18 U.S.C. § 1956(a)(1)*

241.    Devine committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(1).

242.    Devine knowingly conducted financial transactions, including, but not limited to, those identified in Appendix 1 hereto.

243.    At the time she conducted those financial transactions, Devine knew that the property involved represented the proceeds of some form of unlawful activity.

244.    The property involved in those financial transactions was in fact derived from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7) – namely, the Penny Stock Scheme, which violated, *inter alia*, Section 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**"), 15 U.S.C. § 78j(b).

245.    Devine had the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(A)(i) and (c)(7); or knew that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i) and (c)(7).

246.    These financial transactions affected interstate and foreign commerce by, *inter alia*, (a) depositing proceeds of specified unlawful activity in financial institutions in the United States, or (b) transferring proceeds of specified unlawful activity in interstate and international wire transfers, between accounts at financial institutions in the United States and accounts at financial institutions outside of the United States.  Additionally, Devine, residing in Naples, Florida, communicated with individuals in Switzerland and in certain instances traveled to and from Switzerland to facilitate these transactions.

### *Pattern of Racketeering Activity:  Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)*

247.    Devine committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

248.    Devine knowingly transported, transmitted, or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States.

249.    Devine did so with the intent to promote the carrying on of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(A) and (c)(7).

### *Pattern of Racketeering Activity:  Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(B)(i)*

250.    Devine committed acts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

251.    Devine transported, transmitted, or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States.

98

252.     Devine did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(2)(B)(i) and (c)(7) – namely, the Penny Stock Scheme, which violated, *inter alia*, Section 10(b) of the Exchange Act.

*Pattern of Racketeering Activity:  Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C. § 1957*

253.     Devine engaged in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957.

254.     Devine knowingly engaged in monetary transactions in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3), including violations of Section 10(b) of the Exchange Act.

255.     These monetary transactions affected interstate and foreign commerce by, *inter alia*, (a) depositing proceeds of specified unlawful activity in financial institutions in the United States, or (b) transferring proceeds of specified unlawful activity in interstate and international wire transfers, between accounts at financial institutions in the United States and accounts at financial institutions outside of the United States.  Additionally, Devine, residing in Naples, Florida, communicated with individuals in Switzerland and in certain instances traveled to and from Switzerland to facilitate these transactions.

256.     Each such monetary transaction either (a) took place in the United States, or (b) took place outside of the United States and Devine is a "United States person" within the meaning of 18 U.S.C. § 1957(d)(2) and § 3077.

### *Pattern of Racketeering Activity:  Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314*

257.     Devine engaged in the transportation of stolen, converted, or fraudulently-taken goods, securities, or money in violation of 18 U.S.C. § 2314.

258.     Devine transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more – namely, proceeds of the Penny Stock Scheme – in interstate or foreign commerce.

259.     Devine did so knowing the same to have been stolen, converted, or taken by fraud.

### *Pattern of Racketeering Activity:  Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. § 2315*

260.     Devine received, possessed, concealed, sold, or disposed of goods, securities, or money in violation of 18 U.S.C. § 2315.

261.     Devine received, possessed, concealed, sold, or disposed of goods, securities, or money that is of a value of $5,000 or more and that crossed a State or United States boundary after being stolen, unlawfully converted, or taken – namely, proceeds of the Penny Stock Scheme.

262.     Devine did so knowing the same to have been stolen, unlawfully converted, or taken.

*Pattern of Racketeering Activity:  Wire Fraud*
*in Violation of 18 U.S.C. § 1343*

263.    Devine engaged in wire fraud in violation of 18 U.S.C. § 1343.

264.    With specific intent to defraud, Devine knowingly devised or participated in a scheme to defraud the Funds by means of material misstatements and omissions, including, but not limited to, the material misstatements and omissions in:  the divorce petition and the Marital Settlement Agreement; a backdated contract regarding a faked "loan" of property; emails setting forth the supposed reasons for certain financial transactions; and Devine's testimony before the Swiss Prosecutor's Office on May 29 and May 30, 2012, as set forth in Paragraphs 229-31 above.

265.    The objective of the scheme to defraud was to preserve the ill-gotten funds for Devine, Homm, and their family, and to continue to deprive the Funds of the money that was wrongfully taken from them by means of the Penny Stock Scheme.  Through the scheme to defraud, Devine was able to conceal her ongoing relationship with Homm and her possession and control over Penny Stock Scheme proceeds.

266.    In furtherance of the scheme to defraud, Devine transmitted or caused to be transmitted communications by means of wire in interstate or foreign commerce, including, but not limited to, those set forth in Appendix 2 hereto.

*Nature of Pattern of Racketeering*

267.    Devine committed a substantial number of related predicate acts over an extended period of time.  Devine's commission of predicate acts is part of a general course of business and will continue unless and until she is prevented from committing such acts.

