**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| ABSOLUTE ACTIVIST VALUE MASTER FUND LIMITED, ABSOLUTE EAST WEST FUND LIMITED, ABSOLUTE EAST WEST MASTER FUND LIMITED, ABSOLUTE EUROPEAN CATALYST FUND LIMITED, ABSOLUTE GERMANY FUND LIMITED, ABSOLUTE INDIA FUND LIMITED, ABSOLUTE OCTANE FUND LIMITED, ABSOLUTE OCTANE MASTER FUND LIMITED, AND ABSOLUTE RETURN EUROPE FUND LIMITED,<br><br>        Plaintiffs,<br><br>v.<br><br>SUSAN ELAINE DEVINE,<br><br>        Defendant. | CASE NO. _____ |

**DECLARATION OF CHRISTOPHER DYSARD IN SUPPORT OF
PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION,
<u>LIMITED EXPEDITED DISCOVERY, AND DELAYED SERVICE</u>**

I, Christopher Dysard, declare and state as follows:

1.      I am a partner at Spears & Imes LLP ("Spears & Imes"), counsel for Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Germany Fund Limited, Absolute India Fund Limited, Absolute Octane Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited (the "Funds") in this action against Defendant Susan Elaine Devine ("Devine").

2.      I submit this Declaration in support of the Funds' *Ex Parte* Motion for a Temporary Restraining Order and Preliminary Injunction, Limited Expedited Discovery, and Delayed Service.

3.      I have personal knowledge of the matters set forth in this Declaration based on my work on this matter and my review of documents and information.

**Sources of Exhibits**

4.      Attached hereto is an **Index** of Exhibits to this Declaration, submitted pursuant to Rule IV.B of this Court's Administrative Procedures for Electronic Filing in Civil and Criminal Cases.  As that Rule requires, the Index sets forth a description for each Exhibit that is to be filed as a separate attachment to this Declaration.  Pursuant to Rule IV.B.3, any .PDF file of an Exhibit that exceeds five megabytes has been separated into smaller files; each such component file is a separate attachment to this Declaration and is therefore individually listed in the Index.

5.     The documents attached as Exhibits to this Declaration have been collected from a variety of sources.  The source of each Exhibit is identified herein, unless the source is obvious.

6.     Certain Exhibits to this Declaration are publicly available documents, as indicated herein.

7.     The Office of the Attorney General of Switzerland (the "Swiss Prosecutor's Office") is currently conducting a criminal investigation into, among other things, the money laundering activities of Devine's ex-husband Florian Homm ("Homm") and others.  In connection with that investigation, the Swiss Prosecutor's Office has compiled an enormous investigative file (the "Swiss files"), which includes many documents in foreign languages, including German and French.  At considerable expense, the Funds have had a number of these documents translated into English, in whole or in part.  Certain Exhibits to this Declaration are from the Swiss files, as indicated herein.

8.     On October 20, 2009, ACMH Limited – formerly Absolute Capital Management Holdings Limited ("ACM"), the investment manager for the Funds – assigned and transferred to the Funds any and all claims that ACMH Limited may have against Homm (the founder and former Chief Investment Officer of ACM) and others.  At the time of this assignment of claims, ACMH Limited made available to the Funds certain of its electronic and hard-copy files (the "ACM files").  Certain Exhibits to this Declaration are from the ACM files, as indicated herein.

**Homm's Status as a Fugitive**

9.      Attached hereto as **Exhibit 1** is a true and correct copy of the FBI's "Most Wanted" poster for Homm, which is available at http://www.fbi.gov/wanted/wcc/florian-wilhelm-jrgen-homm/view.

**Devine's Balance Sheet**

10.      Attached hereto as **Exhibit 2** is a true and correct copy of a document titled "Susan Devine Balance Sheet As of December 31, 2010," originally from the files of Collins & Associates, an accounting firm in the U.S., and made available to the Funds as part of the Swiss files.  This document shows "Total Assets" of $63,909,500.

**Investigations and Criminal, Civil, and Regulatory Proceedings**

11.      Multiple criminal, civil, and regulatory investigations and litigations, most of which are still pending, focus on the market manipulation scheme involving the rigged purchase and sale of billions of shares of microcap stocks of U.S. companies (the "Penny Stock Scheme") that was orchestrated by Homm and others, including:  Sean Ewing ("Ewing"), the former CEO and Chairman of ACM; Todd Ficeto ("Ficeto"), the President and Director of Hunter World Markets, Inc. ("Hunter"), a California broker-dealer that Ficeto and Homm jointly owned; Hunter; Colin Heatherington, Homm's lead trader at ACM; Craig Heatherington, an ACM employee in its back office (and Colin Heatherington's brother); and CIC Global Capital Ltd. ("CIC"), an entity jointly controlled by Colin and Craig Heatherington.

12.      On October 19, 2009, the Funds, represented by Spears & Imes, commenced a civil action in the U.S. District Court for the Southern District of New York against Homm

and others based on their roles in the Penny Stock Scheme, captioned *Absolute Activist Value Master Fund Ltd., et al. v. Homm, et al.*, No. 09 Civ. 8862 (GBD) (the "SDNY Action"). Attached hereto as **Exhibit 3** is a true and correct copy of the 102-page Second Amended Complaint filed in the SDNY Action on July 6, 2012, which asserts claims for federal securities fraud, fraud and fraud conspiracy, and breach of fiduciary duty.  On March 28, 2013, the District Court denied the motions to dismiss the Second Amended Complaint brought by Homm and five other defendants in the SDNY Action.  Attached hereto as **Exhibit 4** is a true and correct copy of the District Court's Memorandum Decision and Order.

13.     On February 24, 2011, the SEC filed an enforcement action against Homm and others in the U.S. District Court for the Central District of California based on their roles in the Penny Stock Scheme, captioned *SEC v. Ficeto, et al.*, No. 11 Civ. 1637, 2011 WL 658558 (C.D. Cal. Feb. 24, 2011) (the "SEC Enforcement Action").  Attached hereto as **Exhibit 5** is a true and correct copy of the First Amended Complaint in the SEC Enforcement Action, dated May 17, 2011.

14.     On February 24, 2011, Tony Ahn, the primary trader for Hunter, consented to the entry of an SEC administrative Cease-and-Desist Order (the "Ahn Order") based on his role in the Penny Stock Scheme.  *See In re Tony Ahn*, SEC Release No. 63963 (Feb. 24, 2011).  Attached hereto as **Exhibit 6** is a true and correct copy of the Ahn Order.

