UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FILED

15 JUL -1  PM 12: 54

CLERK
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

ABSOLUTE ACTIVIST VALUE
MASTER FUND LIMITED,
ABSOLUTE EAST WEST FUND
LIMITED, ABSOLUTE EAST WEST
MASTER FUND LIMITED,
ABSOLUTE EUROPEAN CATALYST
FUND LIMITED, ABSOLUTE
GERMANY FUND LIMITED,
ABSOLUTE INDIA FUND LIMITED,
ABSOLUTE OCTANE FUND
LIMITED, ABSOLUTE OCTANE
MASTER FUND LIMITED, and
ABSOLUTE RETURN EUROPE FUND
LIMITED,

     Plaintiffs,

v.                    Case No: 2:15-cv-328-FtM-29DNF

SUSAN ELAINE DEVINE,

     Defendant.

---

**OPINION AND ORDER**

This matter comes before the Court on plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order and Preliminary Injunction, Limited Expedited Discovery, and Delayed Service filed on June 1, 2015.

I.

Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Germany Fund Limited, Absolute India Fund Limited, Absolute Octane Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return

Europe Fund Limited (the "Funds" or "plaintiffs") are Cayman Islands hedge funds that invested in a variety of asset classes on behalf of hundreds of investors around the world, including many investors in the United States.  In 2004, the Funds hired Absolute Capital Management Holdings Limited ("ACM") to act as its investment manager pursuant to a written Investment Management Agreement.  ACM typically charged each Fund a monthly management fee of 2% per annum based on the particular Fund's net asset value ("NAV") and a monthly performance fee of 20% of the increase in value of the Fund's NAV.

Florian Wilhelm Jürgen Homm ("Homm") was the Chief Investment Officer at ACM and, in that capacity, was granted discretionary trading authority by the Funds.  Conspiring with others from at least September 2004 to September 2007, Homm used the Funds as vehicles for a massive market manipulation scheme (the "Penny Stock Scheme") that caused the Funds to suffer losses of more than $200 million while generating enormous profits for the conspirators, including $115 million in profits for Homm alone.

In 2006, Homm and his former wife, defendant Susan Elaine Devine (Devine or defendant), established a criminal enterprise to conceal the proceeds of the Penny Stock Scheme (the "Money Laundering Enterprise").  Over the years, Devine has taken numerous steps to advance the objectives of the Money Laundering Enterprise, such as entering into a sham divorce with Homm in Florida, including the joint filing of false financial affidavits

- 2 -

with the court; moving the proceeds of the Penny Stock Scheme through a complex network of bank accounts around the world; forming entities in various foreign countries through which fraud proceeds were funneled; creating and using accounts for which her children, "C" and "I", were the nominal beneficiaries; using the fraud proceeds to purchase difficult-to-trace gold, fine art, and other assets; engaging in simulated cash transactions to disguise account-to-account transfers of fraud proceeds; moving millions of dollars of fraud proceeds out of accounts in advance of the imposition of freezes by the Swiss against those accounts; and providing false testimony to the Office of the Attorney General of Switzerland (the "Swiss Prosecutor's Office") regarding her role in the Money Laundering Enterprise.

As a result of the Penny Stock Scheme, Devine has amassed extraordinary wealth. Assets purchased by Devine since the establishment of the Money Laundering Enterprise include, but are not limited to: the $2.2 million dollar house in Naples, Florida in which she currently resides; a $8.5 million villa in Marbell, Spain (which was purchased with Homm after their sham divorce); a $4.1 million property in Mallorca, Spain; and more than $1 million in gold coins. Devine controls, or has controlled, at least 20 bank accounts holding the equivalent of tens of millions of dollars in the United States, Switzerland, Singapore, Spain, Uruguay, France, and Brazil. Although the Swiss Prosecutor's Office has frozen five of Devine's Swiss accounts, holding more than $20

million, and the United States government has seized one of her accounts in the United States, Devine continues to have access to other accounts and assets.

Plaintiffs filed a six-count Complaint on June 1, 2015, alleging that Devine, in league with Homm, committed numerous acts of money laundering and other criminal offenses in violation of the federal civil Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968 (Counts I & II), and the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. §§ 772.101-772.19, and the Florida RICO Act, Fla. Stat. §§ 895.01-895.09 (Count III & IV). Plaintiffs also assert that Devine has been unjustly enriched with assets belonging to the Funds (Count V), and that her conduct has resulted in the creation of a constructive trust of those assets for the benefit of the Funds (Count VI).

Plaintiffs now seek an order restraining Devine from transferring or dissipating any and all assets in her name or under her control in the United States and abroad, with the exception of reasonable living expenses as determined by the Court upon application by Devine. Plaintiffs also move for limited expedited discovery and delayed service.

## II.

The following facts are based upon the allegations in the Complaint, the Declaration of Christopher Dysard (the "Dysard Declaration"), the investigative file compiled by the Swiss Prosecutor's Office (the "Swiss Report"), documents and emails,

filings with the Securities and Exchange Commission (the "SEC"), trading records, and criminal and forfeiture filings in the United States and Switzerland.

**A.   The Penny Stock Scheme**

   **1.   The Persons and Entities Involved in the Penny Stock Scheme**

Homm is a German national who also holds passports from the United Kingdom and Liberia, as well as a fake Irish passport under the alias "Colin Trainor." (Compl. ¶ 12.) On December 3, 2001, Homm founded Fortune Management Limited, later known as FM Fund Management Limited (collectively, "FM"), an investment consulting company organized under Cayman Islands law. (Swiss Report at 23.) Between May and July 2005, FM's business was merged into, and thereafter continued as, ACM. (Id. at 24.)

ACM was established in the Cayman Islands on August 26, 2004, as a hedge fund management company. The company was listed on the Alternative Investment Market (AIM), a London Stock Exchange market, on March 3, 2006, at which time the funds under its management held assets valued at approximately €700 million. (Id. at 25.) On August 31, 2007, the value of the assets under ACM's management had increased to $2.1 billion. (Id.) When ACM was listed on the AIM, Homm owned more than 50% of the outstanding ACM shares through CSI Asset Management Establishment ("CSI"), an investment vehicle under his control.[1] (Id. at 5.)

_____

[1] CSI is an *Anstalt* (an autonomous legal entity with

Homm served as ACM's Chief Investment Officer and was responsible for management strategy and trading from 2004 until his resignation on September 18, 2007. (Id.) After his abrupt resignation from ACM, Homm went into hiding for the next five years. (Id.) An arrest warrant was issued for Homm on March 6, 2013, by the United States District Court for the Central District of California after he was charged with one count of conspiracy to commit securities fraud and wire fraud, eight counts of securities fraud, and one count of wire fraud. (Compl. ¶ 12.) Homm was arrested in Italy on March 8, 2013, by Italian authorities acting on a provisional arrest warrant after he travelled into the country. While extradition proceedings were pending, Homm was released and fled to Germany. (Id.) Homm is currently on the Federal Bureau of Investigation's ("FBI") "Most Wanted" list. (Dysard Decl. ¶ 9 & Ex. 1.)

Working with Homm at ACM were brothers Colin and Craig Heatherington. Colin Heatherington is a Canadian national and resident of British Columbia, Canada. (Compl. ¶ 33.) Colin was the lead trader at ACM and served as Homm's "right-hand man." (Id.) On October 8, 2013, a Magistrate Judge in the United States

---

beneficiaries) established under Liechtenstein law on August 12, 1997. (Swiss Report at 23.) The letters CSI are the initials of the first names of Devine ("S") and the two Homm children ("C" and "I"). (Compl. ¶ 13.) Since at least September 2004, CSI's primary activity has been to hold ACM shares on behalf of Devine, Homm, and/or their children. (Swiss Report at 18-20.)

District Court for Central District of California issued a warrant for the arrest of Colin Heatherington based on a sworn criminal complaint, which was amended on January 27, 2014. (Id.) Craig Heatherington is also a Canadian national and a resident of Australia. (Id. ¶ 36.) Craig worked in ACM's "back office," and performed essential "back-office functions" in connection with the penny stock transactions. (Id.) Colin and Craig were also two of the three shareholders of CIC Global Capital, Limited ("CIC"), a corporation incorporated in the British Virgin Islands. (Id. ¶ 37.)

Sean Ewing ("Ewing") is an Irish national with a residence in Mallorca, Spain. (Id. ¶ 38.) Ewing was co-founder, Chief Executive Officer, Chairman, and significant shareholder of ACM from 2005 until his resignation in August 2007. (Id.) He was involved in almost every aspect of the Funds' management, including compliance, risk management, marketing and investor relations, calculation of the Funds' NAVs, and occasionally signed money transfers that were used in the fraudulent penny stock trades. (Id.) On August 20, 2013, a Magistrate Judge in the United States District Court for the Central District of California issued a warrant for the arrest of Ewing based on a sworn criminal complaint. On July 2, 2014, a seizure warrant was issued for all funds and securities on deposit in 15 accounts at ABN AMRO (Guernsey) Limited and Cannacord Genuity Wealth (International) Limited, in Guernsey, related to Ewing, his family, and related

businesses and trusts because the assets in those accounts were traced to the Penny Stock Scheme. (Id.) Ewing is currently a fugitive residing in Dubai, United Arab Emirates. (Id.)

In 1995, Todd Ficeto ("Ficeto"), a United States citizen and resident of California, founded Hunter World Markets, Inc. ("HWM"), a Californian broker-dealer registered with the SEC and the Financial Industry Regulatory Authority, Inc. ("FINRA"). (Id. ¶¶ 31-32.) HWM was a placement agent for, or was otherwise involved in, the offerings of the companies whose shares the Funds were caused to purchase. (Id. ¶ 32.) HWM was also affiliated with CIC. Ficeto and Homm each owned 50% of HWM. (Id.)

For a certain period between 2004 and 2007, Ficeto served as the President and Director of HWM. He managed all aspects of HWM's business and was familiar with its trading activities, customers, business records, agents, employees, and affairs. (Id. ¶ 31.) On November 25, 2013, the United States Attorney's Office for the Central District of California filed three civil forfeiture complaints against assets controlled by Ficeto based on his role in the Penny Stock Scheme. (Id.) In August 2014, consent judgments of forfeiture were entered in the forfeiture cases, and in September 2014, the United States Department of Justice ("DOJ") remitted payments from the forfeited assets to the Funds in recognition of their status as victims of the Penny Stock Scheme. (Id.)

Tony Ahn ("Ahn"), a resident of California, was the primary trader for HWM. (Id. ¶ 34.)  On January 10, 2011, Ahn consented to the entry of an SEC administrative Cease-and-Desist Order the "Ahn Order") relating to his involvement with Colin Heatherington and the execution of fraudulent trades to and from the Funds. (Dysard Decl. Ex. 6, at 1-10.)  Among other things, the Ahn Order directed Ahn to pay a civil monetary penalty and barred him from associating with any broker-dealer.  (Id. at 8.)  The Ahn Order contains findings that Ahn executed numerous trades that manipulated the price of a number of penny stocks between September 2005 and September 2007, that Ahn received his orders from Colin Heatherington via an instant messaging system for which records were not retained, and that Ahn used several methods to accomplish the price manipulation.  (Id. at 3-7.)