*Injuries to the Funds*

268.　The Funds were, and continue to be, injured by reason of Devine's violations of 18 U.S.C. § 1962(c) and the predicate acts described above.

269.　The injuries to the Funds include, but are not limited to:  the lost opportunity to recover certain money through mechanisms available in the Swiss proceedings resulting from Devine's transfers from Swiss accounts to evade imminent freeze orders; the lost opportunity to recover certain money that Devine has dissipated or used to purchase functionally untraceable assets (such as gold); the costs associated with attempting to trace Devine's hidden assets around the world; recoupment of the Penny Stock Scheme proceeds; and the continued deprivation of money taken from the Funds by means of the Penny Stock Scheme.

270.　Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

271.　The injuries to the Funds were a direct, proximate, and reasonably foreseeable result of the violations of 18 U.S.C. § 1962(c) and the predicate acts enumerated at Paragraphs 241-66 above.  The Funds have been and will continue to be injured in an amount to be determined at trial.

272.　Pursuant to 18 U.S.C. § 1964(c), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Devine.

## COUNT II

(RICO Conspiracy, 18 U.S.C. § 1962(d))

273.    The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

274.    Devine violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

275.    In connection with the Money Laundering Enterprise, Devine and Homm agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

276.    Devine agreed to the overall objective of the conspiracy, or she agreed to commit personally at least two acts of racketeering.

277.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, the Funds have been injured in their business or property as set forth in Paragraphs 268-71above.

278.    Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

279.    Pursuant to 18 U.S.C. § 1964(c), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Devine.

## COUNT III

(Florida RICO and Civil Remedies for Criminal Activities)

280.    The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

281.     This Count is alleged and contains claims against Devine under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Chapter 772, and the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. Chapter 895, asserting a statutory right of action against Devine for her conduct of, or participation in, an enterprise through a pattern of criminal and racketeering activity in violation of Fla. Stat. §§ 772.103 and 895.03.

282.     Devine and Homm are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the Money Laundering Enterprise described in this Complaint – namely, to hide, launder, and otherwise wrongfully retain the proceeds of the Penny Stock Scheme.  Over the years they have adapted their scheme to changing circumstances, recruiting new conspirators to assist with their wrongful activities and altering the scope and nature of their activities as necessary to advance the objectives of the Money Laundering Enterprise.  That enterprise has been structured to operate as a unit, and the participants in the enterprise operate it to accomplish its common purpose and goal of Devine and Homm's criminal scheme.

283.     Devine, operating out of Florida, is responsible for directing and managing the laundering, concealment, and wrongful retention of the proceeds of the Penny Stock Scheme. She is associated with the Money Laundering Enterprise within the meaning of Fla. Stat. § 772.103(c).  At all relevant times, Devine knew that these proceeds were obtained through wrongful criminal conduct.  Devine committed numerous criminal predicate acts in Florida, which served as the nerve center of the Money Laundering Enterprise and the *de facto* headquarters of its operations.

284.     The Money Laundering Enterprise constitutes an association-in-fact enterprise within the meaning of Fla. Stat. §§ 772.102(3), 772.103(3), 895.02(3), and 895.03(3). Devine and Homm participated in the operation or management of the Money Laundering Enterprise.

285.     Devine participated, directly and indirectly, in the Money Laundering Enterprise, including through the conduct, management, or operation of the Money Laundering Enterprise's affairs through a "pattern of criminal activity" within the meaning of Fla. Stat. § 772.102(4) and in violation of Fla. Stat. § 772.103(3), including the incidents of criminal activity set forth in Paragraphs 241-66 above.  These incidents of criminal activity had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

286.     Devine participated, directly and indirectly, in the Money Laundering Enterprise, including through the conduct, management, or operation of the Money Laundering Enterprise's affairs through a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(4) and in violation of Fla. Stat. § 895.03(3), including the incidents of racketeering conduct set forth in Paragraphs 241-66 above.  These incidents of racketeering conduct had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

287.     Devine committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate

acts enumerated at Paragraphs 241-66 above.  Each predicate act constitutes "criminal activity" within the meaning of Fla. Stat. § 772.102(1) and "racketeering activity" within the meaning of Fla. Stat. § 895.02(1).  Devine's commission of predicate acts is part of a general course of business and will continue unless and until she is prevented from committing such acts.

288.    The Funds were, and continue to be, injured by reason of Devine's violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts, as set forth in Paragraphs 268-71 above.

289.    Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

290.    The injuries to the Funds were a direct, proximate, and reasonably foreseeable result of the violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts enumerated at Paragraphs 241-66 above.  The Funds have been and will continue to be injured in an amount to be determined at trial.