15.     On March 19, 2013, a grand jury in the Central District of California returned a ten-count indictment against Homm based on his role in the Penny Stock Scheme (the "Homm Indictment").  *United States v. Florian Wilhelm Jurgen Homm*, CR No. 13-0183

4

(C.D. Cal.), ECF No. 7.  Attached hereto as **Exhibit 7** is a true and correct copy of the Homm Indictment.

16.     On October 8, 2013, a Magistrate Judge in the Central District of California issued a warrant for the arrest of Colin Heatherington based on his role in the Penny Stock Scheme, on the basis of a sworn criminal complaint, which was amended on January 27, 2014 ("Heatherington Complaint").  *United States v. Colin Heatherington*, No. 13-2726M (C.D. Cal.), ECF No. 3.  Attached hereto as **Exhibit 8** is a true and correct copy of the Heatherington Complaint.

17.     On November 25, 2013, the U.S. Attorney's Office for the Central District of California commenced three civil forfeiture actions against money and real property controlled by Ficeto.  Attached hereto as **Exhibit 9** is a true and correct copy of the complaint in one of those actions, *United States v. $5,437,986.06 & $32,886.36 in Bank Funds*, No. CV 13-8685 GHK (RZx) (C.D. Cal.) (the "Bank Funds Case"), which is in many material respects identical to the two other complaints, both of which I have reviewed.  Each of the three forfeiture actions resulted in a forfeiture.  Attached hereto as **Exhibit 10** is a true and correct copy of the Consent Judgment of Forfeiture entered in the Bank Funds Case on August 11, 2014.  The Funds ultimately received remission payments from the forfeited assets by the U.S. Department of Justice in recognition of the Funds' status as victims of the Penny Stock Scheme.

18.     On July 2, 2014, based on a 63-page sworn affidavit – which recounts, among other things, Ewing's role in the Penny Stock Scheme – a Magistrate Judge in the Central District of California issued a seizure warrant for all funds and securities on deposit in 15

accounts at ABN AMRO (Guernsey) Limited and Cannacord Genuity Wealth (International) Limited, in Guernsey, related to Ewing, his family, and related businesses and trusts. Attached hereto as **Exhibit 11** is a true and correct copy of the seizure warrant and supporting affidavit in that matter.

19.     In connection with the Swiss Investigation, Devine testified before the Swiss Prosecutor's Office on May 29 and May 30, 2012.  Attached hereto as **Exhibit 12** and **Exhibit 13** are true and correct copies of the transcripts of Devine's testimony on May 29 and 30, 2012, respectively, in the original French (from the Swiss files), with certified English translations, which the Funds obtained at considerable expense.  The English translation of Devine's May 30, 2012 testimony is cited herein as "5/30/12 Devine Tr."

20.     On December 16, 2014, the Swiss Prosecutor's Office issued a 219-page *rapport synthése* (the "Swiss Report") that summarized and analyzed the evidence collected up to that point in its ongoing criminal investigation.  Attached hereto as **Exhibit 14** is a true and correct copy of the Swiss Report, in the original French, with a certified English translation.  The Funds obtained the English translation at considerable expense – a project that was not completed until the end of January 2015.

21.     On May 20, 2015, the Swiss Prosecutor's Office issued an indictment of Urs Meisterhans ("Meisterhans") for aggravated money laundering, document forgery, and insufficient vigilance in financial transactions based on his role in laundering Penny Stock Scheme proceeds controlled by Homm and Devine (the "Meisterhans Indictment").  Attached hereto as **Exhibit 15** is a true and correct copy of the Meisterhans Indictment, in the original

French, with a certified English translation.  The Funds obtained the English translation at considerable expense – a project that was not completed until May 26, 2015.

**Penny Stock Scheme**

22.     The statements in this section are based on my review of case documents. The Penny Stock Scheme is addressed in Paragraphs 29-84 of the complaint filed concurrently in this matter ("Devine Complaint" or "Devine Compl.").

23.     The Penny Stock Scheme carried out by Homm and his conspirators consisted of manipulative trading in the shares of certain U.S. microcap companies (the "Penny Stock Companies"), including:  ProElite, Inc. ("ProElite"); MicroMed Cardiovascular, Inc.; Berman Center, Inc.; InterMetro Communications, Inc. (f/k/a Lucy's Cafe, Inc.); NuRx Pharmaceuticals, Inc. (f/k/a Quest Group International, Inc.); Java Detour, Inc.; Logistical Support, Inc.; and DuraVest, Inc.

24.     The following trading records[1] reflect certain, but by no means all, manipulative trades executed by Homm and certain of his conspirators as part of the Penny Stock Scheme:

    (a)     Attached hereto as **Exhibit 16** is a true and correct copy of an excerpt of a trading spreadsheet from ACM's files (the "First ACM Trading Spreadsheet"), which purports to list securities trades entered into by the Funds from June 21, 2004 through February 27, 2007.

    (b)     Attached hereto as **Exhibit 17** is a true and correct copy of an excerpt of a trading spreadsheet from ACM's files (the "Second ACM Trading

---

[1] For purposes of presentation, certain tabs, rows, and columns are not displayed in these Exhibits, and certain rows have been highlighted, as indicated herein.

Spreadsheet"), which purports to list securities trades entered into by the Funds from February 27, 2007 through December 31, 2007.

(c)    Attached hereto as **Exhibit 18** is a true and correct copy of an excerpt of Hunter's trading blotter (the "Hunter Blotter") (from the Swiss files), which purports to list securities trades brokered by Hunter from January 1, 2004 through November 30, 2007.

25.    One example that illustrates the mechanics of the Penny Stock Scheme is the trading in ProElite, which operated as an online and live event sports entertainment company featuring mixed martial arts.  The manipulative trading in ProElite shares is addressed in Paragraphs 54-66 of the Devine Complaint, and certain, but by no means all, ProElite transactions are discussed herein.

26.    As the first step in the Penny Stock Scheme, Homm and Ficeto obtained control of dormant or near-dormant Penny Stock Companies, such as ProElite, through Hunter, the broker-dealer that Homm and Ficeto jointly owned.  Attached hereto as **Exhibit 19** is a true and correct copy of a September 26, 2006 email from Ficeto to Colin Heatherington, stating:  "Everything is moving according to plan with I-fight [an entity owned by ProElite].  We just closed on the purchase of the shell."