### 2.   The Mechanics of the Penny Stock Scheme

From at least September 2004 through September 2007, Homm, Ficeto, Ahn, HWM, and Colin Heatherington (collectively, the "Trading Conspirators") caused the Funds to purchase billions of shares of thinly capitalized microcap companies (the "Penny Stock Companies").[2]  Microcap companies are not traded on a national

---

[2]The Penny Stock Scheme involved the trading of eight Penny Stock Companies:  ProElite, Inc. ("ProElite");  MicroMed Cardiovascular, Inc. ("MicroMed"); Berman Center, Inc. ("Berman Center"); InterMetro Communications, Inc. ("InterMetro"); NuRx Pharmaceuticals, Inc. ("NuRx"); Java Detour, Inc. ("Java Detour"); Logistical Support, Inc. ("Logistical Support"); and DuraVest, Inc. ("DuraVest").  (Dysard Decl. ¶ 23.)

securities exchange; instead, the companies issue shares (penny stocks) that are registered with the SEC and traded on the domestic over-the-counter ("OTC") market.  All of the companies involved in the Penny Stock Scheme were incorporated in the United States and their shares were quoted and traded on either the Over-the Count Bulletin Board ("OTCBB") or the "Pink Sheets."  (Swiss Report at 36-37.)

As the first step in the Penny Stock Scheme, Homm would persuade investors to subscribe to shares in the Funds by using marketing presentations reporting on: the investment strategy utilized by ACM; the research, fundamental analyses, and decision-making process used by Homm and ACM for selecting investments; the application of rigorous stop-loss policies; the Funds' positive historical performance; and the personal and professional background and success of Homm in his capacity as a hedge fund manager.  (Id. at 37.)  While Homm was soliciting investors, Ficeto would identify small companies that had free-trading penny stocks, or that could be reverse merged into public shell entities with free-trading penny stocks.  (Dysard Decl. Ex. 7, at 15.) Ficeto, acting through HWM, would then offer to help the Penny Stock Companies find funding through the issuance of shares via private placements.  (Id.)  In some instances, Homm and Ficeto obtained control of the Penny Stock Companies through capital from the Hunter Fund Limited (the "Hunter Fund"), a fraudulent vehicle incorporated in the British Virgin Islands of Ficeto and Homm's

creation in which certain of the Funds were the only investors. (Dysard Decl. ¶ 30 & Ex. 19.)

After Homm and Ficeto gained control of a Penny Stock Company, they caused the Funds to purchase, through HWM, billions of the company's shares through private placements.  (Swiss Report at 38.)  These substantial investments in the Penny Stock Companies often caused the Funds to beneficially own more than 5%, and sometimes more than 10%, of the outstanding shares of the respective Penny Stock Companies, thus triggering the requirement to file Schedules 13D and Forms 4 with the SEC.  (Dysard Decl. Ex. 7, at 10, 16.)  To conceal the manipulative trading, however, Homm and his co-conspirators did not file these schedules and forms. (Id. at 16.)

Homm would sign the subscription agreements on behalf of the Funds, along with the Registration Rights Agreements that required the Penny Stock Companies to promptly register the shares so they would be freely tradable.  (Id.)  Homm and Ficeto would also obtain agreements from existing shareholders to abstain from selling their shares for a certain period of time, often called "lock-up agreements."  (Id.)

As a condition of the Funds' investment, the Trading Conspirators would cause the Penny Stock Companies to allocate shares, options, or warrants to HWM, Homm, Ficeto, Colin Heatherington, and their nominees.  (Dysard Decl. Ex. 23.)  As set forth below, after fraudulently inflating the prices of the penny

stocks, the Trading Conspirators would sell these shares to the Funds at inflated prices.

The next step in the Penny Stock Scheme was to use a variety of trading techniques to manipulate and fraudulently inflate the price of the penny stocks. (Swiss Report at 38.) Specifically, the Trading Conspirators placed matched orders, placed orders that marked the close or otherwise set the closing price for the day, conducted wash trades, and backdated trades.[3] (Id. at 38-39.) Homm and Colin Heatherington usually bought and sold the Penny Stocks on behalf of the Funds by placing trades with Ficeto and Ahn at HWM. (Id. at 39.) The manipulative trading was primarily performed on a secret instant-messaging system between ACM and HWM. The instant-messaging system allowed the traders at ACM and HWM to trade freely without being discovered by regulatory authorities, investors, employees, or directors of ACM who were not participating in the conspiracy. (Id.) The use of this secret instant-messaging system violated certain rules established by the SEC and FINRA. (Dysard Decl. Ex. 7, at 18.)

The stock manipulation benefitted the Trading Conspirators in many different ways. The Trading Conspirators charged fees and commissions on the Funds' loans to, subscriptions in, and other purchases of shares in the Penny Stock Companies. (Compl. ¶ 75.)

---

[3]The First Amended Complaint filed in SEC v. Ficeto, Case No 2:11-cv-1637-GHK-RZ (C.D. Cal. May 17, 2001), provides a thorough explanation of the trading techniques used by the Trading Conspirators. (Dysard Decl. Ex. 5, at 4-5.)

After manipulating the prices of the penny stocks to the levels they desired, Homm, Ficeto, HWM, Colin and Craig Heatherington, and CIC caused the Funds to buy the penny stocks that were issued to them at little or no cost.   (Id. ¶ 76.)   The Trading Conspirators also caused the Funds to trade the penny stocks between one another, allowing HWM to charge outrageously high commissions on the trades.   (Id. ¶ 77.)   By fraudulently inflating the values of the penny stock, the Trading Conspirators were able to increase the Funds' NAVs, thereby inflating the management fee the Funds paid to ACM and causing enormous performance fees to be paid to ACM.   (Id. ¶ 79.)

### 3.   Example of Fraudulent Trading: ProElite

One example that illustrates the mechanics of the Penny Stock Scheme is the trading in ProElite, which operated as an online and live event sports entertainment company featuring mixed martial arts.

The fraudulent trading in ProElite began in August 2006.   On August 22, 2006, a company called I-Fight, Inc. ("I-Fight") obtained a bridge loan of $350,000 from the Hunter Fund.   (Dysard Decl. Ex. 21, at 6.)   Following a reverse merger in October 2006, ProElite became the sole owner of Real Sport, Inc., which in turn was the sole owner of I-Fight (then ProElite.com).   ProElite was able to repay the Hunter Fund's loan to I-Fight only after the Trading Conspirators caused a number of the Funds to purchase a subscription for ProElite shares.   (Id. at 24-25.)

On September 26, 2006, Ficeto sent Colin Heatherington an email stating that "Everything is moving according to plan with I-fight. We just closed on the purchase of the shell." (Dysard Decl. Ex. 19.) A few days later, on September 29, 2006 and October 2, 2006, the subscription purchases took place. On those dates, the Trading Conspirators caused plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited to spend approximately $9.25 million on shares of ProElite, at the price of $0.002 per share. (Dysard Decl. Ex. 20.) Homm personally signed the Securities Purchase and Registration Rights agreements. (Dysard Decl. Ex. 7, at 23.) HWM paid itself a placement fee for this transaction, totaling about $1 million.[4] (Dysard Decl. Ex. 21, at 8.) In addition to receiving this placement fee, HWM issued itself five-year warrants to purchase shares of ProElite, equal to 30 percent of the shares sold in the offering, at the price of $0.004 per share, along with three-year warrants to purchase 175 million shares of ProElite at the price of $0.0012 per share.[5] (Id. at 59.) HWM's five-year warrants had a cashless exercise

---

[4]The $1 million placement fee – as with all of the fees paid to HWM – ultimately benefited Homm and Ficeto, as Homm and Ficeto each owned 50% of HWM.

[5]At HWM's request, ProElite also agreed to appoint a designee of HWM to its Board of Directors for a period of two years. (Dysard Decl. Ex. 21, at 8.)

feature, which allowed HWM to convert the warrants into equity without making any cash payment. (Id.)  The shares were later issued to HWM, Ficeto's minor children, and CIC.  After the Trading Conspirators fraudulently inflated the price of the shares, the penny stocks were sold to the Funds. (Dysard Decl. Ex. 7, at 23.)

In April 2007, the Trading Conspirators began trading shares of ProElite between and among certain of the Funds and others, thereby generating trading volume, increasing the reported price of the securities, and producing commissions for HWM.  For example, on or about April 27, 2007, the Trading Conspirators caused plaintiff Absolute European Catalyst Fund Limited to sell 3 million shares of ProElite to plaintiff Absolute Return Europe Fund Limited for $3.25 per share.  In connection with this matched order, HWM collected commissions on both sides of the transaction, collecting approximately $150,000 on the sale by Absolute European Catalyst Fund Limited and $150,000 on the purchase by Absolute Return Europe Fund Limited. (Dysard Decl. Ex. 17.)

On or about April 30, 2007, the Trading Conspirators artificially inflated the price of ProElite by causing plaintiff Absolute Return Europe Fund Limited to simultaneously buy and sell approximately 100 shares of ProElite at approximately $12 per share. (Compl. ¶ 60; Dysard Decl. Ex. 17.)  The shares were sold for approximately $12 per share despite the fact that, just three days earlier, ProElite had been trading from one Fund to another at approximately $3.25 per share. (Dysard Decl. Ex. 7, at 24.)

This sale, which was done after business hours, had the effect of nearly quadrupling the price of the stock overnight.   (Dysard Decl. Ex. 17.)   By temporarily elevating the price of ProElite at the end of the month to approximately $12 per share, the Trading Conspirators fraudulently increased ACM's performance fee. (Compl. ¶ 60.)   Homm received the benefit of this inflated performance fee in the form of a semi-annual bonus from ACM and a semi-annual dividend paid to CSI, the investment vehicle that owned Homm's ACM shares.  (Id.)

On or about June 4, 2007, HWM sold 50 shares of ProElite stock to an unknown buyer at $14 per share, double the share price of the most recent ProElite trade.   (Dysard Decl. ¶ 29 & Ex. 18.) Two days later, HWM and CIC sold a total of 300,000 shares of the ProElite stock that they received as a placement fee to the Hunter Fund for approximately $14 per share.   (Dysard Decl. Ex. 18.) These trades generated proceeds of approximately $4.2 million for HWM and CIC.   Then, on June 14, 2007, HWM sold 109 shares of ProElite stock to an unknown buyer at $15 per share.   The next day, HWM and CIC sold another 180,000 shares of ProElite stock to plaintiffs Absolute Return Europe Fund Limited, Absolute Octane Master Fund Limited, and Absolute European Catalyst Fund Limited for approximately $15 per share, generating additional proceeds to HWM and CIC of approximately $2.7 million.  (Id.)

The Trading Conspirators caused plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Master Fund Limited,

Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited to purchase a second offering of ProElite shares on June 29, 2007.  (Dysard Decl. ¶ 33.)   In this offering, the Trading Conspirators caused the investing Funds to spend approximately $25 million on shares of ProElite, at a price of $7 per share.  (Dysard Decl. Ex. 22.)   In connection with this offering, HWM collected a commission of approximately $178,500; a placement agent fee of 10 percent of the gross proceeds, valued at approximately $2.5 million; and warrants to purchase 3,571,428 shares of ProElite stock.  (Dysard Decl. Ex. 23, at 3.)   The stock purchase warrants were exercised by HWM in the months that followed.