291.    Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Devine.

292.    Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), the Funds are entitled to an injunction preventing Devine from committing further violations of Fla. Stat. § 895.03.

## COUNT IV

(Florida RICO and Florida Civil Remedies for Criminal Activities – Conspiracy)

293.    The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

294.    Devine violated Fla. Stat. §§ 772.103(4) and 895.03(4) by conspiring to violate Fla. Stat. §§ 772.103(3) and 895.03(3), respectively.

295.    In connection with the Money Laundering Enterprise, Devine and Homm agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

296.    Devine agreed to the overall objective of the conspiracy, or she agreed to commit personally at least two acts of criminal and racketeering activity.

297.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, the Funds have been injured in their business or property, as set forth in Paragraphs 268-71 above.

298.    Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

299.    Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Devine.

300.    Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), the Funds are entitled to an injunction preventing Devine from committing further violations of Fla. Stat. § 895.03.

## COUNT V

(Unjust Enrichment – Common Law)

301.    The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

302.    The Funds conferred a benefit on Devine in the form of proceeds originating from the Penny Stock Scheme.

303.    Devine was aware of the benefit that flowed to her and knowingly and voluntarily accepted and retained the benefit conferred by the Funds.

304.    Devine provided no goods, services, or other fair consideration in exchange for the benefit conferred by the Funds.

305.    The circumstances are such that it is inequitable for Devine to retain the benefit conferred on her by the Funds.  The Funds, as the victims of the Penny Stock Scheme, are entitled to the return of the proceeds of that fraudulent scheme, and Devine's retention of those proceeds prevents the Funds from recouping their losses.

306.    Devine has therefore been unjustly enriched at the expense of the Funds, in an amount to be determined at trial.

307.    Despite their diligence and efforts, the Funds' discovery of this cause of action, including the conferment onto Devine of the Penny Stock Scheme proceeds, was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

## COUNT VI

(Constructive Trust – Common Law)

308.     The Funds reallege and incorporate herein by reference each and every foregoing Paragraph of this Complaint as if set forth in full.

309.     Devine was unjustly enriched at the expense of the Funds, in the form of proceeds originating from the Penny Stock Scheme.

310.     Devine received proceeds of the Penny Stock Scheme located in Florida, other parts of the United States, and abroad.

311.     The Funds are entitled to the imposition of a constructive trust upon assets under Devine's control because she has been unjustly enriched at the expense of the Funds.

312.     Despite their diligence and efforts, the Funds' discovery of this cause of action, including the conferment onto Devine of the Penny Stock Scheme proceeds, was delayed by Devine's fraudulent concealment activity as set forth in Paragraphs 222-32 above.

## JURY DEMAND

313.     The Funds hereby demand a trial by jury.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, the Funds demand judgment against Defendant on each and every Count in their Complaint and relief as follows:

As to Counts I and II:

(a)     An order that Devine, her officers, agents, servants, and employees and any persons in active concert or participation with them be, and are, restrained and enjoined from directly or indirectly transferring, selling, alienating,

liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any money or other of Devine's assets;

(b)    Damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

(c)    Pre-judgment interest according to statute;

(d)    The Funds' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c);

(e)    An accounting;

(f)    Disgorgement;

(g)    Imposition of a constructive trust;

As to Counts III and IV:

(h)    An order that Devine, her officers, agents, servants, and employees and any persons in active concert or participation with them be, and are, restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any money or other of Devine's assets;

(i)    Damages according to proof at trial, trebled according to statute, Fla. Stat. § 772.104(1);

(j)    Pre-judgment interest according to statute;

110

(k)     The Funds' reasonable attorneys' fees and court costs according to statute, Fla. Stat. § 772.104(1);

As to Counts V and VI:

(l)     An order that Devine, her officers, agents, servants, and employees and any persons in active concert or participation with them be, and are, restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any money or other of Devine's assets;

(m)     An accounting;

(n)     Disgorgement;

(o)     Imposition of a constructive trust; and

As to All Counts:

(p)     Such other legal and equitable relief as the Court may deem just and proper.