27.    After gaining control of the Penny Stock Companies, Homm, Ficeto, Hunter, and Colin Heatherington (collectively, the "Trading Conspirators") caused the Funds to purchase shares (the "Penny Stocks") of the Penny Stock Companies directly from those companies.  For example, on September 29 and October 2, 2006, the Trading Conspirators caused five Plaintiff Funds to spend approximately $9,250,000 on ProElite shares for $0.002

per share in a private placement.  Attached hereto as **Exhibit 20** are true and correct copies of

the Securities Purchase Agreements executed by those Funds (from ACM's files).  These

purchases are reflected in yellow-highlighted rows in the First ACM Trading Spreadsheet

(Exhibit 16).  For this transaction, Homm and Ficeto paid themselves a fee, through Hunter,

of approximately $1,000,000.  Attached hereto as **Exhibit 21** is a true and correct copy of the

SEC Form SB-2 (a registration statement) filed by ProElite on January 12, 2007, which states

(on page F-13):  "In connection with the private placement, the Company [*i.e.*, ProElite] paid

a commission of $1,000,000 to its investment banker [*i.e.*, Hunter]."

28.     In April 2007, the Trading Conspirators began trading shares of ProElite

between and among certain of the Funds and others.  For example, on or about April 27,

2007, the Trading Conspirators caused Plaintiff Absolute European Catalyst Fund Limited to

sell 3,000,000 shares of ProElite to Absolute Return Europe Fund Limited for $3.25 per

share.  Hunter (and Homm and Ficeto as owners of Hunter) collected commissions on both

sides of the transaction, collecting approximately $150,000 on the sale by Absolute European

Catalyst Fund Limited and $150,000 on the purchase by Absolute Return Europe Fund

Limited.  This transaction is reflected in yellow-highlighted rows in the Second ACM

Trading Spreadsheet (Exhibit 17); the difference between the values reflected in the "Gross

Consideration" and "Net Consideration" columns for each side of the trade is equal to the

commission taken by Hunter in connection with these risk-free transactions.

29.     On or about June 4, 2007, Hunter sold 50 shares of ProElite stock to an

unknown buyer at $14.00 per share, double the share price of the most recent ProElite trade

(which was itself a matched trade between two Funds).  This transaction is reflected in yellow-highlighted rows in the Hunter Blotter (Exhibit 18).

30.     On or about June 6, 2007, Hunter and CIC sold 300,000 shares of ProElite stock at approximately $14.00 per share to The Hunter Fund Ltd., a vehicle of Homm and Ficeto's creation in which three of the Plaintiff Funds were made to be the sole investors. *See* Exhibit 7 (Homm Indictment) ¶ 2(c).  This transaction is reflected in green-highlighted rows in the Hunter Blotter (Exhibit 18).  As a matter of simple math, these trades generated proceeds of approximately $4.2 million for Hunter (*i.e.*, Homm and Ficeto as the owners of Hunter) and CIC (*i.e.*, Colin and Craig Heatherington as the owners of CIC).

31.     On or about June 14, 2007, Hunter sold just 109 shares of ProElite stock to an unknown buyer at $15.00 per share. This transaction is reflected in a blue-highlighted row in the Hunter Blotter (Exhibit 18).

32.     On or about June 15, 2007, Hunter and CIC sold another 180,000 shares of ProElite stock to three Plaintiff Funds at approximately $15.00 per share, generating additional proceeds to Hunter and CIC of approximately $2.7 million.  These transactions are reflected in orange-highlighted rows in the Hunter Blotter (Exhibit 18).

33.     On or about June 29, 2007, the Trading Conspirators caused Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Master Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited to purchase ProElite shares in a second private offering.  In this offering, the Trading Conspirators caused the investing Funds to spend approximately $25,000,000 on shares of ProElite, at a price of $7.00 per share.  Attached hereto as **Exhibit 22** are true and correct

copies of the Securities Purchase Agreements executed by those Funds (from ACM's files). These purchases are reflected in green-highlighted rows in the Second ACM Trading Spreadsheet (Exhibit 17).  In connection with this transaction, Homm and Ficeto benefited, through Hunter, in a variety of ways.  Attached hereto as **Exhibit 23** is a true and correct copy of the SEC Form 8-K filed by ProElite on July 18, 2007, which states (at Item 1.01) that Hunter "acted as the exclusive placement agent in the private placement on July 12, 2007" and received, among other things, "a fee of $2,500,000" and "warrants to purchase 3,571,428 shares of common stock, which expires on July 31, 2012."

34.     Additional trading in ProElite shares is reflected on the First and Second ACM Trading Spreadsheets (Exhibit 16 and Exhibit 17, respectively) and the Hunter Blotter (Exhibit 18).

35.     The Devine Complaint estimates the Funds' losses in connection with ProElite to be $67,951,791 and the total losses caused by the Penny Stock Scheme to be more than $200 million.  (*See* Devine Compl. ¶¶ 66, 72-73, 142.)

36.     In the Swiss Report, the Swiss Prosecutor's Office estimates that Homm, alone, made more than $115 million as a result of the Penny Stock Scheme.  (Exhibit 14 (Swiss Report) at 7, 79-80.)

**Arness Email**

37.     On May 4, 2006, a former ACM employee using the pseudonym "Joseph Arness" (the "Former Employee") sent an email that detailed certain elements of the ongoing Penny Stock Scheme (the "Arness Email") based on the Former Employee's own first-hand observations.  On May 5, 2006, Homm received a copy of the Arness Email.  Attached hereto

as **Exhibit 24** is a true and correct copy of the May 5, 2006 email from Ewing to Homm (from ACM's files), forwarding the Arness Email.

38.     Attached hereto as **Exhibit 25** is a true and correct copy of a May 15, 2006 email exchange between the Former Employee and Ewing (from ACM's files).   Among other things, in this exchange, Ewing advises the Former Employee that a retraction of the allegations set forth in the Arness Email "needs to be from you 'and of your own free will,'" and the Former Employee states, "I do not agree with the language you [Ewing] dictated."

**Backdated "Loan" Agreement**

39.     Attached hereto as **Exhibit 26** is a true and correct copy of a May 23, 2006 email from Meisterhans to Andreas Schaer ("Schaer") (from the Swiss files) with a certified English translation of excerpts.   Attached to the email is a contract, in English, and Meisterhans directs Schaer, a personal assistant to Devine and Homm, to "[p]lease forward it to Susan [*i.e.*, Devine] for her signature."   The contract, which is backdated more than two years to May 10, 2004, purports to be an agreement by New York Art Trading Ltd. to loan Devine "various antique furniture, decorative art, silverware, Old Masters and Contemporary Art Works" already in her home in Mallorca, Spain.   Attached hereto as **Exhibit 27** is a true and correct copy of the backdated May 10, 2004 "loan" agreement bearing Devine's signature (from the Swiss files).

**Homm-Devine Divorce**

40.     The Circuit Court of the Twentieth Judicial Circuit in Collier County, Florida ("Florida Circuit Court") entered a divorce judgment concerning Homm and Devine on May 21, 2007.   The Funds have obtained the publicly-available case file relating to the Homm-

Devine divorce, Case Number 06-2462-DR.  Exhibits 28 through 31, identified below, are taken from that case file.