The offering memorandum for the second offering provided that prior to the closing of that offering, ProElite's principal shareholders, along with persons who had been granted warrants to purchase shares in ProElite, would execute a lock-up agreement prohibiting them from selling their stock or exercising their warrants for a specified period of time.  (Id. at 2-3.)   The offering memorandum, however, stated that the lock-ups would not apply if the price per share reached $15.  (Id.)   Thus, the Trading Conspirators continued to trade shares of ProElite between and among certain of the Funds to ensure that the price was artificially inflated to $15 per share, thereby releasing the lock-up.  (Compl. ¶ 63.)   At this price per share, ProElite would have had fully diluted market capitalization of over $1.17 billion even

though it was a start-up company with no earnings and little business activity. (Id.)

Just before Homm's resignation from ACM on September 18, 2007, the volume of trades in ProElite shares dropped dramatically. When the Trading Conspirators were no longer artificially propping up the price, the quoted price of the illiquid ProElite shares declined sharply (to as low as $0.01 per share) and never recovered. Since 2008, the Funds' shares in ProElite have either been sold for an immaterial amount or are still being held by the Funds because they are worthless and/or not sellable. (Id. ¶ 64.) All told, the fraudulent scheme caused the Funds to lose approximately $67,951,791 through ProElite alone.

### 4. The Collapse of the Penny Stock Scheme

#### i. The Arness Email

On April 28, 2006, a former ACM employee sent an email under the pseudonym "Joseph Arness" recommending that an investor redeem his shares in the Funds because Homm had "committed many unethical practices with the funds," including "NAV manipulation and self-dealing." (Dysard Decl. Ex. 24.) On May 4, 2006, the former employee, again using the pseudonym "Joseph Arness," sent a much longer e-mail (the "Arness Email") detailing certain aspects of the Penny Stock Scheme to various financial institutions, including an American based in New York, and several financial media outlets. The email described how Homm manipulated the prices of the penny stocks with the goal of artificially inflating

the Funds' NAVs and increasing performance fees, and how Homm engaged in self-dealing by selling his own shares of penny stocks to the Funds for a profit and through his 50 percent ownership interest in HWM. (Id. at 1-3.)

Homm and Ewing learned of the Arness Email on May 5, 2006, and immediately began to collaborate on how to identify the person who wrote the e-mail. By May 12, 2006, through the use of an outside investigative firm, Ewing had learned that Darius Parsi ("Parsi") authored the Arness Email. (Swiss Report at 49.) Homm and Ewing then contacted Parsi by telephone and angrily demanded a retraction. (Dysard Decl. Ex. 7, at 38.) After Ewing threatened legal action, Parsi agreed to write a letter of retraction. (Dysard Decl. Ex. 25.) Ewing presented this denunciation to ACM's board of directors as baseless and fueled by vengeance towards Homm. (Swiss Report at 49.)

### ii. Homm's Resignation

In June 2007, the Funds' prime brokers executed calls to reduce the Funds' margins, that is, the amount of monies that would be borrowed by the Funds from the prime brokers relative to the value of the cash and stock held in the Funds' accounts. (Dysard Decl. Ex. 7, at 38-39.) The Funds were forced to liquidate certain assets in order to respond to the margin call, which raised concerns within ACM as to the illiquid nature of the penny stocks assets. (Id.) ACM, acting on these concerns, announced that Ewing would no longer serve as ACM's Chief Executive Officer.

Ewing did, however, agree to continue as the Chairman of ACM. (Swiss Report at 50.)

In August 2007, Homm approached ACM's Board of Directors and offered to prop up the Funds' performance by giving 5 million of his ACM shares, held through CSI, to three of the Funds. (Dysard Decl. Ex. 7, at 39.) The Directors agreed to accept the shares, but only if the gift was disclosed pursuant to AIM rules and was included in the Funds' investor newsletter, which was generally disseminated in the third week of the following month. (Id.) The transfer of these shares was performed on August 31, 2007. (Swiss Report at 50.)

Meanwhile, on August 21, 2007, Ewing, citing personal matters, unexpectedly resigned as Chairman of ACM rather than, as promised, carrying on in that position. (Id.)

Just as the disclosure of Homm's "gift" of ACM shares to the Funds was scheduled to occur, on September 18, 2007, Homm announced his resignation in an open letter distributed by Adam Kravitz ("Kravitz"), a Florida attorney and longtime friend of Homm, via PR Newswire and disappeared. (Dysard Decl. Ex. 39; Swiss Report at 51.) According to Homm's 2012 memoir - originally published in German as *Kopf Geld Jagd* ("Head Money Hunt") and published later in English as *Rogue Financier: The Adventures of an Estranged Capitalist* - Homm escaped first to mainland Spain and then Colombia in a private plane with $500,000 in cash stuffed in his underwear, a briefcase, and a cigar box, and with another $700,000 in cash

squirreled away by Homm's "mule and friend" who accompanied him. (Dysard Decl. Ex. 41 & Ex. 42.)   Homm stayed in hiding for the next five years – assuming false identities and secretly traveling the world – until November 2012, when he began to give interviews with certain media outlets ahead of the publication of his memoir. (Id.)

### iii. The Funds' Losses

The Trading Conspirators repeated the pattern of market manipulation described above for at least seven other Penny Stock Companies.   As a result of this fraudulent conduct, the Funds ultimately suffered at least $197,313,667 in losses.   (Swiss Report at 43.)   It is estimated that Homm made more than $115 million as result of the Penny Stock Scheme.   (Id. at 79-80.)

## B.   The Origins of the Money Laundering Enterprise

Although Homm and Ewing succeeded in suppressing the Arness Email in May 2006, Homm recognized that the Penny Stock Scheme could soon be exposed.   It was at this point that Devine, Homm, and their co-conspirators established the Money Laundering Enterprise "to conceal and preserve the ill-gotten gains as a 'multigenerational fortune' for the Devine-Homm family."   (Compl. ¶ 95.)

### 1.   The Persons and Entities Involved in the Money Laundering Enterprise

Devine is a citizen of the United States and Brazil, and currently resides in Naples, Florida.   Devine worked in a bank

from 1984 until she got married in 1989, at which time she only did unpaid work.  She became pregnant a year and a half later and stopped working altogether.  Devine testified before the Swiss Prosecutor's Office that her wealth is the fruit of Homm's business activities.  (Dysard Decl. Ex. 12 & Ex. 13.)

Devine and Homm would not have been able to launder the Penny Stock Scheme proceeds without the help of Urs Meisterhans ("Meisterhans").  Meisterhans, a resident of Switzerland, is the founder and principal of the financial services company Sinitus AG.  (Compl. ¶ 14.)   The Swiss Financial Market Supervisory Authority, the Swiss equivalent of the SEC, took control of Sinitus AG and, after an investigation, put it into liquidation.  The liquidator has since filed for bankruptcy. (Id.)

From at least 2006 through 2008, Meisterhans assisted Devine and Homm in the laundering of the proceeds from the Penny Stock Scheme.  According to the Swiss Report, Meisterhans transferred at least $17 million to accounts accessible by Homm while he was in hiding in 2007 and 2008.  (Swiss Report at 88-153.)  He also facilitated Devine's money laundering activities by sending Penny Stock Scheme proceeds via complex routes through at least a dozen countries, employing false identities, using offshore companies, and executing transactions in cash, gold, and fine art.  (Id.) Swiss authorities have estimated that, between May 2006 and October 2007, Devine and Homm transferred assets valued at approximately $65.9 million to companies controlled by Meisterhans.  On May 20,

2015, the Swiss Prosecutor's Office indicted Meisterhans for aggravated money laundering, securities fraud, and negligence in financial operations based on Meisterhans role in laundering Penny Stock Scheme proceeds controlled by Homm and Devine. (Dysard Decl. Ex. 15.)

Sinitus Limited ("Sinitus") is an affiliate of Sinitus AG incorporated in Mauritius. (Compl. ¶ 15.) Sinitus's accounts at Investee Bank Limited in Australia were a central exchange point for the laundering of Penny Stock Scheme proceeds. (Id.) Money transferred through this account was used to fund the Floma Foundation ("Floma"), one of the many entities controlled by Devine. The Swiss authorities have frozen four Sinitus-related accounts holding more than 24 million Swiss francs (CHF). (Id.)

Marcel Eichmann ("Eichmann"), a resident of Switzerland, was a banker at CBH Compagnie Bancaire Helvétique SA, formerly known as Banque SCS Alliance SA (collectively, "CBH"), before co-founding PHZ Privat-und Handelsbank ("PHZ") in Zurich. (Id. ¶ 16.) Eichmann was the personal banker for Homm and Devine, and Devine and her children were shareholders of PHZ. (Id.) As the head of CBH's Zurich branch, Eichmann managed and monitored Devine and Homm's accounts in 2006 and 2007, which amounted to 25% of Eichmann's overall business at the time. (Swiss Report at 159.) The Swiss Report states that in 2006 and 2007, Eichmann accepted almost $20 million worth of Penny Stock Scheme proceeds into Homm's account at CBH. (Id. at 159-177.) After transferring Devine and

Homm's assets to PHZ, Eichmann was responsible for at least four accounts controlled by Devine that held over €15 million in assets. (Id.)   Between 2007 and 2009, Eichmann facilitated and verified over one dozen cash transactions on behalf of Devine and Homm to assist in their concealment of assets from law enforcement and potential judgment creditors, including simulated transactions falsely and unlawfully recorded as cash withdrawals followed by immediate cash deposits to other accounts at the same bank in order to limit the paper trail. (Compl. ¶ 16.)   Eichmann regularly used a private email address to receive instructions from Devine in violation of bank policy. (Id.)   He is currently the target of a Swiss criminal investigation for money laundering. (Id.)

Pascal Frei ("Frei") is a banker who resides in Switzerland. (Id. ¶ 17.)   Frei worked for Eichmann at CBH and PHZ, and assisted with Devine and Homm's money laundering activities. Specifically, Frei worked with Eichmann to facilitate certain withdrawals and deposits on behalf of Devine and Homm.   Frie is also the target of a Swiss criminal investigation for aggravated money laundering involving Homm and Devine's assets. (Id.)

Sammy Kapleta ("Kapleta") is Belgian citizen and former resident of Florida. (Id. ¶ 18.)   Devine and Homm used accounts in Switzerland, Luxembourg, Panama, and Spain in the names of Kapleta and Fairland Consulting, a vehicle controlled by Kapleta, to launder more than $6 million in Penny Stock Scheme proceeds. (Id.)   According to the Swiss Report, Kapleta is a target of the

Swiss money laundering investigation, and the Swiss have frozen a
Credit Suisse account in his name.  (Id.)   The Swiss have also
convicted Kapleta of procuring false Irish passports.  (Id.)

Phillipe Meyer ("Meyer") is an attorney who resides in
Switzerland.  (Id. ¶ 19.)  Meyer has extensive connections with
Meisterhans and Sinitus.  (Id.)  In 2007 and 2008, he assisted
Devine in the establishment of, and the subsequent transfer of
funds out of, Floma through Singapore, Ireland, and the Czech
Republic under the guise of real estate and precious metal
investments.  (Id.)