Dated: June 1, 2015
      Fort Myers, Florida

Respectfully submitted,

By: */s/ Thomas A. Tucker Ronzetti*        

| | |
|---|---|
| David Spears | Thomas A. Tucker Ronzetti |
| Linda Imes | Florida Bar No. 965723 |
| Christopher Dysard | Kenneth Hartmann |
| Benjamin Silverman | Florida Bar No. 664286 |
| Sharanya Sai Mohan | Maia Aron |
| *Pro Hac Vice Applications Pending* | Florida Bar No. 17188 |
| SPEARS & IMES LLP | KOZYAK TROPIN & THROCKMORTON, LLP |
| 51 Madison Avenue | |
| New York, New York 10010 | 2525 Ponce de Leon Boulevard, 9th Floor |
| Telephone: (212) 213-6996 | Miami, Florida 33134 |
| Facsimile: (212) 213-0849 | Telephone: (305) 372-1800 |
| Email: dspears@spearsimes.com | Facsimile: (305) 372-3508 |
|     limes@spearsimes.com | Email:    tr@kttlaw.com |
|     cdysard@spearsimes.com |       krh@kttlaw.com |
|     bsilverman@spearsimes.com |       ma@kttlaw.com |
|     smohan@spearsimes.com | |
| | |
| *Counsel for Plaintiffs* | *Counsel for Plaintiffs* |

**Appendix 1**

**Devine's Money Laundering Violations**

**(18 U.S.C. §§ 1956, 1957)**

**Appendix 1: Money Laundering Transactions Involving Devine**

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 1. | 05/09/2006 | €6,200,000 | Ridgeville Investment Inc., CBH | Loyr Stiftung, CBH | Devine and Homm eventually directed these funds for the purchase of a hotel in Singapore. | 152 |
| 2. | 05/24/2006 | €8,000,000 | Loyr Stiftung, CBH | Ocean Offshore Bank SA, Commerzbank (South East Asia) Ltd. | Devine and Homm authorized this transfer in order to purchase a hotel in Singapore.  No evidence of such a purchase exists. | 152 |
| 3. | 06/01/2006 | €1,400,000 | CSI, VP Bank | Hosifa Stiftung, EFG Bank von Ernst | This was a cash transfer between two Liechtenstein banks. | 157 |
| 4. | 06/20/2006 | €4,000,000 | Brek Stiftung, CBH | Sinitus, Investec, Australia | €3,900,000 of this money was transferred to EFG Bank in Singapore to capitalize Floma on January 21, 2008. | 158 |
| 5. | 08/25/2006 | €500,000 | Florian Homm, CBH | Brek Stiftung, CBH | This transfer occurred days after Devine and Homm petitioned for divorce. | 153 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 6. | 10/06/2006 | €510,000 | CSI, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and finalization. | 154 |
| 7. | 11/02/2006 | €300,000 | Florian Homm, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and finalization. | 154 |
| 8. | 01/04/2007-11/19/2010* | €240,000 | Brek Stiftung, CBH and PHZ | Florian Homm, C.D. de Bourgogne | These transfers were for expenses related to a property in France. | 126(a) |

* Denotes transactions involving more than one transfer during the reflected date range.