41.     Attached hereto as **Exhibit 28** is a true and correct copy of the Petition for Dissolution of Marriage filed by Devine on August 7, 2006 (the "Divorce Petition"). Attached hereto as **Exhibit 29** and **Exhibit 30** are true and correct copies of the Family Law Financial Affidavit signed by Homm and Devine, respectively, on July 24, 2006 and filed with the Florida Circuit Court in connection with the Divorce Petition.  In these affidavits, Homm and Devine state that their "total assets" are just $1,640,000 and leave blank the space for identifying the current fair market value of any real estate; they do not otherwise identify any real estate holdings in the affidavits.

42.     Attached hereto as **Exhibit 31** is a true and correct copy of the Final Judgment of Dissolution of Marriage entered by the Florida Circuit Court in connection with the Homm-Devine divorce on May 21, 2007.  Exhibit A to that judgment is the Marital Settlement Agreement executed by Devine and Homm, stamped September 18, 2006.  The stated purpose of the agreement is to "settle [between Devine and Homm], now and forever, their respective rights, duties, and obligations regarding property, liabilities, and children."

**Devine and Homm's Continuing Relationship**

43.     Attached hereto as **Exhibit 32** is a true and correct copy of an email dated August 1, 2006 – just six days before the Divorce Petition was filed – from Devine to Homm (from ACM's files), in which Devine signs off, "A big big hug.  I love you."

44.     Attached hereto as **Exhibit 33** is a true and correct copy of an email dated September 5, 2006 – almost a month after the Divorce Petition was filed – from Devine to

Homm (from ACM's files), in which she addresses him as "Gorgeous" and notes that she has "to be very reserved" and "resist" her desire to "be a little bit soppy" in replying to Homm's emails.

45.     Attached hereto as **Exhibit 34** is a true and correct copy of an April 23, 2007 email exchange (from ACM's files), in which Homm forwards Devine an email from an art gallery employee regarding the sale of a painting and notes that he is "[p]assing this on to my wife."

46.     Attached hereto as **Exhibit 35** is a true and correct copy of the Last Will and Testament of Florian Wilhelm Jürgen Homm, dated July 12, 2007 (from the Swiss files).  In his will, Homm devises half of his estate to Devine, even though the couple had purportedly settled all financial matters the previous September and their divorce had become final in May 2007.

47.     Attached hereto as **Exhibit 36** is a true and correct copy of an August 28, 2007 email from Homm to Devine (from ACM's files), in which he states that "[i]f I can succeed[,] the children and you will sit on a multigenerational fortune" and that, in any event, Devine is "fantastically protected already, the optimal outcome has been achieved in that regard."

48.     The divorce caused no change in ownership of Devine and Homm's jointly-owned property located in London (the "London Property"), an asset that is not mentioned in any of the divorce filings with the Florida court.  Attached hereto as **Exhibit 37** is a true and correct copy of the Title Registry for the London Property, dated April 24, 2015, which shows that the owners of the property as of that date are Devine and Homm.

49.     In or about July 2007, Beat Kranz, then the director of CSI Asset Management Establishment ("CSI") – which, at various times, held ACM shares on behalf of Devine, Homm, and/or their children – requested a legal opinion from the Liechtenstein law firm Walch & Schurti concerning, in part, the beneficiaries of CSI.  Walch & Schurti provided that legal opinion, as well as a cover letter, in German, identifying the revisions embodied in the final transmitted opinion.  Attached hereto as **Exhibit 38** is a true and correct copy of the cover letter (from the Swiss files) with a certified English translation of excerpts.  The letter states that the opinion originally contained a reference to the Homms' *Schein-scheidung* – their "[s]ham divorce" – but that the reference has been stricken.

### Homm's Memoir

50.     On September 18, 2007, Homm resigned from ACM.  Attached hereto as **Exhibit 39** is a true and correct copy of Homm's resignation letter (dated September 17, 2007).  On the day he resigned, Homm fled Mallorca, Spain, where ACM was headquartered, and went into hiding for the next five years.  Attached hereto as **Exhibit 40** is a true and correct copy of a *New York Times* article by Jack Ewing published on November 16, 2012 with the headline *After 5 Years of Hiding, a Banker Reappears*.

51.     In 2012, Homm published his German-language memoir *Kopf Geld Jagd* ("Head Money Hunt"), which was published later in English as *Rogue Financier: The Adventures of an Estranged Capitalist*.  Attached hereto as **Exhibit 41** is a true and correct copy of excerpts of the English translation of Homm's memoir, in which Homm:

(a)     Recalls that when he met Devine, she "still lived with her parents" and did not "have a decent investment account, let alone a trust fund" (page 115); and

(b)     Recounts his escape from Mallorca in September 2007, first to mainland

Spain and then to Colombia in a private plane with $500,000 in cash stuffed in

his underwear, a briefcase, and a cigar box and with another $700,000 in cash

squirreled away by Homm's "mule and friend" who accompanied him (pages

17-19, 28).

**Homm's Transfers of Assets to Devine**

52.     Bank records and the Swiss Report show that after Homm learned of the

Arness Email on May 5, 2006, Homm transferred assets to Devine totaling approximately

$45 million.

53.     Devine and Homm were the beneficial owners of certain accounts discussed

in this section:

(a)     Attached hereto as **Exhibit 42** is a true and correct copy of the Form A – a

standard banking form that identifies an account's beneficial owner – for the

account at Banque SCS Alliance (collectively, with its successor entity,

"CBH") in the name of Brek Stiftung ("Brek") (from the Swiss files) with a

certified English translation of excerpts, which identifies Devine as the

beneficial owner of that account.  (*See also* Exhibit 14 (Swiss Report) at 159.)

(b)     Attached hereto as **Exhibit 43** is a true and correct copy of the Form A for the

CBH account in the name of Loyr Stiftung ("Loyr") at CBH (from the Swiss

files) with a certified English translation of excerpts, which identifies Devine

as the beneficial owner of that account.  (*See also* Exhibit 14 (Swiss Report) at

159.)

16

(c)     Attached hereto as **Exhibit 44** is a true and correct copy of a "Client Profile"

for the CBH account in the name of Jürg Brand ("Brand") at CBH (from the

Swiss files), which identifies Devine as the beneficial owner of that account.

(*See also* Exhibit 14 (Swiss Report) at 159.)  The profile explains, in English:

"Our existing clients Florian Homm / Susan Devine, get divorced.  In Order to

keep their Fortune on a safe account, Jürg Brand (Susan Devine's lawyer)

opens up an Escrow account."