Jürg Brand ("Brand"), a Swiss attorney, ostensibly served as
one of Devine's lawyers in connection with her divorce from Homm.
(Id. ¶ 20.)   Through an account Brand held at CBH, millions of
dollars in Penny Stock Scheme proceeds were transferred to accounts
controlled by Devine in Florida and elsewhere.  (Id.)  Brand's
account at CBH also served as a conduit for proceeds arising from
the sale of 5.2 million ACM shares in August and September 2007.
(Id.)

## 2.   Concealment of Art and Furniture

Shortly after the Arness Email, Devine took steps to conceal
valuable art and furniture located at her and Homm's home in
Mallorca, Spain.  Between May 18 and May 23, 2006, Devine created
an inventory of art and furniture with an estimated value exceeding
€2.2 million.  Andreas Schaer ("Schaer"), a personal assistant to
Homm and Devine, emailed this inventory to Meisterhans on May 23,

2006.   (Dysard Decl. Ex. 26, at 1.)   That same day, Meisterhans emailed Schaer a fraudulent loan agreement, backdated for May 10, 2004, and signed by Meisterhans on behalf of New York Art Trading Limited ("New York Art Trading"), to be signed by Devine.   (Id.) By means of this agreement, New York Art Trading purported to lend Devine art and furniture with an estimated value of €2 million, itemized on an "inventory list to be updated on a regular basis." (Id. at 2.)   Devine signed the backdated agreement, which gave the false appearance that the valuable property inventoried by Devine was lent to her, rather than owned by her and Homm.   (Dysard Decl. Ex. 27.)

In September 2007, Devine directed Meisterhans to transport the inventoried art and furniture from Spain to Switzerland for safe keeping.   (Dysard Decl. Ex. 15, at 32.)   This property was stored in Switzerland until June 2008, when Devine directed Meisterhans to move it back to Mallorca, Spain.   (Id.)

### 3.   Devine and Homm's Strategic Divorce

In August 2006, Devine and Homm initiated a strategic divorce. The divorce gave Devine a legal pretext to obtain control of certain proceeds from the Penny Stock Scheme while ostensibly distancing her from the allegations in the Arness Email.   The divorce also provided the pretext for Devine and Homm to repeatedly change the beneficiary structure of CSI, allowing the couple, when it suited their purposes, to hide the tainted proceeds behind an entity purporting to benefit Devine and their children, and to

distance Homm from CSI while CSI sold off ACM shares. (Compl. ¶ 100.)   In reality, throughout the divorce proceedings and thereafter, Devine and Homm continued to interact as spouses – sending each other personal and intimate emails, purchasing a home together, living together, traveling together, and moving money between each other. (Id. ¶ 101.)

### i.  The Divorce Proceedings

On August 7, 2006, Devine and Homm petitioned for divorce in the Circuit Court for the Twentieth Judicial Circuit in and for Collier County, Florida (the "Florida Circuit Court"). (Dysard Decl. Ex. 28.)  With their petition for divorce, Devine and Homm were required to file Family Law Financial Affidavits stating the value of their assets, owned individually and jointly.  Devine and Homm stated in their affidavits that their total assets amounted to only $1.64 million. (Dysard Decl. Ex. 29 & Ex. 30.)   The affidavits, however, were brazenly false.   Indeed, on August 7, 2006, the same day the petition was filed, Meisterhans informed Devine and Homm that New York Art Trading had received wire transfers totaling €16.6 million and $2.05 million, which "we are managing on your behalf." (Swiss Report at 150.)  Devine later testified before the Swiss Prosecutor's Office that Homm was worth roughly $200 million at that time. (Dysard Decl. Ex. 13, at 2.) Furthermore, Devine and Homm did not identify any real estate holdings in their affidavits even though they owned real property

worth millions of dollars in Spain, France, Luxembourg, and England.

On September 18, 2006, Devine and Homm entered into a Marital Separation Agreement, the stated purpose of which was to "settle between [Devine and Homm], now and forever, their respective rights, duties, and obligations regarding property, liabilities, and children." (Dysard Decl. Ex. 31.) The agreement stated that the "parties have already divided all other marital property in an agreeable and satisfactory manner prior to the execution of this Agreement." (Id.) The agreement did, however, mandate that Homm make an "equalizing payment" of $1.5 million to Devine. (Id.) The equalizing payment was made on August 1, 2006. (Id.) The money used to make the payment came directly from HWM and was wired to an account controlled by Devine at Deutsche Bank Alex. Brown in the United States.[6]

The Florida Circuit Court entered a Final Judgment of Dissolution of Marriage (the "Divorce Judgment") on May 21, 2007. (Dysard Decl. Ex. 31.) The terms and conditions set forth in the Marital Settlement Agreement were confirmed by the Divorce Judgment, and Devine and Homm were ordered to comply with those terms. By causing the filing of this public document declaring that they were no longer married, Devine and Homm were able to

---

[6]On February 28, 2014, a federal seizure warrant issued for all funds and securities on deposit in this account. (Dysard Decl. Ex. 11.)

modify the beneficiary structure of CSI to capitalize on ACM's inflated share price, and were further able to conceal and facilitate the laundering of Penny Stock Scheme proceeds. (Compl. ¶ 106.)

### ii.  Modifications to CSI's Beneficiary Structure

As previously noted, ACM was listed on the AIM on March 3, 2006. (Swiss Report at 24.)  After ACM went public, CSI became the majority shareholder, controlling more than 54% of the outstanding shares. (Id. at 27.)

Before ACM was listed on the AIM, CSI and ACM entered into a lock-in deed agreement (the "Lock-In Deed"), a standard agreement when a company is initially listing on a stock market. (Id. at 65.)  Pursuant to the Lock-In Deed, CSI agreed to refrain from selling ACM shares without prior written agreement from the nominated advisor, the broker, and the Chairman of ACM's Board of Directors for a 12-month period ending March 3, 2007. (Id.) During the 12-month period following March 3, 2007, CSI, as well as all persons connected to CSI, were not to dispose of their ACM shares without prior notice to and consultation with the nominated advisor, the broker, and the Chairman of ACM's Board of Directors. (Id.)  The restrictions on the assignment of ACM shares held by CSI did not, however, apply to Homm's wife and children.[7]  (Id.)

---

[7]The restrictions memorialized in the Lock-In Deed were intended to prevent Homm from using CSI to sell shares of a company for which he was the controlling shareholder and a key employee. These restrictions were essential to protect ACM as it went public

In March 2007, immediately after the first set of restrictions in the Lock-In Deed had been lifted, CSI began to liquidate its ACM shares without providing the notice required by the Lock-In Deed, thereby capitalizing on ACM's inflated share price. (Id. at 75.) Between March 2007 and September 18, 2007, the date Homm resigned from ACM, CSI sold or transferred approximately 12 million ACM shares for proceeds of at least £20,161,668. (Id.) In the days immediately after Homm's resignation, CSI unloaded another 13.2 million ACM shares. (Id. at 75-76.)

On June 1, 2007, Glenn Kennedy ("Kennedy"), ACM's general counsel, wrote to CSI director Beat Kranz ("Kranz") to express his concern regarding the fact that CSI did not comply with the Lock-In Deed. (Id. at 66.) Kennedy further indicated that, despite the change in Devine and Homm's marital status, CSI remained a "connected person" to Homm, and was subject to certain restrictions. (Id.) Kennedy also wrote that non-compliance with these conditions could lead to serious consequences for CSI and ACM. (Id.) After reviewing the letter, Kranz contacted Homm and Schaer to learn of the potential consequences for CSI. (Id.) Kranz was then told that Kravitz would be representing Homm with regard to the sale of ACM shares.

---

because any precipitous sales by its largest shareholder would have had a dramatic impact on the trading price of ACM shares. The document admitting ACM to the AIM cited the Lock-In Deed. (Swiss Report at 68.)

On June 5, 2007, Kravitz sent ACM a letter stating that he represented Homm only, and insisted that he did "not represent CSI, which is, or course, a separate and non-affiliated entity from Mr. Homm." (Compl. ¶ 133; Swiss Report at 66.)  The letter further stated that "the beneficiary of CSI is and always has been [Homm's] ex-wife, Susan Devine."  (Id.)  Kravitz also wrote that Homm was no longer connected to CSI because the divorce severed his relationship with CSI.  Accordingly, Kravitz asserted that CSI's liquidation of ACM shares did not trigger regulatory concerns.  (Id.)  To shore up this false account, Kravitz emailed Homm on June 11, 2007, instructing him to inform Krantz that, if anyone other than Homm himself called, his office should reply that "the instructions [to sell the ACM shares] came from Susan, as the beneficiary of CSI."  (Swiss Report at 66.)

The problem with Kravitz's narrative was that Homm had been the sole beneficiary of CSI since July 2006.  (Id. at 19.)  Devine and Homm temporarily resolved this problem by executing two agreements in quick succession in June 2007.  The first agreement, executed June 14, 2007, designated Devine as the primary beneficiary of CSI, providing her with a 60% interest and each of her children with a 20% interest.  (Id. at 66.)  Five days later, in a superseding agreement dated June 19, 2007, Devine and Homm agreed to change the beneficial interests in CSI again, such that Devine would receive a 98% interest and each child would receive a 1% interest.  (Id. at 82.)  This agreement purported to be

- 31 -

retroactive, effective as of July 21, 2006.  (Id.)  By means of this backdated arrangement, Devine and Homm attempted to establish that CSI was controlled by Devine in order to ignore the constraints of the Lock-In Deed.

Then, on July 9, 2007, Devine, Homm, Kravitz, and Meisterhans orchestrated an option agreement between CSI and Stellar Asset Management Limited ("Stellar"), giving Stellar - a company controlled by Meisterhans - an option to purchase the 23,394,163 ACM shares held by CSI for just 10% of the shares' market value. (Id. at 116.)  In April 2014, Schaer testified to Swiss authorities that this option agreement was "related to the fact that [Homm] was trying to find a way to circumvent the prohibition on the sale of ACMH shares" by CSI.  (Id.)  The option was never exercised by Stella.

Around this same time, Kranz requested a legal opinion from the Liechtenstein law firm Walch & Schurti concerning, in part, the beneficiary changes to CSI.  (Id. at 156.)  Walch & Schurti sent a cover letter and its legal opinion to Kranz on July 21, 2007.  (Id.)  The cover letter stated, in German, that the opinion originally contained a reference to the Homms' *Schein-scheidung* - their "sham divorce."  (Dysard Decl. Ex. 38.)  However, after a telephone call with Kranz, Walch & Schurti struck this reference from the final opinion.  When confronted by Swiss authorities with this reference to a "sham divorce," Kranz acknowledged that he

"once heard" that "the couple want[ed] to divide the assets without actually being separated." (Swiss Report at 156-157.)

The Walch & Schurti opinion: (a) concluded that certain sales of ACM shares by CSI likely violated the Lock-In Deed; (b) stated that the purpose of presenting Devine as the person in control of CSI was to avoid running afoul of London Stock Exchange requirements; (c) expressed concerns about the July 9, 2007 option agreement with Stellar, noting that such an agreement was plausible only if Stellar was under Homm's influence; and (d) cautioned Kranz not to sign any "false confirmation," specifically citing Kravitz's untrue statement "according to which Mr. Homm never had any manner of control of CSI." (Id. at 156-158.) Homm subsequently asked Kranz to resign from his board position at CSI, and Kranz's company ceased administering CSI on or around September 24, 2007. (Id. at 18.)