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 9. | 03/01/2007 | €145,000 | Ridgeville Investment Inc, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition their divorce. | 154 |
| 10. | 03/05/2007 | €150,000 | Florian Homm, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and their divorce. | 154 |
| 11. | 03/21/2007-03/22/2007* | €5,086,600 | Brek Stiftung, CBH | Leo Propiedades S.L., Banco de Andalucia | This transaction was to pay for a purchase of property in Marbella, Spain. | 189 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 12. | 03/23/2007 | €400,000 | Florian Homm, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and their divorce. | 154 |
| 13. | 03/30/2007 | €8,386,000 | CSI, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and their divorce. | 154 |
| 14. | 05/10/2007 | €5,308,000 | CSI, CBH | Brek Stiftung, CBH | This transaction was part of over €15,000,000 transferred from Homm to Devine between their divorce petition and their divorce. | 154 |
| 15. | 05/24/2007 | €3,200,000 | Brek Stiftung, CBH | Malon Consulting AG, UBS | This transfer was made pursuant to a payment order signed by Devine for a real estate purchase in Mallorca, Spain. | 191 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 16. | 05/29/2007 | €3,100,000 | Malon Consulting AG, UBS | Vatulele S.L., Caja de Ahorros Bank | This transfer was made in connection with a real estate purchase in Mallorca, Spain. | 191 |
| 17. | 08/09/2007 | €120,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | The withdrawal report notes that the withdrawal was made pursuant to a "telephone call with the client [Devine]." | 177(a) |
| 18. | 08/17/2007 | €500,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(a) |
| 19. | 08/17/2007 | €500,000 | N/A (Cash Deposit) | Devine, CBH | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(b) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 20. | 08/21/2007 | €6,150,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | Devine signed the withdrawal report.  The majority of the withdrawn funds were returned to the Brek Stiftung account at CBH in May 2008. | 177(c) |
| 21. | 08/21/2007 | €6,150,000 | N/A (Cash Deposit) | Levanne Stiftung, CBH | These funds were withdrawn in cash from the Brek Stiftung account at CBH the same day per Devine's instruction. | 177(c) |
| 22. | 08/21/2007 | CHF 1,470,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | Devine signed the withdrawal report. These funds were then used to purchase gold coins. | 177(c) |
| 23. | 08/21/2007 | CHF 1,470,000 | N/A (Cash Deposit) | Levanne Stiftung, CBH | These funds were withdrawn in cash from the Brek Stiftung account at CBH the same day per Devine's instruction. | 177(c) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 24. | 08/27/2007 | $70,000 | Levanne Stiftung, CBH | N/A (Cash Withdrawal) | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(d) |
| 25. | 08/27/2007 | $70,000 | N/A (Cash Deposit) | Brek Stiftung, CBH | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(d) |
| 26. | 08/27/2007 | $70,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(d) |
| 27. | 08/30/2007 | €1,043,000 | CSI, CBH | Jürg Brand, CBH | Money transferred pursuant to Property Settlement Agreement. | 155 |
| 28. | 09/07/2007 | €2,057,000 | CSI, CBH | Jürg Brand, CBH | Money transferred pursuant to Property Settlement Agreement. | 155 |
| 29. | 08/24/2007-9/26/2007* | 5.2 million shares ACMH | CSI, CBH | Jürg Brand, CBH | Shares transferred pursuant to Property Settlement Agreement. | 155 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 30. | 08/2007-2/2008 | £4,112,013; €754,252 | Jürg Brand, CHS | N/A (Liquidation of ACM Shares) | Devine sold the 5.2 million shares transferred to her pursuant to the Property Settlement Agreement. | 155 |
| 31. | 10/2007-03/2008* | CHF 1,405,800 | Levanne Stiftung, CBH | Marius Grossenbacher, UBS | The vast majority of these funds were used to purchase gold coins. | 172 |
| 32. | 10/2007-12/2008* | CHF 1,380,000 | Marius Grossenbacher, UBS | N/A (Purchase of Gold Coins) | Devine directed these purchases. The present location of these coins is unknown. | 172 |
| 33. | 10/05/2007 | €92,000 | Levanne Stiftung, CBH | N/A (Cash Withdrawal) | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(e) |
| 34. | 10/05/2007 | €92,000 | N/A (Cash Deposit) | Brek Stiftung, CBH | This was one of a series of cash transactions conducted around the time of Homm's resignation. | 177(e) |
| 35. | 01/21/2008 | €3,900,000 | Sinitus, Investec, Australia | Floma, EFG Bank in Singapore | This transfer capitalized Floma. | 158 |
| 36. | 03/13/2008 | €117,900 | CSI, CBH | N/A (Cash Withdrawal) | This was one of a series of cash transactions involving accounts at CBH. | 177(f) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 37. | 03/13/2008 | €117,900 | N/A (Cash Deposit) | Jürg Brand, CBH | This was one of a series of cash transactions involving accounts at CBH. | 177(f) |
| 38. | 03/26/2008 | $170,000 | Jürg Brand, CBH | First Title of Naples, Inc., Citibank N.A. | Transfer was for the purpose of purchasing the Naples property. | 182 |
| 39. | 04/04/2008 | $1,982,000 | Jürg Brand, CBH | First Title of Naples, Inc., Citibank N.A. | Transfer was for the purpose of purchasing the Naples property. | 183 |
| 40. | 04/30/2008 | €5,070,000 | Levanne Foundation, CBH | Brek Stiftung, CBH | This money returned the funds transferred from Levanne to Brek through a cash withdrawal and deposit. | 177(g) |
| 41. | 09/17/2008 | €170,900 | EFG Bank, Singapore (Floma) | Zurich Credite Suisse account belonging to the law firm of "Peter Meyer Huerlimann" [*sic*] | "Julia Brown" instructed Meyer to "[k]eep the money in a vault for me until I know what to do with it." | 166 |
| 42. | 10/09/2008 | $60,000 | Jürg Brand, CBH | Devine, Bank of America | Devine directed this transfer by email. | 196(a) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 43. | 04/15/2009 | $100,000 | Jürg Brand, CBH | Devine, Bank of America | Devine directed this transfer by email. | 196(b) |
| 44. | 05/08/2008 | $250,000 | Jürg Brand, CBH | Devine, Bank of America | Devine directed this transfer by email to pay for "renovation and furniture purchase" for the Naples property. | 184 |