(d)     Attached hereto as **Exhibit 45** is a true and correct copy of the Form A for the

CBH account in the name of Ridgeville Investment Inc. ("Ridgeville") (from

the Swiss files), which identifies Homm as the beneficial owner of that

account.  (*See also* Exhibit 14 (Swiss Report) at 159.)

54.     Attached hereto as **Exhibit 46** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts, reflecting a

transfer of €6,200,000 from the account of Ridgeville (Homm) at CBH to the account of

Loyr (Devine) at CBH on or about May 9, 2006, just four days after Homm learned of the

Arness Email.  Attached hereto as **Exhibit 47** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts, reflecting a

transfer of €8,000,000 from the account of Loyr (Devine) at CBH to the account of Ocean

Offshore Bank SA at Commerzbank (South East Asia) Ltd. in Singapore on or about May 24,

2006.  Included among those records is a letter from Homm stating that the funds were to be

transferred for the purchase of a hotel, but no such purchase has ever been identified.  In her

testimony before the Swiss Prosecutor's Office, Devine denied knowledge of a hotel purchase.  (Exhibit 13 (5/30/12 Devine Tr.) at 10.)

55.      Attached hereto as **Exhibit 48** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €145,000 from the account of Ridgeville (Homm) at CBH to the account of Brek (Devine) at CBH on or about March 1, 2007.

56.      Bank records reflect a series of transfers from Homm's account at CBH to the account of Brek (Devine) at CBH:

     (a)      Attached hereto as **Exhibit 49** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €300,000 from Homm's account at CBH to Brek's account at CBH on or about November 2, 2006.

     (b)      Attached hereto as **Exhibit 50** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €150,000 from Homm's account at CBH to Brek's account at CBH on or about March 5, 2007.

     (c)      Attached hereto as **Exhibit 51** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €400,000 from Homm's account at CBH to Brek's account at CBH on or about March 23, 2007.

57.      Bank records reflect a series of transfers from the CSI account at CBH to the account of Brek (Devine) at CBH:

(a)      Attached hereto as **Exhibit 52** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €510,000 from CSI's account at CBH to Brek's account at CBH on or about October 6, 2006.

(b)      Attached hereto as **Exhibit 53** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €8,386,000 from CSI's account at CBH to Brek's account at CBH on or about March 30, 2007.

(c)      Attached hereto as **Exhibit 54** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €5,308,000 from CSI's account at CBH to Brek's account on or about May 10, 2007.

58.      Attached hereto as **Exhibit 55** is a true and correct copy of a Property Settlement Agreement entered into by Devine and Homm on August 21, 2007 (from the Swiss files).  Under Section 2.1 of the agreement, Homm agrees to pay Devine "the sum of €3,100,000 in cash from the assets of CSI."  Under Section 2.2 of the agreement, Homm agrees to transfer 4 million ACM shares to Devine, "free of any encumbrances, liens, lock-ins, or restrictions on transfer."  Bank records show that Homm made, and then exceeded, the payment and share transfer required by the August 21, 2007 Property Settlement Agreement:

(a)      Attached hereto as **Exhibit 56** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €1,043,000 on or about August 30, 2007 and a transfer

of €2,057,000 on or about September 7, 2007 from CSI's account at CBH to

Brand's account at CBH, of which Devine was the beneficial owner, for a

total payment of €3.1 million.

(b)     Attached hereto as **Exhibit 57** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of 500,000 ACM shares from CSI's account at CBH to

Brand's account at CBH on or about August 24, 2007.

(c)     Attached hereto as **Exhibit 58** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of 3.5 million ACM shares from CSI's account at CBH to

Brand's account at CBH on or about August 24, 2007, and a transfer of

1.2 million ACM shares from CSI's account at CBH to Brand's account at

CBH on or about September 26, 2007.

(d)     In total, on August 24 and September 26, 2007, Homm transferred 5.2 million

shares to Devine, despite the fact that the Property Settlement Agreement

required a transfer of only 4 million shares.

59.     According to the Swiss Report, between on or about August 28, 2007 and

February 15, 2008, the ACM shares in the Brand account were sold for the total amounts of

£4,112,013 and €754,252.  (Exhibit 14 (Swiss Report) at 78, 79.)

**Devine's Purchase and Improvement of Real Property**

60.      In April 2008, Devine purchased a property located in Naples, Florida for

approximately $2,200,000 (the "Naples Property").

61.     Bank records reflect that the Naples Property was paid for through two transfers from Brand's account at CBH.

62.     Attached hereto as **Exhibit 59** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a wire of $170,000 on or about March 26, 2008 from Brand's account at CBH to an account with Citibank N.A. in New York, New York in the name of First Title of Naples, Inc. ("First Title"), a title insurance company located in Naples, Florida.  A memorandum line in the records refers to the address of the Naples Property.

63.     Attached hereto as **Exhibit 60** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a wire of $1,982,000 on or about April 4, 2008 from Brand's account at CBH to First Title's Citibank account in New York.  A memorandum line for this payment refers to the address of the Naples Property.

64.     After purchasing the Naples Property, Devine requested multiple wires totaling nearly $500,000 from Brand's account at CBH to an account in her name at Bank of America in Florida:

(a)     Attached hereto as **Exhibit 61** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting (i) a request by Devine on May 8, 2008 that $250,000 be wired to her Bank of America account "for renovation and furniture purchase of the house [she] just purchased," and (ii) the transfer to Devine's Bank of America account the next day.

(b)     Attached hereto as **Exhibit 62** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting (i) an emailed request by Devine on September 1, 2008 that $150,000 be wired to her Bank of America account, and (ii) the transfer to Devine's Bank of America account on September 3, 2008.  A handwritten note on Devine's email indicates that the stated reason for this wire was to pay for property renovations.

(c)     Attached hereto as **Exhibit 63** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting (i) a request by Devine on June 4, 2009 that $60,000 be wired to her Bank of America account in order to pay for a "[n]ew roof and other expenses," and (ii) the transfer to Devine's Bank of America account the next day.

65.     Attached hereto as **Exhibit 64** is a true and correct copy of the publicly-available Property Summary by the Collier County (Florida) Property Appraiser, dated February 2015, which confirms that Devine was still the owner of the Naples Property as of that date.

66.     Attached hereto as **Exhibit 65** is a true and correct copy of the Collier County Tax Collector's records dated May 25, 2015, indicating that as of her November 26, 2014 tax filing, Devine claimed a $50,000 Homestead Exemption for her Naples Property.

67.     With Homm, Devine also purchased a property in Marbella, on the Southern coast of Spain.  Attached hereto as **Exhibit 66** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of a total of €5,086,600 from Brek's account at CBH to an account at Banco de Andalucia in the name of Leo Propiedades S.L. on or about March 21 and 22, 2007.  The memorandum lines on the records state that the purpose of the wire is buying property. Attached hereto as **Exhibit 67** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting an additional transfer of €1,300,000 from Homm's account at CBH on or about March 28, 2007.