Evidently satisfied that their backdated arrangement had served its purpose, Devine and Homm entered into a new Property Settlement Agreement on August 21, 2007, that upended the previously negotiated divorce terms and once again changed the beneficiary status of CSI. (Id. 84.) Kravitz represented both Devine and Homm in connection with this agreement. (Id. at 85.) The agreement, which was governed by Florida law, cancelled the June 19, 2007 agreement and restored Homm's status as the sole beneficiary of CSI. As part of the agreement, Homm agreed to give Devine €3.1 million and 4 million ACM shares. (Dysard Decl. Ex.

55.)   On August 22, 2007, Devine wrote to Kranz to confirm the terms of the new agreement and asked him to inform Eichmann of the changes.  (Swiss Report at 85.)

On August 30, 2007 and September 6, 2007, a total of €3.1 million was transferred to an account at CBH in the name of Jürg Brand (the "Brand Account), of which Devine was the beneficial owner.  (Dysard Decl. Ex. 56.)  Although this account was in Brand's name, Eichmann regularly accepted instructions on this account directly from Devine.  (Swiss Report at 84.)  On August 24, 2007, Homm transferred a total of 4 million ACM shares to the Brand Account.  Bank records indicate that these transfers were identified as relating to the Property Settlement Agreement.  (Id. at 85.)  Then, on September 26, 2007, Homm transferred to the Brand Account an additional 1.2 million ACM shares that were not required by the Property Settlement Agreement.  Between August 2007 and February 2008, all of those ACM shares were sold for a total of £4,112,013 and €754,252, and the proceeds were transferred to Devine's account at PHZ.  (Id.)

### iii. Evidence that Devine and Homm Remained Close after their Divorce

Evidence shows that Devine and Homm remained extremely close after their formal divorce, both financially and in their shared personal life, and never intended to alter their relationship beyond the paperwork dissolving its legal status and establishing the facade of asset separation.

For example, on August 1, 2006, just six days before the divorce petition was filed, Devine addressed Homm as "Gorgeous" in an email and signed off, "A big big hug. I love you." (Dysard Decl. Ex. 32.) On September 5, 2006, one month after the divorce petition, Devine emailed Homm: "Hi Gorgeous, I have to be very reserved when I reply to your e-mails. Can I be a little bit soppy??? No I shall resist." (Dysard Decl. Ex. 33.)

After the Marital Settlement Agreement was executed on September 18, 2006, the spouses continued to contemplate joint financial investments. For example, from January 4, 2007 to November 19, 2010, Devine transferred approximately €240,000 to Homm for expenses related to a property in Burgundy, France. (Compl. ¶ 126.) In February 2007, Devine and Homm shopped together for a property in Marbella, Spain, which they eventually purchased. In an email to Homm dated February 24, 2007, a real estate broker in Marbella noted that he had shown properties to "you and your wife Susan," and Homm responded in part, "Red house, too dark for susan, off list." In connection with the purchase of the Marbella property, Devine sent wire instructions to her bank in March 2007 on "Susan Devine Homm" stationery and signed the instructions "Susan Devine Homm." (Id.) On April 23, 2007, Homm received an email advising him that a painting by the Norwegian artist Hans Dahl was available for purchase for £52,000. Homm forwarded that email to Devine, noting that he was "[p]assing this on to my wife." (Dysard Decl. Ex. 34.)

On July 12, 2007, less than two months after the Divorce
Judgment, Homm executed a will devising half of his estate to
Devine. (Dysard Decl. Ex. 35.) The other half of his estate was
bequeathed to his children. (Id.) The same day, Devine executed
a will devising her estate exclusively to her children. Copies
of both wills were found in Meisterhans's office. (Swiss Report
at 86-87.)

The divorce also caused no change in the ownership of Devine
and Homm's jointly-owned property in London, an asset that is not
mentioned in any of the divorce filings. As of April 2015, that
property was still owned jointly by Devine and Homm. (Dysard
Decl. Ex. 37.)

Finally, the evidence shows that when Homm was arrested in
Florence, Italy on March 8, 2013, he was vacationing with Devine
and their son. (Dysard Decl. Ex. 15, at 5.)

### 4. Homm's Promise of a "Multigenerational Fortune"

After the divorce was finalized and Homm had again become the
sole beneficiary of CSI, he prepared to escape and bury the Penny
Stock Scheme proceeds for use by himself and his family well into
the future. At that time, he wrote two revelatory emails to
Devine, assuring her that she and their children would always be
well taken care of.

On August 28, 2007, Homm promised Devine in an email: "If I
can succeed the children and you will sit on a multigenerational
fortune." (Dysard Decl. Ex. 36.) In the same email, he assured

her that, even if he was not successful, she was "fantastically protected already, the optimal outcome has been achieved in that regard." (Id.) Homm sent Devine another email later that day, informing her that he had "sold a good part of [his] soul and health to protect you and our children under the most extreme business and lifestyle duress for 18 months." (Compl. ¶ 133.) Homm would resign from ACM and go into hiding less than a month later.

## C.   Devine's Use, Transfer, and Concealment of Penny Stock Scheme Proceeds

In collaboration with Homm and her other co-conspirators, Devine steered a breathtaking amount of Penny Stock Scheme proceeds into at least 20 bank accounts under her control around the world, from Florida to Switzerland to Uruguay to Singapore, and used certain of those proceeds to purchase real property, gold, and other valuable assets. The Funds have identified 85 transactions that Devine used to launder the Penny Stock Scheme proceeds. (Compl. at App. 1.)

### 1.   Transfers from Homm to Devine

The Arness Email triggered an urgent need for Devine and Homm to begin liquidating their ACM shares and laundering the proceeds. Between May 2006 and October 2007 Devine and Homm transferred more than $65.9 million from various private and corporate accounts under their control to vehicle companies under the control of Meisterhans. (Swiss Report at 192.) At least 83% of these funds

(approximately $55 million) originated from the Penny Stock Scheme. (Id.)

On May 9, 2006, just four days after Homm learned of the Arness Email, Homm transferred €6.2 million from an account at CBH in the name of Ridgeville Investment Inc. (the "Ridgeville Account") to an account at CBH in the name of Loyr Stiftung (the "Loyr Account").[8] (Dysard Decl. Ex. 46.) The funds transferred out of the Ridgeville Account originated from CSI's account at VP Bank in Lichtenstein, which held dividends from ACM and proceeds from the sales of ACM shares. (Swiss Report at 93.) On May 22, 2006, Meisterhans coordinated, together with Devine and Homm, the transfer of the assets in the Loyr Account (approximately €8 million) to an account in the name of Ocean Offshore Bank SA (the "Ocean Account") at Commerzbank (South East Asia) Limited in Singapore.[9] (Id.) Bank records state that the entirety of assets in the Loyr Account were transferred to the Ocean Account on May 25, 2006, for the purchase of a hotel. (Dysard Decl. Ex. 47.) Homm and Devine, however, both denied knowledge of a hotel investment when questioned by the Swiss Prosecutor's Office.

---

[8]The records at CBH reveal that Homm was the beneficial owner of the Ridgeville Account and Devine was the beneficial owner of the Loyr Account. (Dysard Decl. Ex. 43 & Ex. 45.)

[9]Meisterhans was the director, general manager, and sole employee of Ocean Offshore Bank SA and had signing authority over the Ocean Account. (Swiss Report at 91.)

(Swiss Report at 94.)   The final destination and usage of the funds transferred to the Ocean Account are not yet known.   (Id.)

On June 1, 2006, CSI transferred €1.4 million in cash from its account at VP Bank in Liechtenstein to an account in the name of Hosifa Stiftung (the "Hosifa Account") at EFG Bank von Ernst in Liechtenstein, pursuant to a payment order signed by Homm.   (Id. at 199.)   This amount came from the proceeds of the ACM shares sold between on February 23, 2006 and May 4, 2006, and was transferred to the Hosifa Account for the benefit of Devine and her children.   (Id. at 200.)   The Hosifa Account was transferred to PHZ on April 30, 2009, and the funds in the account were seized by the Swiss on January 14, 2014.   (Id. at 199-202.)

On October 6, 2006, Homm transferred €510,000 from CSI's account at CBH to another CBH account in the name of Brek Stiftung (the "Brek Account").   (Dysard Decl. Ex. 52.)   Devine was the beneficial owner of the Brek Account.   (Dysard Decl. Ex. 42.) Homm transferred an additional €8,386,000 and €5,308,000 from CSI's account at CBH to the Brek Account on March 30, 2007 and May 10, 2007, respectively.   (Dysard Decl. Ex. 53 & Ex. 54.)   These funds originated from the sale of ACM shares on March 27, 2007. (Swiss Report at 196.)   The Brek Account was transferred to PHZ in 2009, and the funds in the account were seized by the Swiss on June 30, 2014.   (Swiss Report at 195.)

As previously discussed, pursuant to the Property Settlement Agreement, Homm transferred €3.1 million and 4 million ACM shares

to the Brand Account in August 2007.   Then, in September 2007, Homm transferred an additional 1.2 million ACM shares that were not part of the Property Settlement Agreement to the Brand Account. (Id. at 198.)   The funds in the Brand account were transferred to Devine's account at PHZ in September and October 2009, and an amount of €7,086,790 was seized by the Swiss on June 30, 2014. (Id.)

### 2.   Post-Divorce Transactions

Following the entry of the Divorce Judgment on May 21, 2007, Devine, acting in concert with Homm, Meisterhans, Eichmann, Meyer, and others, continued to launder funds throughout the world.

### i.   Devine's Purchase and Improvement of Real Property

In April 2008, Devine purchased a waterfront property in Naples, Florida for approximately $2.2 million (the "Naples Property").   Bank records reflect that the Naples Property was paid for through two transfers from the Brand Account at CBH.   The first transfer occurred on March 26, 2008, when $170,000 was wired from the Brand Account to an account with Citibank N.A. in New York in the name of First Title of Naples, Inc. ("First Title"), a title insurance company located in Naples, Florida.   (Dysard Decl. Ex. 59.)   The second transaction occurred on April 4, 2008, when $1,982,000 was transferred from the Brand Account to Title First's Citibank account in New York.   (Dysard Decl. Ex. 60.)   A memorandum line in the bank records cites the address of the Naples Property.   (Id.)

Devine thereafter directed Eichmann to make additional transfers from the Brand Account, purportedly for the purpose of renovating and furnishing the Naples Property, as follows: On May 8, 2008, Devine requested by email that $250,000 be wired to her Bank of America account in Naples, Florida "for renovation and furniture purchase of the house [she] just purchased." (Dysard Decl. Ex. 61.) On September 1, 2008, Devine confirmed by email a request for $150,000 to be wired to her Bank of America account. A handwritten note on this email indicates that the stated reason for this wire was to pay for property renovations. (Dysard Decl. Ex. 62.) On June 4, 2009, Devine requested by email that $60,000 be wired to her Bank of America account in order to pay for a "[n]ew roof and other expenses." (Dysard Decl. Ex. 63.) In total, Devine spent nearly $3 million of Penny Stock Scheme proceeds on the Naples property.

Devine also used the Penny Stock Scheme proceed to purchase two properties in Spain, in both instances through corporate entities that helped conceal her involvement.