| 45. | 09/01/2008 | $150,000 | Jürg Brand, CBH | Devine, Bank of America | Devine directed this transfer by email to pay for property renovations. | 184 |
| 46. | 06/04/2009 | $60,000 | Jürg Brand, CBH | Devine, Bank of America | Devine directed this transfer by email to pay for a "[n]ew roof and other expenses." | 184 |
| 47. | 07/02/2009 | €1,000,000 | Floma, EFG Bank, Singapore | DC Fragments, HSBC Dusseldorf | EFG Bank's compliance Department flagged the transfer because the economic justification was insufficient, and Devine forwarded an explanation that DC Fragments "are dealers in metals of all kinds." | 167 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 48. | 08/05/2009 | €50,000 | Brek Stiftung, CBH | N/A (Cash Withdrawal) | The administrator of Brek Stiftung wrote to CBH and directed it to send €50,000 to Eichmann.  Eichmann signed the withdrawal form. | 177(h) |
| 49. | 09/08/2009 | €1,000,000 | Floma, EFG Bank, Singapore | Check Republis at Unicredit Bank, Czech Republic | Devine emailed Meyer that this money was for an investment in "[m]etals to be exact." | 168 |
| 50. | 09/15/2009 | €887,678 | Brek Stiftung, CBH | Brek Stiftung, PHZ | When Eichmann moved from CBH to PHZ, Devine moved many of her assets with him. | 202(a) |
| 51. | 09/21/2009-11/03/2009* | €8,000,000 in securities | Brek Stiftung, CBH | Brek Stiftung, PHZ | When Eichmann moved from CBH to PHZ, Devine moved many of her assets with him. | 202(b) |
| 52. | 09/21/2009 | €390,000 | Brek Stiftung, CBH | Brek Stiftung, PHZ | When Eichmann moved from CBH to PHZ, Devine moved many of her assets with him. | 202(c) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 53. | 10/01/2009 | €1,488,328.11 | Hosifa Stiftung, EFG Bank von Ernst | Hosifa Stiftung, PHZ | When Eichmann moved from CBH to PHZ, Devine moved many of her assets with him. | 213 |
| 54. | 11/05/2009 | €1,876,769.43 | Floma, EFG Bank, Singapore | Check Republis at Unicredit Bank, Czech Republic | Though this money was transferred to the same account as the "precious metals" investment (#50), Devine represented for compliance purposes that the transfer was to purchase real property in London. | 169 |
| 55. | 12/11/2009-11/16/2010* | €120,000 | Devine, PHZ | Devine, Caja de Ahorros Bank | These transfers were made prior to the Swiss investigation into Devine's PHZ accounts. | 193 |
| 56. | 10/05/2009-05/31/2011* | $736,000 | Devine, PHZ | Devine, Bank of America | These transfers were made prior to the Swiss investigation into Devine's PHZ accounts. | 195 |
| 57. | 11/04/2010-01/14/2011* | €350,000 | Brek Stiftung, PHZ | Long Life Services PTE Ltd., Standard Chartered Bank | These transfers were made prior to the Swiss investigation into Devine's PHZ accounts. | 194 |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 58. | 03/25/2011 | €100,000 | Devine, PHZ | Devine, Lloyds TSB Bank | This transfer was made prior to the Swiss investigation into Devine's PHZ accounts. | 211(c) |
| 59. | 05/12/2011 | $37,500 | Devine, PHZ | Viterbo Rodrigues Alonso, Banco Bradesco | This transfer furthered a purchase of land in Brazil. This transfer was made before Swiss authorities began investigating this account. | 211(d) |
| 60. | 06/2011-11/2011* | €200,000 | Brek Stiftung, PHZ | Devine, C.D. de Bourgogne | These transfers were made after Swiss authorities began investigating this account. | 205(b) |
| 61. | 06/01/2011 | €40,000 | Brek Stiftung, PHZ | Liberia Renaissance Foundation, PHZ | This transfer was made after Swiss authorities began investigating this account. | 205(a) |
| 62. | 06/20/2011 | $50,000 | Devine, PHZ | Devine, Bank of America | Devine requested this transfer by email. This transfer was made after Swiss authorities began investigating this account. | 209(a) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 63. | 06/16/2011-08/04/2011* | €110,000 | Devine, PHZ | Devine, Caja de Ahorros | This transfer was made after Swiss authorities began investigating this account. | 211(a) |
| 64. | 06/27/0211 | €75,000 | Brek Stiftung, PHZ | N/A (Cash Withdrawal) | This transfer was made after Swiss authorities began investigating this account. | 205(c) |
| 65. | 08/04/2011 | $50,000 | Devine, PHZ | Devine, Bank of America | Devine requested this transfer by email. This transfer was made after Swiss authorities began investigating this account. | 209(b) |
| 66. | 08/05/2011 | $450,000 | Brek Stiftung, PHZ | Devine FBO I.H., Pershing LLC, Bank of New York | This transfer was made after Swiss authorities began investigating this account. | 204(b) |
| 67. | 08/05/2011 | $450,000 | Brek Stiftung, PHZ | Devine FBO C.H., Pershing LLC, Bank of New York | This transfer was made after Swiss authorities began investigating this account. | 204(a) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 68. | 08/22/2011 | $50,000 | Devine, PHZ | Devine, Bank of America | Devine requested this transfer by email, citing large school tuition bills. This transfer was made after Swiss authorities began investigating this account. | 209(c) |
| 69. | 08/24/2011 | €250,000 | Devine, PHZ | Long Life Services PTE Ltd., Standard Chartered Bank | This transfer was made after Swiss authorities began investigating this account. | 211(e) |
| 70. | 08/24/2011 | €150,000 | Devine, PHZ | Banca March | This transfer was requested by Devine through an email account under the name of "julia brown." This transfer was made after Swiss authorities began investigating this account. | 211(b) |
| 71. | 08/24/2011 | €150,000 | Devine, PHZ | Devine, Lloyds TSB Bank | This transfer was made after Swiss authorities began investigating this account. | 211(c) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 72. | 09/15/2011 | $50,000 | Devine, PHZ | Devine, Bank of America | Devine requested this transfer by email, citing the need for new storm windows. This transfer was made after Swiss authorities began investigating this account. | 209(d) |
| 73. | 09/16/2011 | $530,766 | Devine, PHZ | Devine, Banco Bradesco | This transfer furthered a purchase of land in Brazil. This transfer was made after Swiss authorities began investigating this account. | 211(d) |
| 74. | 09/16/2011 | €140,000 | Devine, PHZ | Klueger & Stein LLP | This transfer was made after Swiss authorities began investigating this account. | 210 |