68.     Around the same time, Devine used several entities to buy property in Mallorca, Spain.  According to the Swiss Report, Devine is the beneficial owner of an account in the name of Malon Consulting AG ("Malon") at UBS AG ("UBS") in Switzerland.  (Exhibit 14 (Swiss Report) at 160, 202.)  Attached hereto as **Exhibit 68** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €3,200,000 from Brek's account at CBH (of which she was the beneficial owner) to Malon's account at UBS on or about May 24, 2007, less than a week after Malon's UBS account was opened.  The payment order, signed by Devine, indicates that the purpose of the transfer was to purchase real estate in Mallorca. Attached hereto as **Exhibit 69** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €3,100,000 from Malon's account at UBS to the account of Vatulele S.L. at Caja de Ahorros Bank in order to purchase the Mallorca property.

### Devine's Purchase of Gold Coins and Other Metals

69.     Bank records show that Devine also purchased gold coins and other metals.

70.     Attached hereto as **Exhibit 70** is a true and correct copy of a CBH client profile for the account at CBH in the name of Levanne Stiftung ("Levanne") (from the Swiss files) with a certified English translation of excerpts, which identifies Devine as the beneficial owner of that account.  (*See also* Exhibit 14 (Swiss Report) at 159.)

71.     Attached hereto as **Exhibit 71** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a cash withdrawal of €6,150,000 from the account of Brek (Devine) at CBH on August 21, 2007 (the withdrawal form was signed by Devine) and a deposit of €6,150,000 into Levanne's account at CBH that same day.

72.     Attached hereto as **Exhibit 72** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a cash withdrawal of 1,470,000 Swiss francs ("CHF") from Brek's account at CBH on or about August 21, 2007 and a deposit of CHF 1,470,000 into Levanne's account at CBH the same day.

73.     Between October 2007 and March 2008, Devine transferred over CHF 1,400,000 to an account of Marius Grossenbacher at UBS through six separate deposits. Attached hereto as **Exhibit 73** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting the following transfers from Levanne's account at CBH to Grossenbacher:

(a)     a transfer of CHF 165,000 on or about October 10, 2007;

(b)     a transfer of CHF 68,800 on or about December 10, 2007;

(c)     a transfer of CHF 177,000 on or about December 21, 2007;

24

> (d)      a transfer of CHF 386,000 on or about February 11, 2008;
>
> (e)      a transfer of CHF 445,200 on or about March 20, 2008; and
>
> (f)      a transfer of CHF 163,800 on or about March 27, 2008.

Exhibit 73 reflects transfers to Devine's banker, Marcel Eichmann, at or about the same time as each of these transfers to Grossenbacher.

74.      Throughout the same period, Grossenbacher purchased gold coins.  Attached hereto as **Exhibit 74** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting gold purchases by Grossenbacher on:

> (a)      October 15, 2007;
>
> (b)      December 12, 2007;
>
> (c)      December 28, 2007;
>
> (d)      January 9, 2008;
>
> (e)      January 17, 2008;
>
> (f)      January 29, 2008;
>
> (g)      February 14, 2008;
>
> (h)      March 26, 2008;
>
> (i)      April 2, 2008;
>
> (j)      April 11, 2008;
>
> (k)      May 29, 2008;
>
> (l)      July 16, 2008; and
>
> (m)      December 5, 2008.

75.     Devine testified before the Swiss Prosecutor's Office that she engaged in these gold transactions at the instruction of her banker, Marcel Eichmann.  (Exhibit 13 (5/30/12 Devine Tr.) at 4.)

76.     Attached hereto as **Exhibit 75** is a true and correct copy of a April 4, 2012 letter from Grossenbacher to the Swiss Prosecutor's Office (from the Swiss files) with a certified English translation, in which Grossenbacher states:  "I sold these coins to Mr. Marcel Eichmann at SCS Alliance in the previously mentioned timeframe and handed them over to him in person as soon as I received the antecedent payments from SCS Alliance.  For whom the bank purchased these coins I do not know.  He only went so far as to say that the bank recommended the customer buy gold coins and organized the purchase on their behalf."

77.     Devine also apparently used the Floma Foundation ("Floma"), a Panama entity, to launder money in metals.  Money used to fund Floma was transferred through an account in Australia controlled by Meisterhans, who has been indicted in Switzerland for aggravated money laundering, among other crimes:

(a)     Attached hereto as **Exhibit 76** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €4,000,000 on or about June 20, 2006 from the account of Brek (Devine) at CBH to an account at NM Rothschild & Sons (collectively, with its successor, "Investec") in the name of Sinitus Ltd., an entity controlled by Meisterhans.  (*See also* Exhibit 14 (Swiss Report) at 95-96.)

(b)     Attached hereto as **Exhibit 77** is a true and correct copy of certain bank
records (from the Swiss files), reflecting a transfer of €3,900,000 from
Sinitus's account at Investec to Floma's account at EFG Bank ("EFG") in
Singapore.

78.     Devine represented to the Swiss Prosecutor's Office that she opened Floma
with herself as a supervisor and her children as beneficiaries.  (Exhibit 13 (5/30/12 Devine
Tr.) at 7, 8-9.)  However, Devine referred to Floma's account in Singapore as her own.
Attached hereto as **Exhibit 78** is a true and correct copy of a November 5, 2009 email from
Devine, using an email account under the name of "Julia Brown," to Philippe Meyer (from
the Swiss files), which states that she was "purchasing a property and will be needing the
remainder of the money from my account [*i.e.*, the Floma account]."

79.     Attached hereto as **Exhibit 79** is a true and correct copy of a June 29, 2009
email from Devine, using the "Julia Brown" email account, to Meyer (from the Swiss files),
directing a wire of €1,000,000 from the Floma account for a "large investment."  Attached
hereto as **Exhibit 80** is a true and correct copy of a debit advice (from the Swiss files),
reflecting this transfer.  Attached hereto as **Exhibit 81** is a true and correct copy of a
September 3, 2009 email from Meyer (from the Swiss files), setting forth details about the
supposed recipient of the wire, Mesto Zapad Sluzby Limited, described as "dealers in
metals."

80.     Attached hereto as **Exhibit 82** is a true and correct copy of a September 1,
2009 email from Devine, using the "Julia Brown" email account, to Meyer (from the Swiss
files), in which Devine directs a second wire of €1,000,000 from Floma to an entity called

Check Republis purportedly for another investment in "[m]etals."  Attached hereto as **Exhibit 83** is a true and correct copy of a payment order and a debit advice reflecting this transfer (from the Swiss files).