Devine transferred a total of €5,086,600 from the Brek Account at CBH to an account at Banco de Andalucia in the name of Leo Propiedades S.L. on March 21 and 22, 2007. (Dysard Decl. Ex. 66.) Leo Propiedades S.L. was owned by Benley International S.A., a Panama company controlled by Homm. The memorandum lines on the bank records state that the purpose of the wired money was buying property. (Id.) These funds, along with an additional €1.3

million from Homm's account at CBH, were used to purchase a large
seaside villa in Marbella, on the Southern coast of Spain. (Dysard
Decl. Ex. 68.) As discussed above, Devine and Homm shopped for
this property together even as their divorce was being finalized.

Around the same time, Devine used another entity to buy a
property in Mallorca, Spain. Malon Consulting AG ("Malon"), a
Swiss company registered on November 22, 2006, opened an account
with UBS in Switzerland on May 23, 2007, just two days after the
Divorce Judgment. (Swiss Report at 202.) According to the Swiss
Report, Devine is the beneficial owner of this account. (Id.)

On May 24, 2007, less than a week after Malon's UBS account
was opened, Devine transferred €3.2 million from the Brek account
at CBH to Malon's UBS account. The payment order, signed by
Devine, indicates that the purpose of the transfer was to purchase
real estate in Mallorca. (Dysard Decl. Ex. 68.) The €3.2 million
originated from transfers from CSI's account with CBH to the Brek
Account. From that amount, €3.1 million was transferred shortly
thereafter from Malon's UBS account to the account of Vatulele
S.L. at Caja de Ahorros Bank in order to purchase the Mallorca
property. (Dysard Decl. Ex. 69.)

ii.  **The Floma Account**

On June 20, 2006, Devine transferred approximately €4 million
from the Brek Account, to Sinitus's account with Investee Bank.
(Dysard Decl. Ex. 76.) Of the €4 million, approximately

€1,660,217 originated from the sale of the Funds' stock on March 13, 2006. (Swiss Report at 95.)

In August 2007, Devine established Floma, an entity organized under Panamanian law. (Id. at 96.) Atica Nominees S.A. ("Atica"), a British Virgin Islands company operated by Meyer and his law partner, served as the foundation council member of Floma. Originally, Meisterhans was to assist Devine with Floma, but much of the work was done by Meyer, at Meisterhans suggestion.

On January 16, 2008, Meyer informed Meisterhans that a bank account in the name of Floma (the "Floma Account") was opened at EFG Bank in Singapore. (Id.) On January 19, 2008, Meisterhans sent a payment order by email for the wire of €3.9 million from Sinitus's account to the Floma Account. (Dysard Decl. Ex. 77.)

Devine maintained complete control over Floma's assets and instructed Meyer and his colleagues from an email address using the alias "Julia Brown." (Swiss Report at 97.) On June 29, 2009, Devine, using the "Julia Brown" email account, advised Meyer that she was "making a large investment" and directed him to wire €1 million from the Floma Account to an account in the name of DC Fragments at HSBC in Germany. (Dysard Decl. Ex. 78.) On August 28, 2009, Devine, using the "Julia Brown" email account, directed Meyer to wire €1 million from the Floma Account to the account of Check Republis at Unicredit Bank in Czech Republic. On August 31, 2009, Meyer emailed Devine: "Please give us also details, for what the funds are used. We need to have an explanation due to

banking rules." Devine responded: "I gave a message to your assistant saying that the funds are for an investment. Metals to be exact." (Dysard Decl. Ex. 82.)

On November 5, 2009, Devine, using the "Julia Brown" email account, instructed Meyer to close the Floma Account: "I am purchasing a property and will be needing the remainder of the money from my account." (Dysard Decl. Ex. 78.) Meyer subsequently transferred €1,876,769.43 to the same Check Republis account to which Devine had sent funds for a "metals" investment two months earlier.

### iii. Devine's Purchase of Gold Coins

On August 20, 2007, Levanne Stiftung, a Liechtenstein foundation, opened an account at CBH for the benefit of Devine (the "Levanne Account"). (Dysard Decl. Ex. 70.) Bank records indicate that on August 21, 2007, €6.15 million and CHF 1.47 million were withdrawn in cash from the Brek Account at CBH in Zurich, and immediately deposited in the Levanne Account at CBH. The two cash withdrawal forms were signed by Devine. (Dysard Decl. Ex. 71 & 72.) These bank records, however, were falsified by Devine and Eichmann, presumably to conceal the origin of the funds. A CBH compliance officer explained to the Swiss Prosecutor's Office that the treasury of the Zurich branch of CBH did not have this amount of cash in August 2007, and that such simulated cash transactions, which were invisible to the bank's headquarters in Geneva, would have been possible only if the

counterparts both had accounts at CBH.   (Swiss Report at 164.)
Devine testified before the Swiss Prosecutor's Office in May 2012
that she engaged in these cash transactions on Eichmann's
recommendation.[10]   (Id.)

Between October 2007 and March 2008, Devine transferred more
than CHF 1.4 million from the Levanne Account to the account of
Marius Grossenbacher ("Grossenbacher") at UBS through six separate
deposits.   (Dysard Decl. Ex. 73.)   Bank records reflect that
Devine made transfers to Eichmann at or about the same time as
each transfer to Grossenbacher.   (Id.)   Throughout the same
period, Grossenbacher purchased approximately CHF 1.38 million in
gold coins through cash transactions.   (Dysard Decl. Ex. 74.)
Devine testified before the Swiss Prosecutor's Office in May 2012
that she engaged in these gold transactions at the instruction of
Eichmann.   (Dysard Decl. Ex. 13.)   Devine further stated that the
gold coins were placed in a safety deposit box outside of
Switzerland.   (Id.)

### 3.   Transfers to Avoid Swiss Freeze Orders

On August 7, 2007 and May 31, 2008, Frei and Eichmann
respectively left CBH in view of setting up PHZ in Zurich.[11]   From

---

[10] Bank records indicate that Devine and Eichmann were
responsible for a number of simulated cash transactions between
August 9, 2007 and August 13, 2009.   (Swiss Report at 160-171.)
The simulated cash transactions are a basis for a separate Swiss
criminal money laundering investigation targeting Eichmann and
Frei.

[11] Homm, through a series shell corporations established by
Meisterhans, took a 5% stake in PHZ.   (Swiss Report at 179.)

this new bank, Eichmann and Frei continued to manage the accounts for which Devine and her children are identified as beneficiaries. (Id. at 159, 176.)

On May 31, 2011, the Swiss Prosecutor's Office sent PHZ requests for information regarding certain accounts.   Beginning in January 2012, the Swiss Prosecutor's Office issued freeze orders relating to numerous accounts in Switzerland, including the following five accounts in Devine's name or for which Devine or her children are the stated beneficiaries: the Brek Account at PHZ; an account in the name of Susan Devine (the "Devine Account") at PHZ; the Hosifa Account at PHZ; the Malon Account at PHZ; and an account in the name of Susan Devine at Trafina Bank, for which Homm is the beneficial owner.   (Swiss Report at 195.)

Swiss authorities learned upon further investigation that, between their initial requests for information from PHZ and the issuance of the freeze orders, Devine directed multiple transfers of millions of dollars out of three of the PHZ accounts to other accounts, most of which were under her control and located outside of Switzerland, effectively placing those funds beyond the reach of the freeze.   (Id. at 195-202.)

i.   **The Brek Account at PHZ**

The Brek Account at PHZ was opened on August 18, 2009, for the benefit of Devine.   (Dysard Decl. Ex. 84.)   In late 2009,

---

Devine also purchased 300,000 PHZ shares with funds that were traced to the dividends issued by ACM.   (Id. at 180.)

Devine transferred more than €9 million in money and securities from the Brek Account at CBH to the Brek Account at PHZ. (Dysard Decl. Ex. 85 - Ex. 87.) The funds in the Brek Account at PHZ consisted, at least in substantial part, of proceeds from the Penny Stock Scheme, including dividends from ACM and proceeds from sales of ACM shares. (Swiss Report at 196.)

Between May 31, 2011, the date of the Swiss authorities' first request to PHZ, and January 13, 2012, the date of the freeze order, Devine directed at least 14 transfers from the Brek Account at PHZ. Specifically, Devine transferred $4.55 million and €815,000 to accounts in France, Spain, Singapore, Uruguay, and the United States. (Dysard Decl. Ex. 88 - Ex. 99; Swiss Report at 197.) Devine, using the "Julia Brown" email account as well as an email account registered under her own name, emailed the instructions for these transfers to Eichmann's personal email account. (Swiss Report at 197-198.)

On January 13, 2012, after the Swiss Prosecutor's Office had analyzed the origin of the assets on the account, a freeze order was issued for the Brek Account at PHZ, resulting in a freeze of €7,581,770. (Id. at 198.)

### ii.  The Devine Account at PHZ

The Devine Account at PHZ was opened on August 15, 2008, for the benefit of Devine. (Id. at 160.) The funds in this account originated from the Brand Account at CBH and Devine's own account at CBH, and consisted of Penny Stock Scheme proceeds, specifically

dividends from ACM and proceeds from sales of ACM shares.  (Id. at 198.)

Between May 31, 2011, the date of the Swiss authorities' first request to PHZ, and January 13, 2012, the date of the freeze order, Devine directed 11 transfers from her PHZ account, totaling $970,817 and €660,000.  (Dysard Decl. Ex. 101 - Ex. 108; Swiss Report at 199.)  One of the transfers was made to Klueger & Stein, a Los Angeles law firm that touts its expertise in "[c]reative asset protection."  (Dysard Decl. ¶ 92.)

On January 30, 2014, €7,086,790 were seized by the Swiss pursuant to a seizure order issued on January 13, 2012.  (Swiss Report at 198.)

### iii. The Hosifa Account at PHZ

The Hosifa Account at PHZ was opened on April 30, 2009, for the benefit of Devine's children.  (Id. at 199.)  Bank records reveal that CSI transferred €1.4 million in cash to the Hosifa Account at EFG Bank von Ernst on June 1, 2006.  (Id.)  This amount came from the proceeds of the ACM shares sold between on February 23, 2006 and May 4, 2006, and was transferred to the Hosifa Account for the benefit of Devine and her children.  (Id. at 200.)  The Hosifa Account was transferred to PHZ on April 30, 2009.  On January 14, 2014, €518,820 were seized by the Swiss.  (Id. at 199-202.)

Between January 13, 2012, the date of the freeze order for the Brek and Devine Accounts at PHZ, and January 14, 2014, the

date the Hosifa Account was frozen, Devine directed at least four transfers out of the Hosifa Account, totaling over CHF 1.4 million. (Dysard Decl. Ex. 112 - Ex. 116; Swiss Report at 201.)   PHZ's records indicate that one of the transfers was made because Devine "doesn't trust Switzerland regarding her lawsuit and, for this reason, wants to transfer a portion of her children's assets to the accounts of her children in London.  The children have an account set up with Pershing LLC." (Dysard Decl. Ex. 116.)

## III.

The Funds seek a temporary restraining order (TRO) and a preliminary injunction against Devine.  Rule 65 of the Federal Rules of Civil Procedure provides that a court may only issue a preliminary injunction "on notice to the adverse party."  Fed. R. Civ. P. 65(a)(1).  A court may, however, issue a TRO without notice to the adverse party if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  Because Devine has not been served with process, the Court will take the Funds' request for a preliminary injunction under advisement.