16

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 75. | 10/10/2011 | $50,000 | Devine, PHZ | Devine, Bank of America | Devine requested this transfer by email, citing various expenses including accountant bills and new windows. This transfer was made after Swiss authorities began investigating this account. | 209(e) |
| 76. | 10/28/2011-11/25/2011* | €100,000 | Brek Stiftung, PHZ | Devine, Caja de Ahorros | These transfers were made after Swiss authorities began investigating this account. | 205(f) |
| 77. | 11/03/2011 | $3,500,000 | Brek Stiftung, PHZ | Devine, Pershing LLC, Bank of New York | Bank records indicate that this transfer was made to purchase property in the United States.  This transfer was made after Swiss authorities began investigating this account. | 204(c) |
| 78. | 11/25/2011 | €100,000 | Brek Stiftung, PHZ | Devine, Banca March | This transfer was made after Swiss authorities began investigating this account. | 205(d) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 79. | 11/25/2011 | €100,000 | Brek Stiftung, PHZ | Devine, Lloyds TSB Bank | This transfer was made after Swiss authorities began investigating this account. | 205(g) |
| 80. | 11/25/2011 | €200,000 | Brek Stiftung, PHZ | Long Life Services PTE Ltd., Standard Chartered Bank | This transfer was made after Swiss authorities began investigating this account. | 205(e) |
| 81. | 01/10/2012 | $150,000 | Brek Stiftung, PHZ | Devine, Bank of America | This transfer was made after Swiss authorities began investigating this account. | 204(d) |
| 82. | 01/18/2012 | CHF 200,000 | Hosifa Stiftung, PHZ | Jürg Brand, UBS AG | This transfer was made after Swiss authorities began investigating Devine's other PHZ accounts. | 215(a) |
| 83. | 01/19/2012-05/02/2013* | CHF 80,000 and €50,000 | Hosifa Stiftung, PHZ | Liberia Renaissance Foundation, PHZ | These transfers were made after Swiss authorities began investigating Devine's other PHZ accounts. | 215(b) |
| 84. | 01/18/2012-04/02/2013* | CHF 150,000 | Hosifa Stiftung, PHZ | Medipolan AG, VP Bank | This transfer was made after Swiss authorities began investigating Devine's other PHZ accounts for the purpose of "legal assistance." | 215(c) |

| No. | Approximate Date of Transaction(s) | Approximate Amount | Origin Account | Recipient Account | Circumstances | Complaint Paragraph |
|---|---|---|---|---|---|---|
| 85. | 04/19/2012* | CHF 1,000,000 | Hosifa Stiftung, PHZ | Devine, Pershing LLC, Citibank | This transfer was made after Swiss authorities began investigating Devine's other PHZ accounts.  This money was transferred because Devine did not "trust Switzerland in connection with their procedure." | 215(d) |