### Devine Has Previously Transferred Assets to Evade Freezes

81.     According to the Swiss Report, the Swiss Prosecutor's Office sent PHZ Bank ("PHZ") a request for information on May 31, 2011.  (Exhibit 14 (Swiss Report) at 197.)  Beginning on January 13, 2012, the Swiss froze five PHZ accounts in Devine's name or for which Devine or her children are the stated beneficiaries.  (*Id.* at 195, 197.)  The Swiss Prosecutor's Office discovered that between its initial request for information from PHZ and the freeze orders, Devine directed multiple transfers and withdrawals amounting to millions of dollars out of the three following accounts:  Brek, Devine, and Hosifa.  (*Id.* at 195-202.)

*Brek*

82.     Attached hereto as **Exhibit 84** is a true and correct copy of the Form A for Brek's account at PHZ (from the Swiss files) with a certified English translation of excerpts, which states that Devine is the beneficial owner of that account.  (*See also* Exhibit 14 (Swiss Report) at 196.)

83.     In late 2009, Devine transferred over €9 million in money and securities from Brek's account at CBH to Brek's account at PHZ:

(a)     Attached hereto as **Exhibit 85** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of $887,678.06 from Brek's account at CBH to Brek's account at PHZ on or about September 15, 2009.

(b)     Attached hereto as **Exhibit 86** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of approximately €390,000 from Brek's account at CBH to Brek's account at PHZ on or about September 21, 2009.

(c)     Attached hereto as **Exhibit 87** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting transfers of over €8 million in securities from Brek's account at CBH to Brek's account at PHZ from September to November 2009.  (*See also* Exhibit 14 (Swiss Report) at 196.)

84.     According to the Swiss Report, the Swiss Prosecutor's Office sent an inquiry to PHZ on May 31, 2011 and froze the Brek account on January 13, 2012.  (Exhibit 14 (Swiss Report) at 197.)  After the Swiss Prosecutor's Office sent the inquiry but before the freeze, Devine directed at least 14 transfers of funds out of that account, totaling over $5 million.  (*Id.* at 195-98.)

85.     Of the total transferred out of Brek's account during this period, $4,550,000 was transferred into the U.S.:

(a)     Attached hereto as **Exhibit 88** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of $450,000 from Brek's account at PHZ to an account with Pershing LLC at Bank of New York in New York on or about August 5, 2011.

(b)     Attached hereto as **Exhibit 89** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of $450,000 from Brek's account at PHZ to an account

with Pershing LLC at Bank of New York in New York on or about August 5,

2011.

(c)     Attached hereto as **Exhibit 90** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of $3,500,000 from Brek's account at PHZ to an account

with Pershing LLC at Bank of New York in New York on or about November

3, 2011.  Attached hereto as **Exhibit 91** is a true and correct copy of a PHZ

record (from the Swiss files) with a certified English translation, indicating

that Devine's stated purpose for her $3,500,000 transfer to Bank of New York

on or about November 3, 2011 was to purchase a new house in the U.S.  Such

a purchase has never been identified.

(d)     Attached hereto as **Exhibit 92** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of $150,000 from Brek's account at PHZ to Devine's

account at Bank of America in Florida on or about January 10, 2012.

86.     The remaining 11 transfers from Brek's account at PHZ were made to

accounts outside of the U.S.:

(a)     Attached hereto as **Exhibit 93** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €40,000 from Brek's account at PHZ to an account in the name of the Liberia Renaissance Foundation at PHZ on or about June 1, 2011.

(b)      Attached hereto as **Exhibit 94** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting four transfers totaling €200,000 from Brek's account at PHZ to Devine's account at C.D. de Bourgogne in France from June through November 2011.

(c)      Attached hereto as **Exhibit 95** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €100,000 from Brek's account at PHZ to Devine's account at Banca March in Spain on or about November 25, 2011.

(d)      Attached hereto as **Exhibit 96** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of €200,000 from Brek's account at PHZ to an account in the name of Long Life Services PTE Ltd. ("Long Life Services") at Standard Chartered Bank in Singapore on or about November 25, 2011.

(e)      Attached hereto as **Exhibit 97** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting two transfers totaling €100,000 from Brek's account at PHZ to Devine's account at Caja de Ahorros Bank in Spain on or about October 28, 2011 and November 25, 2011.

(f)     Attached hereto as **Exhibit 98** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €100,000 from Brek's account at PHZ to Devine's

account at Lloyds TSB Bank in Uruguay on or about November 25, 2011.

(g)     Attached hereto as **Exhibit 99** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a €75,000 cash withdrawal from Brek's account at PHZ on or about

June 27, 2011.

87.     According to the Swiss Report, the Swiss Prosecutor's Office has frozen

€7,581,770 in Brek's account at PHZ.  (Exhibit 14 (Swiss Report) at 195.)

*Devine*

88.     Attached hereto as **Exhibit 100** is a true and correct copy of the Form A for

the account at PHZ in the name of Devine (from the Swiss files) with a certified English

translation of excerpts, which states that Devine was the beneficial owner of that account.

89.     According to the Swiss Report, the funds in the PHZ account in the name of

Devine originated at least in part from Brand's account at CBH and her own account at CBH,

and consisted of Penny Stock Scheme proceeds, specifically dividends from ACM and

proceeds of the sale of ACM shares.  (Exhibit 14 (Swiss Report) at 198; *see generally id.* at

60, 70.)

90.     According to the Swiss Report, PHZ sent the Swiss Prosecutor's Office

information about Devine's account on June 14, 2011, and the Swiss Prosecutor's Office

froze that account on January 13, 2012.  (Exhibit 14 (Swiss Report) at 198-99.)  After PHZ

sent the information to the Swiss Prosecutor's Office but before the freeze, Devine directed
at least 11 transfers of funds out of that account, totaling over $1 million.

91.     Of the total transferred out of the Devine account during this period, $250,000
was transferred into Devine's Bank of America account in Florida.  Attached hereto as
**Exhibit 101** is a true and correct copy of certain bank records (from the Swiss files) with a
certified English translation of excerpts, reflecting requests from Devine for wires from her
account at PHZ to her account at Bank of America in Florida.

92.     Attached hereto as **Exhibit 102** is a true and correct copy of certain bank
records (from the Swiss files), reflecting a transfer of $140,000 from Devine's account at
PHZ to Klueger & Stein LLP, a law firm in Los Angeles, California, on or about September
16, 2011.  According to Klueger & Stein LLP's website, lataxlawyers.com, one of the firm's
specialties is "[c]reative asset protection."