A court is authorized to enter a TRO in limited circumstances. See Fed. R. Civ. P. 65(b); Local Rule 4.05.  "Such orders will be entered only in emergency cases to maintain the status quo until the requisite notice may be given and an opportunity is afforded

to opposing parties to respond to the application for a preliminary injunction." Local Rule 4.05(a). The party seeking relief must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury "so imminent that notice and a hearing on the application for preliminary injunction is impractical if not impossible"; (3) that the balance of equities favors the movant; and (4) that the TRO, if issued, will not be adverse to the public interest. Local Rule 4.05(b)(2)-(4). See also Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005). A TRO "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes 'the burden of persuasion' as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)).

## A.   Substantial Likelihood of Success on the Merits

The first factor in determining whether a TRO should issue is whether the plaintiffs are likely to prevail on the merits of their claims. The Funds assert that they are likely to prevail on their claims under the federal civil RICO Act and the Florida RICO Act, as well as their claims for unjust enrichment and constructive trust.

### 1.   RICO

The Florida RICO statute is patterned after its federal counterpart, and the analysis under both statutes is generally the

same.   See Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263-
64 (11th Cir. 2004) (recognizing that "Florida courts often look
to the Federal RICO decisions for guidance in interpreting and
applying the act.").

Section 1962(c) of the RICO Act makes it unlawful "for any
person employed by or associated with any enterprise engaged in,
or the activities of which affect, interstate or foreign commerce,
to conduct or participate, directly or indirectly, in the conduct
of such enterprise's affairs through a pattern of racketeering
activity."  18 U.S.C. § 1962(c).  To establish a federal civil
RICO violation under § 1962(c), the plaintiff must prove (1)
conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity and (5) injury to "business or property" (6)
that was "by reason of" the substantive RICO violation.  Williams
v. Mohawk Indus., 465 F.3d 1277, 1282 (11th Cir. 2006), cert.
denied, 549 U.S. 1260 (2007) (citing 18 U.S.C. §§ 1962(c),
1964(c)).  Plaintiffs assert that Devine violated the Florida and
federal RICO Acts by directing the Money Laundering Enterprise
from Florida to launder and conceal the proceeds of the Penny Stock
Scheme in Florida, the United States, and elsewhere, thereby
injuring the Funds.

### i.   Conduct of an Enterprise

An "enterprise" "includes any individual, partnership,
corporation, association, or other legal entity, and any union or
group of individuals associated in fact although not a legal

entity." 18 U.S.C. § 1961(4).[12] An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle, 556 U.S. at 946 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). In Boyle, the Supreme Court held that an association-in-fact enterprise must have at least three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit associates to pursue the enterprise's purpose. Id. Beyond that, virtually any "continuing unit" suffices, regardless of whether it lacks regular meetings, a formal decision-making process, consistent activity, or a hierarchical structure. Id. at 948. An enterprise may be "readily proven by what it does, rather than by [an] abstract analysis of its structure. Id. at 951.

In this case, plaintiffs have presented evidence showing that Devine and Homm are distinct persons that associated together for the common purpose of laundering and concealing Penny Stock Scheme proceeds to preserve, in Homm's words, a "multigenerational fortune."

Devine and Homm's efforts to conceal the Penny Stock Scheme proceeds began shortly after Parsi sent the Arness Email and continue to this day. Their relationship is evidenced by the

---

[12]The definition of "enterprise" has "a wide reach" and is to be "liberally construed to effectuate [RICO's] remedial purposes." Boyle v. United States, 556 U.S. 938, 944 (2009) (internal quotation marks omitted).

submission of false financial affidavits during the divorce proceedings in August 2006, the execution of the Property Settlement Agreement in August 2007, and the joint transfer of Penny Stock Scheme proceeds through vehicle companies to purchase a seaside villa in Marbella, Spain. Furthermore, between September 18, 2006 and May 21, 2007, a total amount of €15,199,000 was transferred to accounts for which Devine was the beneficial owner, originating from accounts for which Homm was the beneficial owner.

As to the common purpose, the evidence clearly shows that Devine and Homm intended to conceal the Penny Stock Scheme proceeds for the benefit of their children. Homm explicitly stated in an email that the purpose of his actions was to protect the children's financial future. Homm also stated that "we are bound by children and financially." (Dysard Decl. Ex. 36.) Bank records further indicate that Devine ordered certain transfers for the same purpose, to protect the children's assets. Without the enterprise, Devine and Homm would never have been able to fulfil this purpose. For instance, they would not have been able to capitalize on the inflated ACM shares held by CSI.

Based on this evidence, the Court finds that plaintiffs are substantially likely to establish an association-in-fact enterprise.

### ii.  Pattern of Racketeering Activity

To establish a pattern of racketeering activity, plaintiffs must establish at least two distinct but related acts of racketeering activity.  Williams, 465 F.3d at 1283.  The RICO Act defines "racketeering activity" comprehensively in 18 U.S.C. § 1961(1) to include a variety of enumerated criminal offenses. Here, plaintiffs contend that Devine (1) engaged in numerous acts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (2) engaged in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957; and (3) transferred, received, and concealed stolen and fraudulently-obtained assets in violation of 18 U.S.C. §§ 2314 and 2315.  For purposes of this motion, the Court will only address the alleged violations of 18 U.S.C. § 1956(a)(1)(B)(i).

A person is guilty of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) when:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

United States v. Miles, 290 F.3d 1341, 1355 (11th Cir. 2002) (citing 18 U.S.C. § 1956(a)(1)(B)(i)).

The Funds have presented evidence showing that Devine conducted approximately 85 financial transactions between May 9, 2006 and April 19, 2012.  According to the Swiss Report, these

transactions involved the proceeds of the penny stock transactions, dividends from ACM, and proceeds from sales of ACM shares. As such, it is likely that the transactions involved the proceeds of statutorily specified unlawful activity, namely violations of Section 10(b) the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.[13]  See, i.e., Absolute Activist Master Funds, Ltd. v. Ficeto, Case No. 1:09-cv-8862-GBD, 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013); United States v. Homm, 2:13-cr-183, Doc. #7 (C.D. Cal. May 19, 2013) (the Homm Indictment).

It is also likely that Devine knew the proceeds were derived from some form of illegal activity.[14]  Shortly after Homm learned of the Arness Email, Devine inventoried valuable art and furniture and executed a backdated loan agreement prepared by Meisterhans in order to conceal the ownership of the property. Around this same time, Devine and Homm transferred approximately €8 million to the Ocean Account in Singapore, stating that the funds were for the purchase of a hotel. Devine and Homm, however, both denied the purchase. Devine and Homm also filed false financial affidavits drastically understating their income in the divorce proceedings.

---

[13] "Statutorily specified unlawful activity" includes most RICO predicate offenses, and specifically includes securities fraud. See 18 U.S.C. § 1956(c)(7).

[14] Knowledge of the proceeds' origin may be actual or constructive and may be inferred from circumstantial evidence. See United States v. Turner, 400 F.3d 491, 497 (7th Cir. 2005); United States v. Tokars, 95 F.3d 1520, 1541 (11th Cir. 1996).

On August 28, 2007, Homm promised Devine in an email: "If I can succeed the children and you will sit on a multigenerational fortune."  In the same email, he assured her that, even if he was not successful, she was "fantastically protected already, the optimal outcome has been achieved in that regard."  Homm also told Devine that he had "sold a good part of [his] soul and health to protect you and our children under the most extreme business and lifestyle duress for 18 months."  Homm resigned from ACM and went into hiding less than a month later.

Looking at all of this evidence in combination, it is likely that Devine knew that Homm's wealth was derived from some form of illegal conduct, and, as Devine told the Swiss Prosecutor's Office, her fortune was the fruit of Homm's business activities.

Finally, the Court finds that Devine likely knew that a purpose of the transactions was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.  Evidence to consider in determining whether a transaction was designed to conceal includes, among other things:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction . . . [and] whether the money is better concealed or concealable after the transaction than before.

United States v. Johnson, 440 F.3d 1286, 1291 (11th Cir. 2006)
(internal quotation marks and citations omitted).

Here, the evidence shows that Devine used approximately 20
bank accounts bearing different names, failed to disclose the
purpose of certain transactions, engaged in simulated cash
transactions, purchased gold coins, used an email address under a
fake name when communicating with Eichmann and Meyer, and sent
instructions to Eichmann's personal email account.  Devine was
also direct with Eichmann in explaining her willingness to use
deceptive transactions.  For example, in a December 3, 2007 email
regarding a proposed transfer of €25,000, she explained: "I do not
want it to come directly from my Brek account.  Originally, it
used to come from the Hlmes acct.  I do not want to have the
Spanish authorities get greedy and want a piece of my money. How
can we send the money without making problems[?]  At first I
thought to transfer the money to Hlms acct. and wiring it out of
there but does it still exist?"  Devine was referring to Homm's
account at CBH labeled "Holmes."  (Swiss Report at 187.)

Devine's efforts to conceal the nature of the funds is
illustrated by the following transactions.  On August 21, 2007,
Devine withdrew €6.15 million and CHF 1.47 million in cash from
the Brek Account at CBH and immediately deposited it in the Levanne
Account at CBH.  According to the Swiss Report, the funds in the
Brek Account originated from the sales of ACM shares between March
and June 2007, and are therefore proceeds of a statutorily

specified unlawful activity.   The purpose of simulated cash transactions, such as this one, is to eliminate the paper trail and to conceal the identity of the person who made the withdrawal or deposit.   Devine then transferred CHF 1.4 million from the Levanne Account to Grossenbacher through six separate deposits for the purchase of gold coins, effectively concealing the source and location of Penny Stock Scheme proceeds.

Based on the foregoing, the Court finds that the Funds are likely to establish that Devine conducted numerous money laundering transactions in violation of 18 U.S.C. 1956(a)(1)(B)(i).[15]

### iii. Injury

The final elements of a RICO claim are injury to "business or property" that was "by reason of" the substantive RICO violation. Williams, 465 F.3d at 1282.   Here, the Funds have, and continue to be, injured by reason of Devine's violations of 18 U.S.C. § 1956(a)(1)(B)(i).   The injuries to the Funds include: the lost opportunity to recover certain money through mechanisms available in the Swiss proceedings resulting from Devine's transfers from Swiss accounts to evade imminent freeze orders; the lost

---

[15]The Funds are also likely to establish that Devine violated 18 U.S.C. § 1957, which makes it unlawful to knowingly engage or attempt to engage in a monetary transaction in proceeds of specified unlawful activity in excess of $10,000 if the defendant is United States person.   See United States v. Moran, 778 F.3d 942, 963 (11th Cir. 2015) ("Due to the omission of a 'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood.").

opportunity to recover certain money that Devine has dissipated or used to purchase functionally untraceable assets (such as gold); the costs associated with attempting to trace Devine's hidden assets around the world; recoupment of the Penny Stock Scheme proceeds; and the continued deprivation of money taken from the Funds by means of the Penny Stock Scheme.

In conclusion, the Court finds that the Funds have demonstrated a substantial likelihood of success on the merits of their RICO claims.