**Appendix 2**

**Wire Fraud Violations**

**(18 U.S.C. § 1343)**

**Appendix 2: Table of Violations of 18 U.S.C. § 1343 (Wire Fraud)**

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|-----|------|-----|------|--------|---------|-------------------------------------|
| 1. | Urs Meisterhans | Susan Devine | 05/22/2006 | Email | Fraudulently conceal asset location and owner | Devine, working with Meisterhans, misrepresented the economic justification for a wire transfer, falsely stating that it was to purchase a non-existent hotel in Singapore.  The lie was designed to conceal the purpose of the transaction.<br><br>(Compl. ¶ 152.) |
| 2. | Urs Meisterhans | Susan Devine | 05/23/2006 | Email | Fraudulently conceal asset location and owner | Devine, working with Meisterhans, orchestrated a fraudulent backdated loan contract regarding valuable art.  The lie was designed to conceal Homm's ownership of those assets.<br><br>(Compl. ¶ 97.) |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 3. | Adam Kravitz | Glenn Kennedy | 06/05/2007 | Fax | Fraudulently conceal asset location and owner | Kravitz fraudulently represented that Devine was "always" the sole beneficiary of CSI in an apparently attempt to circumvent the Lock-In Deed that would otherwise have limited Devine and Homm's ability to liquidate their ACM shares prior to the exposure of the fraud and collapse in value of the stock price they knew to be imminent.<br><br>(Compl. ¶ 113(b).) |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|-----|------|-----|------|--------|---------|-----------------------------------|
| 4. | Adam Kravitz | Florian Homm | 06/11/2007 | Email | Fraudulently conceal asset location and owner | Kravitz instructed Homm to have Kranz tell others that Devine was the beneficial owner of CSI as part of the scheme to circumvent the Lock-In Deed that would otherwise have limited Devine and Homm's ability to liquidate their ACM shares prior to the exposure of the fraud and collapse in value of the stock price they knew to be imminent.<br><br>(Compl. ¶ 113(c).) |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 5. | Susan Devine | Beat Kranz | 08/22/2007 | Email | Change the economic beneficiary of CSI to hide the true beneficial owner of proceeds of the Penny Stock Scheme | This email was part of the scheme to circumvent the Lock-In Deed that would otherwise have limited Homm's ability to liquidate his ACM shares prior to the exposure of the fraud and collapse in value of the stock price they knew to be imminent.<br><br>(Compl. ¶ 120.) |
| 6. | CSI, CBH | Jürg Brand, CBH | 08/30/2007 | Payment via Wire Transfer in the amount of €1,043,000 | Fund fraudulent scheme to hide location and beneficial owner of Penny Stock Scheme proceeds | This wire transfer was part of the scheme to understate the number of shares transferred from CSI's account to Devine's account.<br><br>(Compl. ¶ 121). |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 7. | CSI, CBH | Jürg Brand, CBH | 09/07/2007 | Payment via Wire Transfer in the amount of €2,057,000 | Fund fraudulent scheme to hide location and beneficial owner of Penny Stock Scheme proceeds | This wire transfer was part of the scheme to understate the number of shares transferred from CSI's account to Devine's account.<br><br>(Compl. ¶ 121). |
| 8. | Devine Using an Email Address Registered to "Julia Brown" | Meyer | 09/17/2008 | Email | Fraudulently conceal asset location and owner | Using the pseudonym "Julia Brown," Devine instructs Meyer to transfer €170,900 from Floma's account at EFG Bank in Singapore to his firm's account and "[k]eep the money in a vault for me until I know what to do with it."<br><br>(Compl. ¶ 166.) |
| 9. | Devine Using an Email Address Registered to "Julia Brown" | Meyer | 06/29/09 | Email | Fraudulently conceal asset location and owner | Using the pseudonym "Julia Brown," Devine instructs Meyer to transfer €1,000,000 from Floma's account at EFG Bank to DC Fragments.<br><br>(Compl. ¶ 167.) |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 10. | Devine Using an Email Address Registered to "Julia Brown" | Meyer | 08/28/09 | Email | Fraudulently conceal asset location and owner | Using the pseudonym "Julia Brown," Devine instructs Meyer to transfer €1,000,000 from Floma's account at EFG Bank to DC Fragments. <br><br> (Compl. ¶ 168.) |
| 11. | Devine Using an Email Address Registered to "Julia Brown" | Meyer | 11/05/09 | Email | Fraudulently conceal asset location and owner | "Brown" falsely asserts that she is "purchasing a property and will be needing the remainder of the money from my account" with EFG Bank in Singapore.  The money was subsequently transferred to DC Fragments' account in the Czech Republic, and no real property was purchased in London, contrary to what "Brown" represented. <br><br> (Compl. ¶ 169.) |

| No. | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 12. | Transfers As Set Forth in Appendix 1 | | May 2006 through May 2013 | Wires of Money | Fraudulently conceal and hide location and beneficial owner of Penny Stock Scheme proceeds | Devine orchestrated scores of wire transfers of Penny Stock Scheme proceeds to and from accounts in the United States and all over the world. |