93.     The remaining five transfers from Devine's account at PHZ were made to
accounts outside of the U.S.:

(a)     Attached hereto as **Exhibit 103** is a true and correct copy of certain bank
        records (from the Swiss files) with a certified English translation of excerpts,
        reflecting two transfers totaling €110,000 from Devine's account at PHZ to
        Devine's account at Caja de Ahorros Bank in Spain on or about June 16, 2011
        and August 4, 2011.

(b)     Attached hereto as **Exhibit 104** is a true and correct copy of certain bank
        records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €150,000 from Devine's account at PHZ to Devine's

account at Banca March in Spain on or about August 24, 2011.

(c)     Attached hereto as **Exhibit 105** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €150,000 from Devine's account at PHZ to Devine's

account at Lloyds TSB Bank in Uruguay on or about August 24, 2011.

(d)     Attached hereto as **Exhibit 106** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €250,000 on or about August 24, 2011 from Devine's

account at PHZ to Long Life Services' account at Standard Chartered Bank in

Singapore.  Devine attempted to conceal the destination of the funds related to

at least one of the above transfers.  Attached hereto as **Exhibit 107** is a true

and correct copy of an August 22, 2011 email from Devine, using her "Julia

Brown" email account, to Eichmann (from the Swiss files), requesting that

this transfer be booked as a cash withdrawal:  "This is a cash bezug

[withdrawal] from Brek and Brek does not need to hold anything and it can be

documented as so.  This investment remains in my name so no money is going

to a different person only to myself."

(e)     Attached hereto as **Exhibit 108** is a true and correct copy of certain bank

records (from the Swiss files) with a certified English translation of excerpts,

reflecting a transfer of €530,766 from Devine's account at PHZ to Devine's

account at Banco Bradesco in Brazil on or about September 16, 2011.

94.     According to the Swiss Report, the Swiss Prosecutor's Office has frozen €7,086,790 in Devine's account at PHZ.  (Exhibit 14 (Swiss Report) at 198.)

*Hosifa*

95.     Attached hereto as **Exhibit 109** is a true and correct copy of the Form A for the account at PHZ in the name of Hosifa Stiftung ("Hosifa") (from the Swiss files) with a certified English translation of excerpts, which states that the Homm children were the purported beneficial owners of that account.

96.     Bank records reflect the funding of the Hosifa account at PHZ:

(a)     Attached hereto as **Exhibit 110** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a cash transfer of €1,400,000 from CSI's account at VP Bank to an account in Hosifa's name at EFG Bank von Ernst on or about June 1, 2006.

(b)     Attached hereto as **Exhibit 111** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of approximately €1,488,328.11 in October 2009 from Hosifa's EFG Bank von Ernst account to Hosifa's PHZ account.

97.     According to the Swiss Report, the Swiss froze Hosifa's account at PHZ on January 14, 2014.  (Exhibit 14 (Swiss Report) at 202.)

98.     Between January 13, 2012, when the Brek and Devine accounts at PHZ were frozen, and January 14, 2014, when the Hosifa account was frozen, Devine directed at least four transfers out of the Hosifa account, totaling over CHF 1.4 million:

(a)     Attached hereto as **Exhibit 112** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of CHF 200,000 from Hosifa's account at PHZ to Brand's account at UBS on or about January 18, 2012.

(b)     Attached hereto as **Exhibit 113** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting transfers of CHF 80,000 and €50,000 from Hosifa's account at PHZ to an account in the name of Liberia Renaissance Foundation at PHZ between on or about January 17, 2012 and May 2, 2013.

(c)     Attached hereto as **Exhibit 114** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting transfers of CHF 150,000 from Hosifa's account at PHZ to an account in the name of Medipolan AG at VP Bank between on or about January 18, 2012 and April 2, 2013.

(d)     Attached hereto as **Exhibit 115** is a true and correct copy of certain bank records (from the Swiss files) with a certified English translation of excerpts, reflecting a transfer of CHF 1,000,000 from Hosifa's account at PHZ to Devine's account with Pershing LLC at Citibank N.A. on or about April 19, 2012.  Attached hereto as **Exhibit 116** is a true and correct copy of an entry from PHZ's computer system (from the Swiss files) with a certified English translation, which states: "[C]lient [Devine] doesn't trust Switzerland regarding her lawsuit and, for this reason, wants to transfer a portion of her

36

children's assets to the accounts of her children in London.  The children have

an account set up with Pershing LLC."

99.     According to the Swiss Report, the Swiss Prosecutor's Office has frozen

€518,820 in Hosifa's account at PHZ.  (Exhibit 14 (Swiss Report) at 202.)

**Irreparable Injury and the Need for *Ex Parte* Relief**

100.    The increasing scrutiny by the Swiss Prosecutor's Office on Devine's

conduct, as reflected in the Swiss Report (issued on December 16, 2014) and the Meisterhans

Indictment (issued on May 20, 2015), and her history of transferring and dissipating assets to

evade seizure, as evidenced by the documents identified and summarized in this Declaration,

demonstrate that immediate and irreparable injury, loss, and damage – specifically, the

untraceable transfer and further dissipation of Penny Stock Scheme proceeds currently under

Devine's control – will result to the Funds in the absence of *ex parte* injunctive relief.  In

light of this risk of immediate and irreparable injury, loss, and damage, counsel for the

Funds, including the undersigned, have not attempted to give notice to Devine.

**Unpublished Orders**

101.    Attached hereto as **Exhibit 117** are true and correct copies of the following

unpublished orders cited by the Funds in their Memorandum of Law in Support of their *Ex

Parte* Motion for a Temporary Restraining Order and Preliminary Injunction, Limited

Expedited Discovery, and Delayed Service, arranged in chronological order:

- *CFTC v. Chilcott*, No. 02-CV-00094, Dkt. No. 8 (M.D. Fla. Mar. 7, 2002);

- *AT&T Broadband v. Tech Commc'ns, Inc.*, No. 02-CV-61596, Dkt. No. 91 (S.D. Fla. Feb. 4, 2003);

- *SEC v. Founding Partners Cap. Mgmt.*, No. 09-CV-00229, Dkt. No. 56 (M.D. Fla. May 7, 2009);

- *Bloomfield Institutional Opportunity Fund, LLC v. Allen Inv. Props., LLC*, No. 10-CV-1475, Dkt. No. 6 (M.D. Fla. July 1, 2010);

- *Tiffany (NJ), LLC v. 925JewlryMax.com*, No. 12-CV-23518, Dkt. No. 9 (S.D. Fla. Oct. 2, 2012); and

- *Adobe Sys. Inc. v. Bea's Hive LLC*, No. 14-CV-81102, Dkt. No. 13 (S.D. Fla. Aug. 25, 2014).

\*      \*      \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 31, 2015 in New York, New York.

By: _____
Christopher Dysard

38