### 2.   Unjust Enrichment

Florida courts have long recognized a cause of action for unjust enrichment "to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, 739 F.3d 579, 584 (11th Cir. 2013) (quoting Butler v. Trizec Props., Inc., 524 So. 2d 710, 711 (Fla. 2d DCA 1988)).   To establish unjust enrichment, a plaintiff must show that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof. Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012) (citing Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).   Proof of fraud or other misconduct is not required for a finding of

unjust enrichment.  See Golden v. Woodward, 15 So. 3d 664, 670 (Fla. 1st DCA 2009).

Here, plaintiffs have presented evidence showing that they directly conferred a benefit on Homm as a result of the Penny Stock Scheme.  Homm then transferred this benefit to Devine for no consideration.  Devine is therefore in possession of millions of dollars of Penny Stock Scheme proceeds that she was not legally entitled to receive in the first place.  See State Farm, 739 F.3d at 584.  The fact that the benefits conferred on Devine by the Funds passed through Homm does not preclude plaintiffs' unjust-enrichment claim.  See Williams v. Wells Fargo Bank, N.A., Case No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant.").  Accordingly, plaintiffs are likely to demonstrate that Devine was unjustly enriched and that her continued retention of the Penny Stock Scheme proceeds would violate "good conscience and fundamental principles of justice or equity." Golden, 15 So. 3d at 670 (internal quotation marks omitted).

   3.   **Constructive Trust**

A constructive trust is an "equitable remedy-not a cause of action." Collinson v. Miller, So. 2d 221, 228 (Fla. 2d DCA 2005; B&C Investors, Inc. v. Vojak, 79 So. 3d 42, 46 (Fla. 2d DCA); Diamond "S" Dev. Corp. v. Mercantile Bank, So. 2d 696, 697 (Fla.

1st DCA 2008). Because "a constructive trust is not itself a cause of action but, rather, something which must be imposed based upon and established cause of action," the Court need not address this "claim." See B&C Investors, 79 So. 3d at 46 (internal quotation marks omitted). See also McGee v. S-Bay Dev., LLC, Case No. 8:11-cv-1091-T-27TGW, 2012 WL 760797, at *8 (M.D. Fla. March 8, 2012).

## B.   Irreparable Injury

"A showing of irreparable injury is the *sine qua non* of injunctive relief." Siegel, 234 F.3d at 1176 (quoting Ne. Fla. Chapter of Ass'n of General Contractors v. Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)). The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." Id. Further, because injunctions regulate future conduct, "a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate-as opposed to a merely conjectural or hypothetical-threat of *future* injury." Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) (citing Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).

Here, the likelihood of irreparable injury is great because Devine will continue to dissipate and conceal the Penny Stock Scheme proceeds absent injunctive relief, thereby diminishing the legal remedies available to the Funds. Indeed, the evidence shows that Devine has previously moved assets to evade looming freeze orders. Because of this, the Court finds that *ex parte* relief,

with delayed service, is appropriate due to the significant risk that Devine will transfer or otherwise dissipate the Penny Stock Scheme proceeds before the issuance of a preliminary injunction. Accordingly, the Court finds that plaintiffs have demonstrated a threat of imminent and irreparable harm.

C.   **Balance of the Harm to the Parties**

The third factor in determining whether a TRO should issue is whether the balance of equities favors the plaintiffs.  The Funds argue that the threatened harm substantially outweighs any potential harm to Devine because they are likely to lose their right to recover while Devine will simply be prevented from concealing and dissipating assets that were fraudulently obtained and, therefore, do not belong to her.  The Court agrees.  The TRO will allow the parties to maintain the status quo thereby ensuring that Devine will not have an opportunity to use or conceal the Penny Stock Scheme proceeds.  Furthermore, the Court has discretion to modify the TRO to accommodate reasonable living expenses and attorneys' fees.  The balance of harm thus weighs in favor of the Funds.

D.   **Public Interest**

Here, there is no evidence that a TRO would be adverse to the public interest.  Indeed, it is in the public interest to protect against fraud and to make victims of fraud whole.  Accordingly, entry of a TRO in this matter would serve the public interest and should therefore be granted.

- 62 -

E.   **Injunctive Relief**

The Funds seek an order temporarily restraining Devine from transferring or dissipating any and all assets in her name or under her control in the United States and abroad, with the exception of reasonable living expenses as determined by the Court upon application by Devine.

It is well established that the freezing of a defendant's asset prior to trial is improper in a case seeking only legal relief in the form of money damages. <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 319 (1999); <u>Rosen v. Cascade Int'l</u>, 21 F.3d 1520, 1530 (11th Cir. 1994). A district court can, however, issue an asset freeze order where equitable relief is sought, <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 987 (11th Cir. 1995), even if the request for equitable relief is coupled with requests for money damages, <u>SEC v. ETS Payphones, Inc.</u>, 408 F.3d 727, 734 (11th Cir. 2005). In this case, the Funds seek a number of equitable remedies, including an accounting, disgorgement, and the imposition of a constructive trust; therefore, the Court has the authority to issue a freeze order.[16]

---

[16]The Florida RICO Act also provides for injunctive and other equitable relief, <u>Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.</u>, 162 F.3d 1290, 1302 n.18 (11th Cir. 1998) (citing Fla. Stat. § 895.05(6)), and federal courts in Florida have used this statutory basis to place prejudgment restrictions on a defendant's right to dispose of assets, <u>Barfield v. Chisholm Props. Circuit Events, LLC</u>, Case No. 3:09-cv-232-MCR-MD, 2009 WL 1659641, at *2 & n.3 (N.D. Fla. June 12, 2009).

In light of the evidence tracing the Penny Stock Scheme proceeds to Devine and her history of moving assets to evade freeze orders, the Court finds good cause to believe that unless the Court immediately enters an asset freeze, Devine will continue to dissipate or conceal assets before they can be identified and restrained.

The Funds further request that the asset freeze extend to the Naples Property. The "homestead exemption" in Florida's Constitution generally protects a "family home" from a forced sale, liens, and judgments. See Havoco of Am., Ltd. v. Hill, 790 So. 2d 1018, 1021 (Fla. 2001). This exemption, however, is inapplicable where "funds obtained through fraud or egregious conduct were used to *invest in, purchase or improve the homestead.*" *In re Hecker*, 264 F. App'x 786, 789 (11th Cir. 2008) (quoting *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880, 888 (11th Cir. 2003)) (emphasis in original). "In such cases, an equitable lien upon the property is a viable remedy for creditors." Because the evidence in this case shows that proceeds from the Penny Stock Scheme were used to purchase the Naples Property, the Court will extend the asset freeze to the Naples Property.

## F.   Bond

Rule 65(c) provides that a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

- 64 -

The Funds assert that a bond of $10,000 is sufficient under the circumstances. The Court finds that this amount is sufficient to recompense Devine for any costs or damages she may suffer as a result of an improvidently issued TRO.

IV.

The Funds request that Devine be ordered to produce, within five days of service of the TRO, documents sufficient to identify all assets, in the United States and abroad, currently under her direct or indirect control, including, for every financial account: the bank or other entity, its location, the accountholder's name, the account number, and the current balance; and for every other asset, a description of the asset, its location, and its actual or estimated value. The Funds also seek to depose Devine, within five days within which she is to provide the required documents regarding the assets under her direct or indirect control.

The Court has the discretion to authorize expedited discovery in aid of a preliminary injunction hearing, particularly where the discovery is narrow and essential and good cause exists. See Thyssenkrupp Elevator Corp. v. Hubbard, Case No. 2:13-cv-202-FtM-29SPC, 2013 WL 1953346, at *1 (M.D. Fla. May 10, 2013). Factors bearing on the existence of good cause include: "(1) whether a motion for preliminary injunction is pending; (2) the breadth of the requested discovery; (3) the reason(s) for requesting expedited discovery; (4) the burden on the opponent to comply with

the request for discovery; and (5) how far in advance of the typical discovery process the request is made." *Id.* Here, the requested discovery is narrowly tailored to identify the assets subject to the freeze. The Court will therefore grant the Funds' motion for expedited discovery.

Accordingly, it is hereby

ORDERED:

1.  Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order is **GRANTED.**

 a.  Defendant Susan Elaine Devine, her officers, agents, servants, and employees and any persons in active concert or participation with them are temporarily restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any money or other of Devine's assets, including: (i) any assets located in bank accounts or other financial accounts in Devine's name (or for her benefit or the benefit of her children) or the names of foundations benefitting or controlled by Devine, including but not limited to any account of Brek Stiftung, Loyr Stiftung, Hosifa Stiftung, Floma Foundation, and/or Levanne Stiftung, or otherwise under her direct or indirect control; (ii) Devine's residence

in Naples Florida; and (iii) any other assets of any type, and in any form, held by Devine, or under her direct or indirect control, anywhere in the world.

b.  Upon application by Devine making the requisite factual showing, the Court may modify this Opinion and Order to permit Devine to withdraw and use funds frozen under the terms of this Temporary Restraining Order as necessary, and approved by the Court, to pay normal living expenses and attorneys' fees.

c.  Devine, her officers, agents, servants, and employees and any persons in active concert or participation with them are temporarily restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents or electronic files of any type that relate to the assets or finances of Devine.

d.  Pursuant to Fed. R. Civ. P. 65(c), plaintiffs shall post a surety bond or a certified or attorney's check in the amount of **$10,000.00**, as payment of damages to which defendant may be entitled for wrongful injunction or restraint.

e.  The Temporary Restraining Order shall remain in effect for **fourteen (14) days**, unless the Court, for good cause shown, extends it for a like period or the defendant

consents to a longer extension. Fed. R. Civ. P. 65(b)(2).

2. Plaintiffs' Motion for Limited Expedited Discovery is **GRANTED.** Devine shall produce, within **five (5) days** of service of this Opinion and Order, documents sufficient to identify all assets, anywhere in the world, currently under her direct or indirect control, including, for every bank account or other financial account: the bank or entity, its location, the accountholder's name, the account number, and the current balance; and for every other asset, a description of the asset, its location, and its actual or estimated value. The Funds may also seek to depose Devine within **five (5) days** after the date by which she is required to produce the aforementioned documents identifying the assets under her direct or indirect control. The deposition shall be limited the identification of the assets under direct or indirect control, unless the parties agree otherwise. Forty-eight (48) hours' notice shall be deemed sufficient for any such deposition.

3. Plaintiffs' Motion for Delayed Service is **GRANTED.** Plaintiffs shall serve upon Devine the Summons, the Complaint, the Order temporarily sealing the case, the Motion Papers, and this Temporary Restraining Order within **twenty-four (24) hours** of the entry of this Opinion and Order.

4. Plaintiffs' Motion for a Preliminary Injunction is **TAKEN UNDER ADVISEMENT.** The hearing on the motion will be held on

Friday, **July 24, 2015, at 10:00 a.m.**, in Courtroom 6A of the United States Courthouse and Federal Building, Fort Myers, Florida, at which time Devine and/or any other affected persons may challenge the appropriateness of the Temporary Restraining Order and move to dissolve the same and at which time the Court will hear argument on plaintiffs' requested Preliminary Injunction.

**DONE and ORDERED** at Fort Myers, Florida, this __1st__ day of July, 2015.


JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:

Counsel of Record