UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ABSOLUTE ACTIVIST VALUE
MASTER FUND LIMITED,
ABSOLUTE EAST WEST FUND
LIMITED, ABSOLUTE EAST WEST
MASTER FUND LIMITED,
ABSOLUTE EUROPEAN CATALYST
FUND LIMITED, ABSOLUTE
GERMANY FUND LIMITED,
ABSOLUTE INDIA FUND LIMITED,
ABSOLUTE OCTANE FUND
LIMITED, ABSOLUTE OCTANE
MASTER FUND LIMITED, and
ABSOLUTE RETURN EUROPE FUND
LIMITED,

      Plaintiffs,

v.                         Case No: 2:15-cv-328-FtM-29MRM

SUSAN ELAINE DEVINE,

      Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on review of defendant's Motion to Dismiss Amended Complaint (Doc. #252) filed on February 12, 2016.[1]  Plaintiffs filed a Memorandum in Opposition to

---

[1] Defendant filed a corrected version of the Motion to Dismiss Amended Complaint (Doc. #304-1) on February 26, 2016.  The only difference between the corrected version and the initial version is a change to the margins and font. (Doc. #304.)  The corrected version is otherwise identical to the initial motion to dismiss. Throughout this Opinion and Order, the Court cites to the initial Motion to Dismiss.

Defendant's Motion to Dismiss Amended Complaint (Doc. #318) on March 11, 2016, to which defendant filed a Reply (Doc. #336) on March 25, 2016, and plaintiffs filed a Surreply (Doc. #351) on April 11, 2016. The parties have also submitted supplemental briefing regarding the effect of a recent Supreme Court decision on defendant's Motion to Dismiss (Docs. ##426, 427, 429, 449, 451) and supplemental authority (Docs. ##472, 466, 467, 479, 483, 487, 489, 492, 512, 515).

Also before the Court are defendant's Motion to Strike plaintiffs' Amended Complaint (Doc. #254), plaintiffs' Memorandum in Opposition thereto (Doc. #319), Reply (Doc. #337), and Surreply (Doc. #352). Defendant also filed a Request for Judicial Notice of Exhibits Attached to Motion to Dismiss Plaintiffs' Amended Complaint (Doc. #253), to which plaintiffs filed a Memorandum in Opposition (Doc. #320).

## I.

Plaintiffs' Amended Complaint (Doc. #196) contains the following allegations:

Plaintiffs Absolute Activist Value Master Fund Limited, Absolute East West Fund Limited, Absolute East West Master Fund Limited, Absolute European Catalyst Fund Limited, Absolute Germany Fund Limited, Absolute India Fund Limited, Absolute Octane Fund Limited, Absolute Octane Master Fund Limited, and Absolute Return Europe Fund Limited (the "Funds" or "plaintiffs") are nine (9)

Cayman Islands companies previously operated as mutual (hedge) funds that invested in a variety of asset classes on behalf of hundreds of investors around the world, including many investors in the United States. (Doc. #196, ¶ 9.)  Each Fund is a citizen of the Cayman Islands, is incorporated in the Cayman Islands, and has its principal place of business in the Cayman Islands.  (Id.)  The Funds hired Absolute Capital Management Holdings Limited ("ACM") to act as its investment manager pursuant to a written Investment Management Agreement. (Id. ¶¶ 12, 40.)  ACM typically charged each Fund a monthly management fee of 2% per annum based on the particular Fund's net asset value ("NAV") and a monthly performance fee of 20% of the increase in value of the Fund's NAV. (Id. ¶ 40.)

Florian Wilhelm Jürgen Homm ("Homm") was the Chief Investment Officer at ACM and, in that capacity, was granted discretionary trading authority by the Funds. (Id. ¶ 41.)  Conspiring with others from at least September 2004 to September 2007, Homm used the Funds as vehicles for a massive market manipulation scheme (the "Penny Stock Scheme") that caused the Funds to suffer losses of more than $200 million while generating enormous profits for Homm and those that assisted Homm in executing the Penny Stock Scheme.[2]  (Id. ¶¶

---

[2] For the sake of brevity, the Court only briefly discusses the mechanics of the Penny Stock Scheme.  Details regarding the Penny Stock Scheme are set forth in detail in plaintiffs' Amended Complaint. (Doc. #196.)   The Amended Complaint provides an example

29, 42-84.)   A number of manipulative techniques were utilized including placing matched orders, placing orders that marked the close or otherwise set the closing price for the day, conducting wash sales, and backdating trades.   (Id. ¶ 47.)

**A. The Origins of the Money Laundering Enterprise**

In May 2006, after an email authored by a former ACM employee under a pseudonym ("Arness Email") was distributed alleging fraudulent activity by Homm, Homm recognized that the Penny Stock Scheme could soon be exposed. (Id. ¶¶ 85-88.)   Homm and his former wife, defendant Susan Elaine Devine ("Devine" or "defendant"), established a criminal enterprise to conceal the proceeds of the Penny Stock Scheme (the "Money Laundering Enterprise"). (Id. ¶ 3.) The Money Laundering Enterprise was intended "to conceal and preserve the ill-gotten gains as a 'multigenerational fortune' for the Devine-Homm family."  (Id. ¶ 95.)

Over the years, Devine has taken numerous steps to advance the objectives of the Money Laundering Enterprise, such as entering into a sham divorce with Homm in Florida and jointly filing false financial affidavits with the court; moving the proceeds of the Penny Stock Scheme through a complex network of bank accounts around the world; forming entities in various foreign countries through

---

of the manipulative tactics in action in regard to the fraudulent trading in ProElite.  (Id. ¶¶ 54-66.)

which fraud proceeds were funneled; creating and using accounts for which her children, Conrad and Isabella, were the nominal beneficiaries; using the fraud proceeds to purchase difficult-to-trace gold, fine art, and other assets; engaging in simulated cash transactions to disguise account-to-account transfers of fraud proceeds; moving millions of dollars of fraud proceeds out of accounts in advance of the imposition of freezes by the Swiss against those accounts; and providing false testimony to the Office of the Attorney General of Switzerland (the "Swiss Prosecutor's Office") regarding her role in the Money Laundering Enterprise. (Id. ¶¶ 3, 7.)

As a result of the Penny Stock Scheme, Devine has amassed extraordinary wealth. (Id. ¶ 7.) Assets purchased by Devine since the establishment of the Money Laundering Enterprise include, but are not limited to: the $2.2 million dollar house in Naples, Florida in which she currently resides; an $8.5 million villa in Marbell, Spain (which was purchased with Homm after their sham divorce); a $4.1 million property in Mallorca, Spain; and more than $1 million in gold coins. (Id. ¶¶ 7, 189-90.) Devine controls, or has controlled, at least 20 bank accounts holding the equivalent of tens of millions of dollars in the United States, Switzerland, Singapore, and Uruguay. (Id. ¶ 143.)

1.    **The Persons and Entities Involved in the Money Laundering Enterprise**

Devine is a citizen of the United States and Brazil, and currently resides in Naples, Florida. (Id. ¶ 10.) Since 1989, Devine has only performed unpaid work. (Id. ¶ 143.)

Devine and Homm would not have been able to launder the Penny Stock Scheme proceeds without the help of Urs Meisterhans ("Meisterhans"). (Id. ¶ 14.) Meisterhans, a resident of Switzerland, is the founder and principal of the financial services company Sinitus AG. (Id.) The Swiss Financial Market Supervisory Authority, the Swiss equivalent of the Securities and Exchange Commission (SEC), took control of Sinitus AG and, after an investigation, put it into liquidation. (Id.) The liquidator has since filed for bankruptcy. (Id.)

From at least 2006 through 2008, Meisterhans assisted Devine and Homm in the laundering of the proceeds from the Penny Stock Scheme. (Id.) According to the Swiss Report, Meisterhans transferred at least $17 million to accounts accessible by Homm while he was in hiding in 2007 and 2008. (Id.) He also facilitated Devine's money laundering activities by sending Penny Stock Scheme proceeds via complex routes through at least a dozen countries, employing false identities, using offshore companies, and executing transactions in cash, gold, and fine art. (Id.) Swiss authorities have estimated that, between May 2006 and October 2007, Devine and

Homm transferred assets valued at approximately $65.9 million to companies controlled by Meisterhans. (Id.) On May 20, 2015, the Swiss Prosecutor's Office indicted Meisterhans for a number of crimes, including aggravated money laundering, based on Meisterhans role in laundering Penny Stock Scheme proceeds controlled by Homm and Devine. (Id.)

Sinitus Limited ("Sinitus") is an affiliate of Sinitus AG incorporated in Mauritius. (Id. ¶ 15.) Sinitus's account at Investee Bank Limited in Australia was a central exchange point for the laundering of Penny Stock Scheme proceeds. (Id.) Money transferred through this account was used to fund the Floma Foundation ("Floma"), one of the many entities controlled by Devine. (Id.) The Swiss authorities have frozen four Sinitus-related accounts holding more than 24 million Swiss francs ("CHF"). (Id.)

Marcel Eichmann ("Eichmann"), a resident of Switzerland, was a banker at CBH Compagnie Bancaire Helvétique SA, formerly known as Banque SCS Alliance SA (collectively, "CBH"), before co-founding PHZ Privat-und Handelsbank ("PHZ") in Zurich. (Id. ¶ 16.) Eichmann was the personal banker for Homm and Devine, and Devine and her children were shareholders of PHZ. (Id.) As the head of CBH's Zurich branch, Eichmann managed and monitored Devine and Homm's accounts in 2006 and 2007, which amounted to 25% of Eichmann's overall business at the time. (Id.) The Swiss Report states that

in 2006 and 2007, Eichmann accepted almost $20 million worth of Penny Stock Scheme proceeds into Homm's account at CBH. (Id.) After transferring Devine and Homm's assets to PHZ, Eichmann was responsible for at least four accounts controlled by Devine that held over €15 million in assets. (Id.) Between 2007 and 2009, Eichmann facilitated and verified over one dozen cash transactions on behalf of Devine and Homm to assist in their concealment of assets from law enforcement and potential judgment creditors, including simulated transactions falsely and unlawfully recorded as cash withdrawals followed by immediate cash deposits to other accounts at the same bank in order to limit the paper trail. (Id.) In violation of bank policy, Eichmann regularly used a private email address to receive instructions from Devine. (Id.) He is currently the target of a Swiss criminal investigation for aggravated money laundering. (Id.)

Pascal Frei ("Frei") is a banker who resides in Switzerland. (Id. ¶ 17.) Frei worked for Eichmann at CBH and PHZ, and assisted with Devine and Homm's money laundering activities. (Id.) Specifically, Frei worked with Eichmann to facilitate certain withdrawals and deposits on behalf of Devine and Homm. (Id.) Frei is also the target of a Swiss criminal investigation for aggravated money laundering involving Homm and Devine's assets. (Id.)

Sammy Kapleta ("Kapleta") is a Belgian citizen and former resident of Florida. (Id. ¶ 18.) Devine and Homm used accounts

in Switzerland, Luxembourg, Panama, and Spain in the names of Kapleta and Fairland Consulting, a vehicle controlled by Kapleta, to launder more than $6 million in Penny Stock Scheme proceeds. (Id.)  According to the Swiss Report, Kapleta is a target of the Swiss money laundering investigation, and the Swiss have frozen a Credit Suisse account in his name.  (Id.)  The Swiss have also convicted Kapleta of procuring false Irish passports.  (Id.)

Phillipe Meyer ("Meyer") is an attorney who resides in Switzerland.  (Id. ¶ 19.)  Meyer has extensive connections with Meisterhans and Sinitus.  (Id.)  In 2007 and 2008, he assisted Devine in the establishment of, and the subsequent transfer of funds out of, Floma through Singapore, Ireland, and the Czech Republic under the guise of real estate and precious metal investments.  (Id.)

Jürg Brand ("Brand"), a Swiss attorney, ostensibly served as one of Devine's lawyers in connection with her divorce from Homm. (Id. ¶ 20.)  Through an account Brand held at CBH, millions of dollars in Penny Stock Scheme proceeds were transferred to accounts controlled by Devine in Florida and elsewhere.  (Id.)  Brand's account at CBH also served as a conduit for proceeds arising from the sale of 5.2 million ACM shares in August and September 2007. (Id.)

## 2.   Concealment of Art and Furniture

Shortly after the Arness Email, Devine took steps to conceal valuable art and furniture located at her and Homm's home in Mallorca, Spain.  (Id. ¶ 96.)  Between May 18 and May 23, 2006, Devine created an inventory of art and furniture with an estimated value exceeding €2.2 million.  (Id.)  Andreas Schaer ("Schaer"), a personal assistant to Homm and Devine, emailed this inventory to Meisterhans on May 23, 2006.  (Id.)  That same day, Meisterhans emailed Schaer a fraudulent loan agreement, backdated for May 10, 2004, and signed by Meisterhans on behalf of New York Art Trading Limited ("New York Art Trading"), to be signed by Devine.  (Id. ¶ 97.)  By means of this agreement, New York Art Trading purported to lend Devine art and furniture with an estimated value of €2 million, itemized on an "inventory list to be updated on a regular basis."  (Id.)  Devine signed the backdated agreement, which gave the false appearance that the valuable property inventoried by Devine was lent to her, rather than owned by her and Homm.  (Id.)

In September 2007, Devine directed Meisterhans to transport the inventoried art and furniture from Spain to Switzerland for safekeeping.  (Id. ¶ 98.)  This property was stored in Switzerland until June 2008, when Devine directed Meisterhans to move it back to Mallorca, Spain.  (Id.)

### 3.   Devine and Homm's Strategic Divorce

In August 2006, Devine and Homm initiated a strategic divorce in Florida.  (<u>Id.</u> ¶ 100.)  The divorce gave Devine a legal pretext to obtain control of certain proceeds from the Penny Stock Scheme while ostensibly distancing herself from the allegations in the Arness Email.  (<u>Id.</u>)  The divorce also provided the pretext for Devine and Homm to repeatedly change the beneficiary structure of CSI, allowing the couple, when it suited their purposes, to hide the tainted proceeds behind an entity purporting to benefit Devine and their children, and to distance Homm from CSI while CSI sold off ACM shares.  (<u>Id.</u>)  In reality, throughout the divorce proceedings and thereafter, Devine and Homm continued to interact as spouses – sending each other personal and intimate emails, purchasing a home together, living together, traveling together, and moving money between each other.  (<u>Id.</u> ¶ 101.)

### i.   The Divorce Proceedings

On August 7, 2006, Devine and Homm petitioned for divorce in the Circuit Court for the Twentieth Judicial Circuit in and for Collier County, Florida (the "Florida Circuit Court").  (<u>Id.</u> ¶ 103.)  With their petition for divorce, Devine and Homm were required to file Family Law Financial Affidavits stating the value of their assets owned individually and jointly.  (<u>Id.</u>)  Devine and Homm stated in their affidavits that their total assets amounted to only $1.64 million.  (<u>Id.</u>)  The affidavits, however, were

brazenly false. (Id.)  Indeed, on August 7, 2006, the same day the petition was filed, Meisterhans informed Devine and Homm that New York Art Trading had received wire transfers totaling €16.6 million and $2.05 million, which "we are managing and holding on your behalf." (Id.)  Devine later testified before the Swiss Prosecutor's Office that Homm was worth roughly $200 million at that time. (Id.)  Furthermore, Devine and Homm did not identify any real estate holdings in their affidavits even though they owned real property worth millions of dollars in Spain, France, Luxembourg, and England. (Id.)

On September 18, 2006, Devine and Homm entered into a Marital Separation Agreement, the stated purpose of which was to "settle [between Devine and Homm], now and forever, their respective rights, duties, and obligations regarding property, liabilities, and children." (Id. ¶ 104) (alteration in original).  The agreement mandated that Homm make an "equalizing payment" of $1.5 million to Devine, which was made on August 1, 2006. (Id. ¶ 105.)  The money used to make the payment came directly from Hunter[3] and was wired to an account controlled by Devine at Deutsche Bank Alex.Brown in the United States.[4] (Id. ¶ 105.)

---

[3] Hunter is a California corporation used by Homm and Todd Ficeto to effectuate the Penny Stock Scheme. (Id. ¶ 32.)

[4] On February 28, 2014, a federal seizure warrant was issued for all funds and securities on deposit in this account. (Id. ¶ 105.)

The Florida Circuit Court entered a Final Judgment of Dissolution of Marriage (the "Divorce Judgment") on May 21, 2007. (Id. ¶ 106.)   The terms and conditions set forth in the Marital Settlement Agreement were confirmed by the Divorce Judgment, and Devine and Homm were ordered to comply with those terms. (Id.)   By causing the filing of this public document declaring that they were no longer married, Devine and Homm were able to modify the beneficiary structure of CSI to capitalize on ACM's inflated share price, and were further able to conceal and facilitate the laundering of Penny Stock Scheme proceeds. (Id. ¶¶ 106-07.)

### ii.   Modifications to CSI's Beneficiary Structure

During the 12-month period following March 3, 2007, CSI, as well as all persons connected to CSI, were not to dispose of their ACM shares without prior notice to and consultation with the nominated advisor, the broker, and the Chairman of ACM's Board of Directors. (Id. ¶ 109.)   The restrictions on the assignment of ACM shares held by CSI did not, however, apply to Homm's wife and children.[5]  (Id.)

---

[5] The restrictions memorialized in the Lock-In Deed were intended to prevent Homm from using CSI to sell shares of a company for which he was the controlling shareholder and a key employee. (Id.)   These restrictions were essential to protect ACM as it went public because any precipitous sales by its largest shareholder would have had a dramatic impact on the trading price of ACM shares. (Id.)   The document admitting ACM to the AIM, a London Stock Exchange market, cited the Lock-In Deed. (Id.)

In March 2007, immediately after the first set of restrictions in the Lock-In Deed had been lifted, CSI began to liquidate its ACM shares without providing the notice required by the Lock-In Deed, thereby capitalizing on ACM's inflated share price. (<u>Id.</u> ¶ 112.) Between March 2007 and September 18, 2007, the date Homm resigned from ACM, CSI sold or transferred approximately 12 million ACM shares for proceeds of at least £20,161,668. (<u>Id.</u>)  In the days immediately after Homm's resignation, CSI unloaded another 13.2 million ACM shares. (<u>Id.</u>)

Evidently satisfied that their backdated arrangement had served its purpose, Devine and Homm entered into a new Property Settlement Agreement on August 21, 2007, which upended the previously negotiated divorce terms and once again changed the beneficiary status of CSI. (<u>Id.</u> ¶ 120.)  Kravitz, a Florida attorney who is Homm's longtime friend and who at various times served as legal counsel to both Homm and Devine, represented both Devine and Homm in connection with this agreement. (<u>Id.</u> ¶¶ 113(b), 120.)  The agreement, which was governed by Florida law, cancelled the June 19, 2007 agreement and restored Homm's status as the sole beneficiary of CSI. (<u>Id.</u> ¶ 120.)  As part of the agreement, Homm agreed to give Devine €3.1 million and 4 million ACM shares. (<u>Id.</u>)  On August 22, 2007, Devine wrote to CSI director Kranz to confirm the terms of the new agreement and asked him to inform Eichmann of the changes. (<u>Id.</u>)

On August 30, 2007 and September 7, 2007, a total of €3.1 million was transferred to an account at CBH in the name of Jürg Brand (the "Brand Account"), of which Devine was the beneficial owner. (Id. ¶ 121.) Although this account was in Brand's name, Eichmann regularly accepted instructions on this account directly from Devine. (Id.) On August 24, 2007, Homm transferred a total of 4 million ACM shares to the Brand Account. (Id.) Bank records indicate that these transfers were identified as relating to the Property Settlement Agreement. (Id.) Then, on September 26, 2007, Homm transferred to the Brand Account an additional 1.2 million ACM shares that were not required by the Property Settlement Agreement. (Id.) Between August 2007 and February 2008, all of those ACM shares were sold for a total of £4,112,013 and €754,252, and the proceeds were transferred to Devine's account at PHZ. (Id.)

### iii. Evidence that Devine and Homm Remained Close after their Divorce

Evidence shows that Devine and Homm remained extremely close after their formal divorce, both financially and in their shared personal life, and never intended to alter their relationship beyond the paperwork dissolving their legal status and establishing the facade of asset separation. (Id. ¶ 123.) For example, on August 1, 2006, just six days before the divorce petition was filed, Devine addressed Homm as "Gorgeous" in an email and signed off, "A big big hug. I love you." (Id. ¶ 124.) On September 5, 2006, one

month after the divorce petition, Devine emailed Homm:  "Hi Gorgeous, I have to be very reserved when I reply to your e-mails. Can I be a little bit soppy??? No I shall resist."  (Id. ¶ 125.)

After the Marital Settlement Agreement was executed on September 18, 2006, the spouses continued to contemplate joint financial investments.  (Id. ¶ 126.)  For example, from January 4, 2007 to November 19, 2010, Devine transferred approximately €240,000 to Homm for expenses related to a property in Burgundy, France.  (Id.)  In February 2007, Devine and Homm shopped together for a property in Marbella, Spain, which they eventually purchased. (Id.)  In an email to Homm dated February 24, 2007, a real estate broker in Marbella noted that he had shown properties to "you and your wife Susan," and Homm responded in part, "Red house, too dark for susan, off list."  (Id.)  In connection with the purchase of the Marbella property, Devine sent wire instructions to her bank in March of 2007 on "Susan Devine Homm" stationery and signed the instructions "Susan Devine Homm."  (Id.)  On April 23, 2007, Homm received an email advising him that a painting by the Norwegian artist Hans Dahl was available for purchase for £52,000.  (Id.) Homm forwarded that email to Devine, noting that he was "[p]assing this on to my wife."  (Id.)

On July 12, 2007, less than two months after the Divorce Judgment, Homm executed a will devising half of his estate to Devine.  (Id. ¶ 128.)  The same day, Devine executed a will devising

her estate exclusively to her children.  (Id.)  Copies of both wills were found in Meisterhans's office.  (Id.)

The divorce also caused no change in the ownership of Devine and Homm's jointly-owned property in London, an asset that is not mentioned in any of the divorce filings.  (Id. ¶ 129.)  As of April 2015, that property was still owned jointly by Devine and Homm. (Id.)

Finally, the evidence shows that when Homm was arrested in Florence, Italy on March 8, 2013, he was vacationing with Devine and their son.  (Id. ¶ 130.)

### 4.  Homm's Promise of a "Multigenerational Fortune"

After the divorce was finalized and Homm had again become the sole beneficiary of CSI, he prepared to escape and bury the Penny Stock Scheme proceeds for use by himself and his family well into the future.  (Id. ¶ 131.)  At that time, he wrote two revelatory emails to Devine, assuring her that she and their children would always be well taken care of.  (Id.)

On August 28, 2007, Homm promised Devine in an email: "If I can succeed the children and you will sit on a multigenerational fortune."  (Id. ¶ 132.)  In the same email, he assured her that, even if he was not successful, she was "fantastically protected already, the optimal outcome has been achieved in that regard." (Id.)  Homm sent Devine another email later that day, informing her that he had "sold a good part of [his] soul and health to protect

you and our children under the most extreme business and lifestyle duress for 18 months." (Id. ¶ 133) (alteration in original).  Homm would resign from ACM and go into hiding less than a month later. (Id. ¶ 134.)

## B. Devine's Use, Transfer, and Concealment of Penny Stock Scheme Proceeds

In collaboration with Homm and her other co-conspirators, Devine steered a breathtaking amount of Penny Stock Scheme proceeds into at least 20 bank accounts under her control around the world, from Florida to Switzerland to Uruguay to Singapore, and used the proceeds to purchase real property, gold, and other valuable assets.  (Id. ¶ 143.)  The Funds have identified 85 transactions that Devine used to launder the Penny Stock Scheme proceeds.  (Doc. #196, App. I.)

### 1.   Transfers from Homm to Devine

The Arness Email triggered an urgent need for Devine and Homm to begin liquidating their ACM shares and laundering the proceeds. (Id. ¶ 151.)  On May 9, 2006, just four days after Homm learned of the Arness Email, Homm transferred €6.2 million from an account at CBH in the name of Ridgeville Investment Inc. (the "Ridgeville Account") to an account at CBH in the name of Loyr Stiftung (the "Loyr Account").[6]   (Id.)   The funds transferred out of the

_____

[6] Homm was the beneficial owner of the Ridgeville Account and Devine was the beneficial owner of the Loyr Account.  (Id. ¶ 152.)

Ridgeville Account originated from CSI's account at VP Bank in Lichtenstein, which held dividends from ACM and proceeds from the sales of ACM shares. (Id.) On May 22, 2006, Meisterhans coordinated, together with Devine and Homm, the transfer of the assets in the Loyr Account (approximately €8 million) to an account in the name of Ocean Offshore Bank SA (the "Ocean Account") at Commerzbank (South East Asia) Limited in Singapore. (Id.) Bank records state that the entirety of assets in the Loyr Account were transferred to the Ocean Account on May 25, 2006, for the purchase of a hotel. (Id.) Homm and Devine, however, both denied knowledge of a hotel investment when questioned by the Swiss Prosecutor's Office. (Id.)

On June 1, 2006, CSI transferred €1.4 million in cash from its account at VP Bank in Liechtenstein to an account in the name of Hosifa Stiftung (the "Hosifa Account") at EFG Bank von Ernst in Liechtenstein, pursuant to a payment order signed by Homm. (Id. ¶ 157.) This amount came from the proceeds of the ACM shares sold between February 23, 2006 and May 4, 2006, and was transferred to the Hosifa Account for the benefit of Devine and her children. (Id.) The Hosifa Account was transferred to PHZ on April 30, 2009, and the funds in the account were frozen by the Swiss on January 14, 2014. (Id. ¶ 144(h)).

On October 6, 2006, Homm transferred €510,000 from CSI's account at CBH to another CBH account in the name of Brek Stiftung

(the "Brek Account").  (Id. ¶ 202.)  Devine was the beneficial
owner of the Brek Account.  (Id. ¶ 215.)  Homm transferred an
additional €8,386,000 and €5,308,000 from CSI's account at CBH to
the Brek Account on March 30, 2007 and May 10, 2007, respectively.
(Id. ¶ 202.)  The funds in the Brek Account consisted at least in
substantial part of proceeds from the Penny Stock Scheme, including
dividends from ACM and proceeds from the sale of ACM shares.  (Id.)
In 2009, funds in the Brek Account at CBH were transferred to the
Brek Account at PHZ, and the funds in the account were frozen by
the Swiss in June 2014.  (Id. ¶¶ 201-02.)

    As previously discussed, pursuant to the Property Settlement
Agreement, Homm transferred €3.1 million and 4 million ACM shares
to the Brand Account in August and September of 2007.  (Id. ¶ 155.)
Then, on September 26, 2007, Homm transferred an additional 1.2
million ACM shares that were not part of the Property Settlement
Agreement to the Brand Account.  (Id.)  The funds in the Brand
account were transferred to Devine's account at PHZ in September
and October 2009, and an amount of €7,086,790 was seized by the
Swiss on January 13, 2012.  (Id. ¶¶ 206-07.)

    **2.  Post-Divorce Transactions**

    Following the entry of the Divorce Judgment on May 21, 2007,
Devine, acting in concert with Homm, Meisterhans, Eichmann, Meyer,
and others, continued to launder funds throughout the world. (Id.
¶ 159.)

### i.   Devine's Purchase and Improvement of Real Property

In April 2008, Devine purchased a waterfront property in Naples, Florida for approximately $2.2 million (the "Naples Property"). (Id. ¶ 179.)  Bank records reflect that the Naples Property was paid for through two transfers from the Brand Account at CBH. (Id. ¶ 180.)  The first transfer occurred on March 26, 2008, when $170,000 was wired from the Brand Account to an account with Citibank N.A. in New York in the name of First Title of Naples, Inc. ("First Title"), a title insurance company located in Naples, Florida. (Id. ¶ 182.)  The second transaction occurred on April 4, 2008, when $1,982,000 was transferred from the Brand Account to First Title's Citibank account in New York.  (Id. ¶ 183.)  A memorandum line in the bank records cites the address of the Naples Property. (Id.)

Devine thereafter directed Eichmann to make additional transfers from the Brand Account, purportedly for the purpose of renovating and furnishing the Naples Property, as follows:  On May 8, 2008, Devine requested by email that $250,000 be wired to her Bank of America account in Naples, Florida "for renovation and furniture purchase of the house [she] just purchased." (Id. ¶ 184(a)) (alteration in original).  On September 1, 2008, Devine confirmed by email a request for $150,000 to be wired to her Bank of America account. (Id. ¶ 184(b)).  A handwritten note on this email indicates that the stated reason for this wire was to pay for

property renovations. (Id.)  On June 4, 2009, Devine requested via email that $60,000 be wired to her Bank of America account in order to pay for a "[n]ew roof and other expenses." (Id. ¶ 184(c)) (alteration in original).  In total, Devine spent nearly $3 million of Penny Stock Scheme proceeds on the Naples property. (Id. ¶ 185.)

Devine also used the Penny Stock Scheme proceeds to purchase two properties in Spain, in both instances through corporate entities that helped conceal her involvement. (Id. ¶ 188.)

Devine transferred a total of €5,086,600 from the Brek Account at CBH to an account at Banco de Andalucia in the name of Leo Propiedades S.L. on March 21 and 22, 2007. (Id. ¶ 189.)  Leo Propiedades S.L. was owned by Benley International S.A., a Panama company controlled by Homm. (Id.)  The memorandum lines on the bank records state that the purpose of the wired money was buying property. (Id.)  These funds, along with an additional €1.3 million from Homm's account at CBH, were used to purchase a large seaside villa in Marbella, on the Southern coast of Spain. (Id.)  As discussed above, Devine and Homm shopped for this property together even as their divorce was being finalized. (Id.)

Around the same time, Devine used another entity to buy a property in Mallorca, Spain. (Id. ¶ 190.)  Malon Consulting AG ("Malon"), a Swiss company registered on November 22, 2006, opened an account with UBS in Switzerland on May 23, 2007, just two days

after the Divorce Judgment.  (Id.)  According to the Swiss Report, Devine is the beneficial owner of this account.  (Id.)

On May 24, 2007, less than a week after Malon's UBS account was opened, Devine transferred €3.2 million from the Brek account at CBH to Malon's UBS account.  (Id. ¶ 191.)  The payment order, signed by Devine, indicates that the purpose of the transfer was to purchase real estate in Mallorca.  (Id.)  The €3.2 million originated from transfers from CSI's account with CBH to the Brek Account.  (Id.)  From that amount, €3.1 million was transferred shortly thereafter from Malon's UBS account to the account of Vatulele S.L. at Caja de Ahorros Bank in order to purchase the Mallorca property.  (Id.)

### ii. The Floma Account

On June 20, 2006, Devine transferred approximately €4 million from the Brek Account, to Sinitus's account at Investec in Australia.  (Id. ¶ 158.)  These funds consisted at least in part of the Penny Stock Scheme proceeds.  (Id.)

In August 2007, Devine established Floma, an entity organized under Panamanian law.  (Id. ¶ 160.)  Atica Nominees S.A. ("Atica"), a British Virgin Islands company operated by Meyer and his law partner, served as the foundation council member of Floma.  (Id.)  Originally, Meisterhans was to assist Devine with Floma, but much of the work was done by Meyer, at Meisterhans' suggestion.  (Id. ¶ 161.)

On January 16, 2008, a bank account in the name of Floma (the "Floma Account") was opened at EFG Bank in Singapore.  (Id. ¶ 163.)  On January 21, 2008, Meisterhans sent a payment order by email for the wire of €3.9 million from Sinitus's account to the Floma Account.  (Id. ¶ 164.)

Devine maintained complete control over Floma's assets and instructed Meyer and his colleagues from an email address using the alias "Julia Brown."  (Id. ¶ 165.)  On June 29, 2009, Devine, using the "Julia Brown" email account, advised Meyer that she was "making a large investment" and directed him to wire €1 million from the Floma Account to an account in the name of DC Fragments at HSBC in Germany.  (Id. ¶ 167.)  On August 28, 2009, Devine, using the "Julia Brown" email account, directed Meyer to wire €1 million from the Floma Account to the account of Check Republis at Unicredit Bank in Czech Republic.  (Id. ¶ 168.)  On August 31, 2009, Meyer emailed Devine:  "Please give us also details, for what the funds are used. We need to have an explanation due to banking rules."  (Id.)  Devine responded: "I gave a message to your assistant saying that the funds are for an investment.  Metals to be exact."  (Id.)

On November 5, 2009, Devine, using the "Julia Brown" email account, instructed Meyer to close the Floma EFG Account:  "I am purchasing a property and will be needing the remainder of the money from my account."  (Id. ¶ 169.)  Meyer subsequently transferred €1,876,769.43 to the same Check Republis account to

which Devine had sent funds for a "metals" investment two months earlier.  (Id.)

### iii. Devine's Purchase of Gold Coins

On August 20, 2007, Levanne Stiftung, a Liechtenstein foundation, opened an account at CBH for the benefit of Devine (the "Levanne Account").  (Id. ¶ 144(e)).  Bank records indicate that on August 21, 2007, €6.15 million and CHF 1.47 million were withdrawn in cash from the Brek Account at CBH in Zurich, and immediately deposited in the Levanne Account at CBH.  (Id. ¶ 171.) The two cash withdrawal forms were signed by Devine.  (Id.)  These bank records, however, were falsified by Devine and Eichmann, presumably to conceal the origin of the funds.  (Id.)  A CBH compliance officer explained to the Swiss Prosecutor's Office that the treasury of the Zurich branch of CBH did not have this amount of cash in August 2007, and that such simulated cash transactions, which were invisible to the bank's headquarters in Geneva, would have been possible only if the counterparts both had accounts at CBH.  (Id.)  Devine testified before the Swiss Prosecutor's Office in May 2012 that she engaged in these cash transactions on Eichmann's recommendation.[7]  (Id.)

---

[7] These and other simulated cash transactions are a basis for a separate Swiss criminal money laundering investigation targeting Eichmann and Frei.  (Id.)

Between October 2007 and March 2008, Devine transferred more than CHF 1.4 million from the Levanne Account to the account of Marius Grossenbacher ("Grossenbacher") at UBS through six separate deposits. (Id. ¶ 172.)  Eichmann received commission from Levanne for each of these transfers.  (Id.)  Throughout the same period, Grossenbacher purchased approximately CHF 1.38 million in gold coins through cash transactions.  (Id.)  Devine testified before the Swiss Prosecutor's Office in May 2012 that the gold coins were placed in a safety deposit box outside of Switzerland.  (Id. ¶ 174.)

### 3.   Transfers to Avoid Swiss Freeze Orders

On May 31, 2011, the Swiss Prosecutor's Office sent PHZ requests for information regarding certain accounts.  (Id. ¶ 201.) Beginning in January 2012, the Swiss Prosecutor's Office issued freeze orders relating to numerous accounts in Switzerland, including the following five accounts in Devine's name or for which Devine or her children are the stated beneficiaries:  the Brek Account at PHZ; an account in the name of Susan Devine (the "Devine Account") at PHZ; the Hosifa Account at PHZ; the Malon Account at PHZ; and an account in the name of Susan Devine at Trafina Bank, for which Homm is the beneficial owner.  (Id. ¶ 198.)

Swiss authorities learned upon further investigation that, between their initial requests for information from PHZ and the issuance of the freeze orders, Devine directed multiple transfers

of millions of dollars out of three of the PHZ accounts to other accounts, most of which were under her control and located outside of Switzerland, effectively placing those funds beyond the reach of the freeze. (Id. ¶ 199.)

### i.  The Brek Account at PHZ

The Brek Account at PHZ was opened on August 18, 2009, for the benefit of Devine.  (Id. ¶ 144(g)).  In late 2009, Devine transferred more than €8 million in money and securities from the Brek Account at CBH to the Brek Account at PHZ.  (Id. ¶¶ 144(g), 202(a)-(c)).  The funds in the Brek Account at PHZ consisted, at least in substantial part, of proceeds from the Penny Stock Scheme, including dividends from ACM and proceeds from sales of ACM shares. (Id. ¶ 202.)

Between May 31, 2011, the date of the Swiss authorities' first request to PHZ, and January 13, 2012, the date of the freeze order, Devine directed at least 14 transfers from the Brek Account at PHZ. (Id. ¶ 203.)  Specifically, Devine transferred $4.55 million and €815,000 to accounts in France, Spain, Singapore, Uruguay, and the United States.  (Id. ¶¶ 204-05.)  Devine emailed the instructions for these transfers to Eichmann's personal email account.  (Id. ¶ 203.)

On January 13, 2012, after the Swiss Prosecutor's Office had analyzed the origin of the assets on the account, a freeze order

was issued for the Brek Account at PHZ, resulting in a freeze of €7,581,770.  (Id. ¶ 201.)

### ii.  The Devine Account at PHZ

The Devine Account at PHZ was opened on August 15, 2008, for the benefit of Devine.  (Id. ¶ 144(f)).  The funds in this account originated from the Brand Account at CBH and Devine's own account at CBH, and consisted of Penny Stock Scheme proceeds, specifically dividends from ACM and proceeds from sales of ACM shares.  (Id.)

Between June 14, 2011, the date PHZ first provided information to the Swiss authorities about Devine's PHZ account, and January 13, 2012, the date of the freeze order, Devine directed 11 transfers from her PHZ account, totaling $920,766 and €660,000.  (Id. ¶ 208.) One of the transfers was made to Klueger & Stein, a Los Angeles law firm that touts its expertise in "[c]reative asset protection." (Id. ¶ 210 (alteration in original)).

On January 13, 2012, the Swiss issued a freeze order for this account, resulting in the freeze of €7,086,790.  (Id. ¶ 206.)

### iii. The Hosifa Account at PHZ

The Hosifa Account at PHZ was opened on April 30, 2009, for the benefit of Devine's children.  (Id. ¶ 144(h)).  Bank records reveal that CSI transferred €1.4 million in cash to the Hosifa Account at EFG Bank von Ernst on June 1, 2006.  (Id. ¶ 213.)  This amount came from the proceeds of the ACM shares sold between February 23, 2006 and May 4, 2006, and was transferred to the Hosifa

Account for the benefit of Devine and her children. (Id.) The Hosifa Account was transferred to PHZ on April 30, 2009. (Id. ¶ 144(h)). On January 14, 2014, €518,820 were seized by the Swiss. (Id. ¶ 212.)

Between January 13, 2012, the date of the freeze order for the Brek and Devine Accounts at PHZ, and January 14, 2014, the date the Hosifa Account was frozen, Devine directed at least four transfers out of the Hosifa Account, totaling over CHF 1.4 million. (Id. ¶ 215) PHZ's records indicate that one of the transfers was made because Devine "doesn't trust Switzerland regarding her lawsuit and, for this reason, wants to transfer a portion of her children's assets to the accounts of her children in London. The children have an account set up with Pershing LLC." (Id. ¶ 215(d)).

## C. The Underlying Litigation

On June 1, 2015, plaintiffs filed a six-count Complaint against Ms. Susan Devine ("Devine") alleging that Devine engaged in a money laundering enterprise with her ex-husband, Florian Homm, to conceal tens of millions of dollars fraudulently taken from the plaintiffs pursuant to an illegal "Penny Stock Scheme." (Doc. #2.) Plaintiffs' Complaint, and now Amended Complaint[8] (Doc. #196), asserts claims against Devine for: (1) Violation of RICO, 18 U.S.C.

---

[8] On January 14, 2016, plaintiffs filed an Amended Complaint (Doc. #196), which is the operative pleading currently before the Court.

§ 1962(c); (2) RICO Conspiracy, 18 U.S.C. § 1962(d); (3) Florida RICO and Civil Remedies for Criminal Activities; (4) Florida RICO and Florida Civil Remedies for Criminal Activities—Conspiracy; (5) Unjust Enrichment; and (6) Constructive Trust. (Docs. ##2, 196.)

Currently before the Court are defendant's Motion to Strike plaintiffs' Amended Complaint, Motion for Judicial Notice of Documents Attached to Motion to Dismiss Amended Complaint, and Motion to Dismiss. (Docs. ##252, 253, 254.)

## II. Motion to Strike

Defendant moves to strike plaintiffs' Amended Complaint and dismiss plaintiffs' claims with prejudice on the basis that plaintiffs' Amended Complaint is a shotgun pleading. (Doc. #254.) Defendant asserts that plaintiffs have once again incorporated all 232 paragraphs into each subsequent count "mak[ing] it difficult, if not impossible for Ms. Devine to file a streamlined motion to dismiss because, to this day, Plaintiffs' claims and legal theories are unclear and amendable to shifting." (Id. at 9.)

Defendant's motion is not really a motion to strike under Federal Rule of Civil Procedure 12(f), but rather a motion to dismiss. While there are a large number of background paragraphs incorporated into the subsequent counts of plaintiffs' Amended Complaint, these paragraphs provide a succinct summary of the extremely complex scheme in which Ms. Devine and her husband were allegedly involved. The incorporated information is pertinent to

each of the subsequent counts, and therefore the pleading is not properly characterized as a shotgun complaint.   Accordingly, the Court denies defendant's Motion to Strike.   (Doc. #254.)

### III. Motion for Judicial Notice

Defendant requests that the Court take judicial notice of the exhibits referenced in its Motion to Dismiss.   (Doc. #253.) Specifically, defendant requests that the Court take Judicial Notice of portions of the "Homm Book," London Stock Exchange notices and news articles, the Marital Settlement Agreement, the pleadings and stay filings related to the SDNY Action, a letter written to Devine, and pages of the Swiss Report related to CSI beneficiaries. (Id.)   Defendant argues that because these items were referenced and relied on by plaintiffs in the Amended Complaint, they are the proper subject for judicial notice and the Court should take judicial notice of them pursuant to Federal Rule of Civil Procedure 10(c) or Federal Rule of Evidence 201. (See id.)   Plaintiffs object to most of the items, but do not oppose the use of some exhibits for limited purposes.   (Doc. #320.)

"The court may take judicial notice at any stage of the proceeding."   Fed. R. Evid. 201(d).   Federal Rule of Evidence 201 governs judicial notice of adjudicative facts.   Fed. R. Evid. 201(a).   "Adjudicative facts are simply the facts of the particular case."   Fed. R. Evid. 201(a) advisory committee's notes to 1972 proposed rules.   Courts can take judicial notice of certain facts

31

where the fact is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).

The Eleventh Circuit has urged caution when taking judicial notice of facts because the judicial notice process "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court."  Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997).  "[T]he kinds of things about which courts ordinarily take judicial notice are (1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958."  Id.

Under limited circumstances, a court can look beyond the four corners of the complaint and its attached exhibits when ruling on a motion to dismiss, without converting it into a motion for summary judgment.  One circumstance is where a district court takes judicial notice of certain facts.  Universal Express v. S.E.C., 177 F. App'x 52, 53 (11th Cir. 2006) (citation omitted).  Another recognized by the Eleventh Circuit is that a district court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is

32

(1) central to the plaintiff's claim and (2) undisputed." Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005). Undisputed in this sense means that its authenticity is not challenged. Id. "[A] document need not be physically attached to a pleading to be incorporated by reference into it . . . ." Id. (citations omitted). Accordingly, "if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document provided it meets the centrality requirement." Id. (citing Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)).

Accordingly, the Court may consider information beyond the four corners of a Complaint on a motion to dismiss if the Court takes judicial notice of the information or if the document is central to the complaint and undisputed in terms of authenticity. The Court addresses each item in turn.

### A. Exhibit 1:  Homm Book

Defendant requests the Court to take judicial notice of portions of a book written by her ex-husband that have been attached to defendant's Motion to Dismiss as Exhibit 1.  (Docs. ##252-1; 253, pp. 3-8.)  Defendant asserts that portions of the book were referenced and relied upon in plaintiffs' Amended Complaint and attached to plaintiffs' request for a temporary restraining order, thus making judicial notice appropriate.  (Doc. #253, pp. 4, 6-7.) The Court disagrees.

The Homm Book was referenced in plaintiffs' Amended Complaint in two brief areas. (See Doc. #196, ¶¶ 141, 229(h)). Plaintiffs cite to the Homm Book for statements Florian Homm made about his abrupt departure in 2007 and about defendant's involvement in Florian Homm's first company. (Id.) The Court finds that these portions of the Homm Book are not central to plaintiffs' claims and, even if they were, Exhibit 1 to defendant's Motion to Dismiss is admittedly only a portion of the Homm Book, and does not even contain the portions referenced in plaintiffs' Amended Complaint. (Doc. #252-1.)

Additionally, the Court declines to take judicial notice of the excerpts of the Homm Book pursuant to Federal Rule of Evidence 201(b) because the "facts" fail the "not subject to reasonable dispute" component of Rule 201(b). The portion of the Homm Book of which defendant seeks judicial notice contains information regarding the "sham" marriage between Susan Devine and Florian Homm, a matter which is disputed by the parties. Further, a party seeking judicial notice must supply the Court with necessary information. Fed. R. Evid. 201(c)(2). The only information supplied to the Court is that the Homm Book was referenced in the Complaint. This is insufficient information to support the Court's taking of judicial notice. Accordingly, the Court declines to take judicial notice of Exhibit 1, the Homm Book excerpts.

**B. Exhibits 2, 3, 4, 6, and 13:   London Stock Exchange Notices and News Articles**

Defendant requests the Court take judicial notice of the existence of three London Stock Exchange Notices dated February 15, 2006, November 10, 2006, and September 6, 2007 (Docs. ##252-2; 252-3; 252-13; 253, pp. 8-13), and two news articles (Docs. ##252-4; 252-6; 253, pp. 8-13).  Defendant does not request judicial notice of the truth of the matters within the notices and articles.  (Doc. #253, pp. 8-13.)  Plaintiffs respond that defendant is really seeking to improperly use these items for the truth of the statements they contain.  (Doc. #320, pp. 11-12.)  Plaintiffs do not dispute the fact that these documents are currently available on the internet, but otherwise oppose the Court taking judicial notice of the documents.  (Id. at 12.)

The Court will take judicial notice of the fact that these notices and articles now exist, but not the truth of the matters asserted therein.  The Court will not, however, take judicial notice of when and where these notices and articles were published, since defendant has not carried its burden of establishing this information to the Court.

**C. Exhibits 7, 8, 9, 12, and 14: SDNY Documents**

Defendant requests the Court to take judicial notice of certain documents filed in a federal action brought in the Southern District of New York ("SDNY Action") by plaintiffs against Florian

Homm and others allegedly involved in the "Penny Stock Scheme," and a public corporate disclosure filing made by plaintiffs in the United States Court of Appeals for the Second Circuit in connection with the SDNY Action.  (Docs. ##252-7; 252-8; 252-9; 252-12; 252-14; 253, pp. 2-6, 15.)  Specifically, defendant requests the Court take judicial notice of the Complaint, Amended Complaint, and Declaration of Stephen A. Cazares in Support of Government's Motion to Intervene and Motion to Stay Discovery because these documents were referenced in plaintiffs' Complaint.  (Doc. #253, pp. 2-8.) Defendant also requests the Court take judicial notice of the Corporate Disclosure Statement filed by plaintiffs because it is a court filing and thus a proper subject for judicial notice.  (Id. at 15.)

Plaintiffs argue against the Court taking judicial notice of the facts contained within the SDNY documents, as they are disputed. (Doc. #320, p. 14.)  Plaintiffs agree to the Court taking judicial notice that:

> the SDNY Action was filed in October 2009; the complaint
> was first amended one month after that; a second amended
> complaint was filed on July 6, 2012; each of the
> complaints in the SDNY Actions included "Doe" defendants;
> the Funds did not oppose the prosecutors' request for a
> stay of discovery in that action; discovery is currently
> stayed in that action; and the action contains securities
> fraud claims.

(Id. at 16.)

36

Plaintiffs' Amended Complaint refers to their lawsuit against Florian Homm and others in the Southern District of New York and that the action is currently stayed.  (See, e.g., Doc. #196, ¶¶ 12, 31-33, 149.)  Defendant also references the SDNY Action within her Motion to Dismiss. (See Doc. #252, pp. 20-21, 34, 56, 59.)

The facts contained within the documents are clearly disputed by the parties and it would therefore be inappropriate to take judicial notice of facts contained in the documents.  See United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) ("[A] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)).  Accordingly, the Court will take judicial notice of the existence of the complaint, first amended complaint, second amended complaint, and stay in the SDNY Action, and the Corporate Disclosure Statement in the Second Circuit Court of Appeals in connection with the SDNY Action, but not the truth of the matters asserted therein.

**D. Exhibit 10: 2006 Marital Settlement Agreement**

Defendant also requests that the Court take judicial notice of the Marital Settlement Agreement between defendant Susan Devine and Florian Homm.  (Docs. ##252-10; 253, pp. 3-8.)  In support, defendant points to the fact that the Marital Settlement Agreement was referenced in plaintiffs' Amended Complaint and attached to

plaintiffs' Motion for Temporary Restraining Order. (Doc. #253, p. 5.)   Plaintiffs do not dispute the existence of the Marital Settlement Agreement or the words contained within the Marital Settlement Agreement, but instead dispute the circumstances under which the Agreement was entered.   (Doc. #320, p. 18.)

The Court finds that the Marital Settlement Agreement is referenced in the Complaint, is central to the plaintiffs' claims, and its authenticity has not been disputed.   Therefore, its existence and content can be considered when ruling on defendant's Motion to Dismiss.   The Court will take judicial notice of the existence and content of the Marital Settlement Agreement, but nothing further.

### E. Exhibit 11[9]: Letter to Devine

Defendant also requests that the Court take judicial notice of correspondence in the SDNY action from plaintiffs' counsel to defendant dated July 3, 2013 requesting that defendant retain copies of records in her possession related to her divorce, the Penny Stock Scheme, etc.   (Docs. ##252-11; 253, pp. 14-15.) Plaintiffs oppose this, arguing that the letter does not establish that plaintiffs were aware of their claims against Devine and, even

---

[9] Defendant's Motion for Judicial Notice refers to this correspondence as Exhibit 13 to its Motion to Dismiss when it is actually Exhibit 11.

if it does, the date of the letter is well within the statute of limitations.   (Doc. #320, pp. 19-20.)

The Court finds that the letter is not a proper subject for judicial notice and therefore denies defendant's request.   The letter is not central to plaintiffs' case, although it may have relevance to an affirmative defense.

**F. Exhibit 5: Swiss Report**

Defendant next requests that the Court take judicial notice of three pages of the Swiss Report because it was referenced in plaintiffs' Amended Complaint.   (Docs. ##252-5; 253, pp. 3-8.) Plaintiffs assert that the Court should decline to take judicial notice of the pages from the Swiss Report because the facts are disputed.   (Doc. #320, pp. 12-14.)

The Court declines to take judicial notice of the three pages of the Swiss Report.   It appears that defendant is seeking to introduce the portion of the Swiss Report to show that some language within it translates to "sham decision" as opposed to "sham divorce."   The translation of the phrase in question is disputed and the Court declines to take judicial notice of the preferred translation or the document at this stage of the proceedings.

**IV. Motion to Dismiss**

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   This

obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id.  See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted).  Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

The standards set forth in Iqbal and Twombly are altered for RICO claims dealing with fraud.  Miccosukee Tribe of Indians of Fla. v. Cypress, 814 F.3d 1202, 1212 (11th Cir. 2015).

> When a plaintiff asserts RICO and RICO conspiracy claims, the court must look at the underlying allegations of racketeering predicates to determine the nature of the alleged wrongdoing.  When the underlying allegations assert claims that are akin to fraud, the heightened pleading standards of Rule 9(b) apply to the RICO claims. As such, the pleading requirements do not extend merely to plausibility, they demand plausibility based upon Rule 9(b)'s heightened degree of specificity.  To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud.

Id. (internal citation and quotations marks omitted).

**A. Federal RICO and RICO Conspiracy, 18 U.S.C. § 1962(c), (d)**

Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To establish a federal civil RICO violation under section 1962(c), the plaintiff must allege and ultimately prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and (5) injury to "business

or property" (6) that was "by reason of" the substantive RICO violation.  <u>Williams v. Mohawk Indus.</u>, 465 F.3d 1277, 1282 (11th Cir. 2006) (citing 18 U.S.C. §§ 1962(c), 1964(c)), <u>abrogated on other grounds as recognized in</u>, <u>Simpson v. Sanderson Farms, Inc.</u> 744 F.3d 702, 714 (11th Cir. 2014).  To establish a federal civil RICO conspiracy violation under section 1962(d), a plaintiff must allege and ultimately prove that defendant conspired with another to violate section 1962(c).  18 U.S.C. § 1962(d).  "To establish a RICO conspiracy, a plaintiff must show either agreement with the objective of the conspiracy or agreement to commit two racketeering predicates."  <u>Rajput v. City Trading, LLC</u>, 476 F. App'x 177, 180 (11th Cir. 2012).

Defendant moves to dismiss plaintiffs' Amended Complaint on the basis that plaintiffs have failed to state federal RICO claims because: (1) the Private Securities Litigation Reform Act of 1995 ("PSLRA") bars plaintiffs' claims, (2) RICO has no extraterritorial reach, (3) a "marriage" is not a RICO enterprise, (4) plaintiffs have failed to adequately plead a "pattern of racketeering activity," and (5) plaintiffs have failed to adequately plead causation under RICO.  (Doc. #252, pp. 31-58.)  Plaintiffs disagree with each assertion.

## 1.    Private Securities Litigation Reform Act of 1995

Defendant Devine contends that the PSLRA bars plaintiffs' RICO claims because the RICO claims are predicated on securities law

violations.   (Id. at 31-35.)   Defendant argues that the predicate acts plaintiffs rely on are "all premised on the alleged Penny Stock Scheme and, thus, rely on conduct 'actionable as fraud in the purchase or sale of securities,'" (id. at 33), and because plaintiffs "expressly rely upon conduct that constitutes securities fraud," their federal RICO claims are barred by the PSLRA, (id. at 34).   Plaintiffs respond that their RICO claims are not within the PSLRA bar because "Devine's alleged conduct is not 'actionable as securities fraud.'"   (Doc. #318, p. 15.)

Section 107 of the PSLRA, enacted as an amendment to the federal civil RICO statute, provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" unless the person who committed the fraud has been criminally convicted.   18 U.S.C. § 1964(c).   The Conference Committee Report accompanying the PSLRA states that the amendment was intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."   H.R. Rep. No. 104-396, at 47 (1995) (Conf. Rep.).

"[C]ourts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon

securities fraud as a predicate act or even had standing to pursue a securities fraud claim." Licht v. Watson, 567 F. App'x 689, 693 (11th Cir. 2014) (citing Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 330 (3d Cir. 1999)). "[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." Bald Eagle Area Sch. Dist., 189 F.3d at 330. See also MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011) (holding that the PSLRA bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant"); Howard v. Am. Online, Inc., 208 F.3d 741, 749 (9th Cir. 2000) (holding that the RICO bar applies even where the plaintiff does not have standing to bring a securities fraud action). As the Eleventh Circuit recently stated, "[a] plaintiff may not dodge this bar by pleading other offenses as predicate acts in a civil RICO action if the claim is based on conduct that would have been actionable as securities fraud." Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1249 (11th Cir. 2016) (citation omitted).

It is undisputed that Devine has not been criminally convicted. As such, the question becomes whether the RICO causes of action alleged in Counts I and II rely on conduct that "would have been actionable as fraud in the purchase or sale of securities"

within the meaning of section 1964(c).  If so, the RICO counts are barred.

The gravamen of plaintiffs' Amended Complaint is that after her husband's securities fraud scheme was disclosed in May 2006, Devine performed acts and conspired with her husband and others to hide and launder the proceeds of the securities fraud scheme.  It is alleged that Devine and her co-conspirators established the Money Laundering Enterprise "to conceal and preserve the ill-gotten gains as a 'multigenerational fortune' for the Devine-Home family." (Doc. #196, ¶ 95.)  Plaintiffs also state that the "objective of the scheme to defraud was to preserve the ill-gotten funds for Devine, Homm, and their family, and to continue to deprive the Funds of the money that was wrongfully taken from them by means of the Penny Stock Scheme."  (Id. ¶ 265.)

The RICO predicate acts attributed to defendant all flow from the efforts to conceal and preserve the proceeds of the successful securities fraud scheme:  (1) Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(B)(i)[10]; (2) Money Laundering in Violation of

---

[10] Plaintiffs' Amended Complaint alleges that the "property involved in those financial transactions was in fact derived from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7) — namely, the Penny Stock Scheme . . . which violated inter alia, Section 10(b) of the Securities Exchange Act of 1934 . . . ."  (Doc. #196, ¶ 244.)

18 U.S.C. § 1956(a)(1)(A)(i)[11]; (3) Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)[12]; (4) Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(B)(i)[13]; (5) Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C. § 1957[14]; (6) Transportation of Stolen, Converted, or Fraudulently-Taken Goods, Securities, or Money in Violation of 18 U.S.C. § 2314[15]; (7) Receipt, Possession, Concealment, Sale, or Disposal of Stolen, Converted, or Taken Goods in Violation of 18 U.S.C. §

---

[11] Plaintiffs' Amended Complaint alleges that the property involved was "derived from specified unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7) — namely, the Penny Stock Scheme . . . which violated *inter alia*, Section 10(b) of the Exchange Act." (Id. ¶ 244F.)

[12] Plaintiffs' Amended Complaint alleges that Devine "knowingly transported, transmitted, or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States. . . . with the intent to promote the carrying on of . . . the Money Laundering Enterprise." (Id. ¶¶ 248-49.)

[13] Plaintiffs' Amended Complaint alleges that Devine transferred "the proceeds of some form of unlawful activity — namely, the Penny Stock Scheme" as a basis for this predicate act. (Id. ¶ 252.)

[14] Plaintiffs' Amended Complaint alleges that the money was "derived from specific unlawful activity within the meaning of 18 U.S.C. § 1957(a) and (f)(3) — namely, the Penny Stock Scheme . . ., which violated, *inter alia*, Section 10(b) of the Exchange Act." (Id. ¶ 254.)

[15] Plaintiffs' Amended Complaint alleges that Devine "transported, transmitted, or transferred goods, securities, or money, of a value of $5,000 or more — namely, proceeds of the Penny Stock Scheme" as a basis for this predicate act. (Id. ¶ 258.)

2315[16]; and (8) Wire Fraud in Violation of 18 U.S.C. § 1343.[17]  (Id. ¶¶ 241-66.)

While the RICO predicate acts against Devine are certainly related to the Penny Stock Scheme, the conduct alleged is not "conduct that would . . . [be] actionable as fraud in the purchase or sale of securities."  The alleged conduct at issue took place after the purchase or sale of securities.  "Because [m]oney laundering is an offense to be punished separately from the underlying criminal offense, it cannot occur until after the predicate crime becomes a completed offense."  United States v. Gross, --- F. App'x ----, No. 15-11780, 2016 WL 5929206, at *9 (11th Cir. Oct. 12, 2016) (alteration in original) (citing United States v. Nolan, 223 F.3d 1311, 1315 (11th Cir. 2000)).  "By definition, the injury caused by an offense such as money laundering cannot occur until money is received by the perpetrator.  Yet Congress has recognized that money laundering and other post-investment offenses may constitute predicate acts causing racketeering injury for which damages may be recovered under § 1964."  Maiz v. Virani, 253 F.3d 641, 674 (11th Cir. 2001) (citing 18 U.S.C. § 1961(1)(B)).

---

[16] Plaintiffs premise this predicate act on the Penny Stock Scheme proceeds being stolen, unlawfully converted, and/or taken. (Id. ¶ 261.)

[17] The wire fraud predicate act involves proceeds of Penny Stock Scheme.  (Id. ¶ 266.)

The Court finds that the predicate acts alleged as part of the pattern of racketeering activity in this case are not based on conduct that would be actionable as fraud in the purchase or sale of securities.   Counts I and II are therefore not barred by the PSLRA.

### 2.   **Extraterritorial Application of Federal RICO**

Defendant next asserts that plaintiffs' federal RICO claims fail because the federal RICO statute has no extraterritorial application and plaintiffs have not alleged a domestic injury as required by RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016).   (Doc. #427.)   Plaintiffs respond that they have sufficiently alleged a domestic injury under RJR Nabisco, Inc. (Doc. #426.)[18]

This Court previously held that plaintiffs' Amended Complaint contained sufficient allegations to show that their claims "are not solely based on extra-territorial activities." (Doc. #368, pp. 20-21.) RJR Nabisco, Inc. requires a fresh look at this determination.

Section 1964(c) allows for a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).   RJR Nabisco, Inc. considered whether RICO applies extraterritorially — "that is, to

---

[18] The parties have also alerted the Court as to supplemental authority regarding the RJR Nabisco, Inc. decision. (See Docs. ## 466, 467, 472, 479, 483, 487, 489, 492, 512, 515.)

events occurring and injuries suffered outside the United States."
136 S. Ct. at 2096.   This required the Court to determine two
related but importantly distinct issues:   (1) "[D]o RICO's
substantive prohibitions, contained in [section] 1962, apply to
conduct that occurs in foreign countries?"; and (2) "[D]oes RICO's
private right of action, contained in [section] 1964(c), apply to
injuries that are suffered in foreign countries?"   Id. at 2099.

As to the first issue, the Supreme Court held that the
substantive prohibitions of section 1962 do "appl[y] to some
foreign racketeering activity."   Id. at 2103.   To be included within
the "some," the foreign racketeering activity must violate a
predicate statute which itself has extraterritorial application.
Id.   As the Supreme Court stated, "[a] violation of [section] 1962
may be based on a pattern of racketeering that includes predicate
offenses committed abroad, provided that each of those offenses
violates a predicate statute that is itself extraterritorial."   Id.
"Accordingly, conduct occurring in foreign countries may violate
Section 1962, and thus give rise to criminal liability or a civil
enforcement proceeding, when the state or federal statutes setting
forth the underlying predicate offenses overcome the presumption
against extraterritoriality."   City of Almaty v. Ablyazov, No. 15-
CV-5345 (AJN), 2016 WL 7756629, at *4 (S.D.N.Y. Dec. 23, 2016).

Applying this to the case at hand, there is extraterritorial
jurisdiction over conduct prohibited by section 1956 if the conduct

is by a United States citizen and it involves funds exceeding $10,000. 18 U.S.C. § 1956(f). This principle also determines the extraterritorial reach of conspiracy and aiding and abetting charges relating to section 1956. United States v. Belfast, 611 F.3d 783, 813 (11th Cir. 2010) ("[E]xtraterritorial jurisdiction over a conspiracy charge exists whenever the underlying substantive crime applies to extraterritorial conduct."); United States v. Yakou, 428 F.3d 241, 252 (D.C. Cir. 2005) ("The aiding and abetting statute, however, is not so broad as to expand the extraterritorial reach of the underlying statute.").

The prohibition against engaging in monetary transactions in criminally derived property predicate act has also been held to apply extraterritorially. See 18 U.S.C. § 1957(d)(2) (providing that statute applies where "the offense under this section takes place outside the United States and under special jurisdiction, but the defendant is a United States person"); RJR Nabisco, Inc., 136 S. Ct. at 2101 (finding 18 U.S.C. § 1957(d)(2) applies to "at least some foreign conduct"). Plaintiffs also allege predicate acts of transportation of stolen, converted, or fraudulently-taken goods, securities, or money in violation of 18 U.S.C. § 2314; receipt, possession, concealment, sale, or disposal of stolen, converted or taken goods in violation of 18 U.S.C. § 2315; and wire fraud in violation of 18 U.S.C. § 1343. While the Second Circuit has held that 18 U.S.C. § 1343 does not have extraterritorial application,

European Cmty. v. RJR Nabisco, Inc.(RJR Nabsico, Inc. 2d Cir.), 764
F.3d 129, 140-41 (2d Cir. 2014) (finding the wire fraud statute
does not overcome the presumption against extraterritoriality),
rev'd on other grounds, RJR Nabisco, Inc., 136 S. Ct. 2090, other
courts have held to the contrary, see United States v. Georgiou,
777 F.3d 125, 137-38 (3d Cir. 2015); United States v. Lyons, 740
F.3d 702, 718 (1st Cir. 2014), and it does not appear that the
Eleventh Circuit has opined on the issue.

Additionally, 18 U.S.C. § 2314 and 18 U.S.C. § 2315 both
contain language that could arguably be interpreted to have
extraterritorial application. See 18 U.S.C. § 2314 ("Whoever
transports, transmits, or transfers in interstate or **foreign
commerce** any goods, wares, merchandise, securities or money, of the
value of $5,000 or more, knowing the same to have been stolen . .
. ." (emphasis added)); 18 U.S.C. § 2315 ("Whoever receives,
possesses, conceals, stores, barters, sells, or disposes any goods,
wares, or merchandise, securities, or money of the value of $5,000
or more . . . which have crossed a **State or United States boundary**
after being stolen . . . ." (emphasis added)).  While 18 U.S.C. §
2314 mentions "foreign commerce," some courts have held that this
in and of itself is insufficient to overcome the presumption against
extraterritoriality.  See Morrison v. Nat'l Australia Bank Ltd.,
561 U.S. 247, 263 (2010) ("The general reference to foreign commerce
in the definition of 'interstate commerce' does not defeat the

presumption against extraterritoriality."); RJR Nabsico, Inc. 2d
Cir., 764 F.3d at 141 ("We conclude that the references to foreign
commerce in these statutes . . . do not indicate a congressional
intent that the statutes apply extraterritorially."); United States
v. Hayes, 99 F. Supp. 2d 409, 419-20 (S.D.N.Y. 2015).  But see
Georgiou, 777 F.3d 125, 137-38 (citing Pasquantino v. United
States, 554 U.S. 349, 371-72 (2005)); Lyons, 740 F.3d 702, 718 (1st
Cir. 2014).

However, without drawing a line as to whether these predicate
acts apply extraterritorially, plaintiffs have alleged domestic
conduct sufficient to support these predicate act violations at
this time.  (Doc. #196, ¶¶ 257-66.)  Accordingly, the predicate
acts in and of themselves do not violate the presumption against
extraterritoriality.

On the second issue, the Supreme Court found that "the civil
remedy is not coextensive with [section] 1962's substantive
prohibitions," RJR Nabisco, Inc., 136 S. Ct. at 2108, and held that
"[i]rrespective of any extraterritorial application of [section]
1962 . . . [section] 1964(c) does not overcome the presumption
against extraterritoriality," id. at 2106.  For this reason,
"[s]ection 1964(c) requires a civil RICO plaintiff to allege and
prove a domestic injury to business or property and does not allow
recovery for foreign injuries."  Id. at 2111.  The Supreme Court

dismissed plaintiffs' RICO claims because they "rest[ed] entirely on injury suffered abroad."  Id.

The Supreme Court admittedly provided little guidance to courts in analyzing whether injuries alleged are domestic or foreign in nature.  Id. ("The application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.' But we need not concern ourselves with that question in this case.").  A few district courts have examined whether the alleged injuries constituted domestic or foreign injuries under RJR Nabisco, Inc., applying varying and evolving standards.  See Ablyazov, 2016 WL 7756629, at *7-10; Exceed Indus., LLC v. Younis, No 15C14, 2016 WL 6599949, at *3 (N.D. Ill. Nov. 8, 2016); Garcia v. Lion Mexico Consol., L.P., No. 5:15-CV-1116-DAE, 2016 WL 6157436, at *3 (W.D. Tex. Oct. 21, 2016); Bascuñan v. Elsaca, No. 15-cv-2009 (GBD), 2016 WL 5475998, at *1 (S.D.N.Y. Sept. 28, 2016); Elsevier, Inc. v. Grossman, No. 12 Civ. 5121 (KPF), 2016 U.S. Dist. LEXIS 103444, at *1 (S.D.N.Y. Aug. 4, 2016).

Plaintiffs assert that "in the context of federal RICO, the location of a plaintiff's economic injury is the place where the acts producing the injury occurred," (Doc. #426, p. 6), and that the Amended Complaint asserts sufficient facts to allege that "Devine's injury-causing conduct occurred in the U.S." (id.). Plaintiffs point to personal jurisdiction cases for the proposition

that the economic injury occurred "where the original events that caused the alleged injury took place." (Id. at 8) (citation omitted). Alternatively, plaintiffs assert the location of the injury is the location of the property at issue when it was harmed.[19] (Id. at 9-12.) In support of this proposition, plaintiffs cite cases dealing with the conversion of property. (Id. at 9-10.) Plaintiffs argue that "Devine caused injury to the Funds by directing specific proceeds to the U.S. and then dissipating those proceeds so that the Funds could never secure them." (Id. at 10.)

Defendant, on the other hand, asserts that the essential inquiry focuses on the "locus of the injury, and not the predicate activity." (Doc. #427, p. 5.) Defendant asserts that each one of the plaintiffs' alleged injuries occurred outside of the United States and, alternatively, were caused by the Penny Stock Scheme and not Devine's actions. (Id. at 6-13.) Defendant also asserts that plaintiffs cannot recover for the predicate acts that the Supreme Court held do not apply extraterritorially. (Id. at 13-14.)

Defendant is correct to the extent she argues that the focus of the matter is the geographic location of the injury to

_____

[19] Plaintiffs also discuss the constructive trust and the location of the constructive trust as the place where the injury occurred. The Court summarily rejects this argument, since the constructive trust is the legal fiction this lawsuit seeks to create.

plaintiffs, not the location of a defendant's wrongful acts.  RJR Nabisco, Inc., 136 S. Ct. at 2108; Bascuñan, 2016 WL 5475998, at *5-6.  Defendant is also correct that plaintiffs cannot recover for injuries which occur outside the United States, even if there may be other injuries for which recovery is permissible.  RJR Nabisco, Inc., 136 S. Ct. at 2111.

It is clear that the Amended Complaint has only alleged economic injuries.  The Amended Complaint alleges the following injuries:

> the lost opportunity to recover certain money through mechanisms available in the Swiss proceedings resulting from Devine's transfers from Swiss accounts to evade imminent freeze orders; the lost opportunity to recover certain money that Devine has dissipated or used to purchase functionally untraceable assets (such as gold); the costs associated with attempting to trace Devine's hidden assets around the world; recoupment of the Penny Stock Scheme proceeds; and the continued deprivation of money taken from the Funds by means of the Penny Stock Scheme.

(Doc. #196, ¶ 269.)  The Court finds that these economic injuries were suffered by the plaintiffs in the only location where the plaintiffs were located – in the Cayman Islands.[20]  (See id. ¶ 9.)

Even under plaintiffs' proposed focus - the place where the acts producing the injury occurred or the location of the property

---

[20] The Court notes the Supreme Court's statement that "[t]his does not mean that foreign plaintiffs may not sue under RICO." RJR Nabisco, Inc., 136 S. Ct. at 2110 n.12.  There are no allegations in the Amended Complaint which would allow the foreign plaintiffs in this case to sue under RICO.

at issue when it was harmed – Counts I and II are essentially gutted. The Amended Complaint alleges many acts of misconduct which took place entirely outside the United States and therefore cannot form the basis of RICO recovery. For example, it is alleged that defendant concealed valuable art and furniture at a home in Mallorca, Spain, (id. ¶¶ 96-98), and that eighteen of the twenty bank accounts allegedly used by defendant to carry out the Money Laundering Enterprise are foreign bank accounts, (id. ¶ 144). The two United States accounts are alleged to have been the consistent recipient of proceeds from the Penny Stock Scheme. (Id. ¶ 144(k), (p)). Many of the allegedly wrongful acts by Devine are pleaded in such a manner in which it is not possible to determine if they were committed domestically or abroad, although it appears that abroad was the more typical situation. At best, under any test for determining domestic injury, the Amended Complaint does not set forth plausible civil RICO claims.

Given the intervening decision in RJR Nabisco Inc., the Court will allow plaintiffs to file a second amended complaint to attempt to state plausible RICO claims. The Court declines to address the remaining arguments in light of the ruling on this issue.

**B. Florida RICO and Florida Civil Remedies for Criminal Activities**[21]

Defendant Devine moves to dismiss plaintiffs' Florida RICO and Florida Civil Remedies for Criminal Activities counts on the same grounds that it presented for dismissing plaintiffs' federal RICO counts. (Doc. #252, pp. 31-58.)

**1. PSLRA**

Devine summarily asserts that "given that Plaintiffs' state RICO claims are based entirely on federal predicates to which the PSLRA applies, those claims are barred, too, for there is no basis to provide relief under Florida law greater than that afforded under federal law." (Id. at 35) (citation omitted). The Court is not convinced, even if the federal RICO claims had been dismissed as barred by the PSLRA.

The plain language of the PSLRA does not impact a state RICO claim: "[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities **to establish a violation of section 1962**." 18 U.S.C. § 1964(c) (emphasis added). The Florida RICO count does not seek to establish a violation of section 1962, and the Court declines to extend the PSLRA bar to state RICO claims. Additionally, the federal PSLRA amended the federal RICO statute in 1995. In the twenty-two years

---

[21] The Act is actually called "Civil Remedies for Criminal Practices Act." Fla. Stat. § 772.101.

since its amendment, there has been no equivalent amendment to the Florida RICO statute. Accordingly, the Court declines to dismiss plaintiffs' Florida RICO and Florida Civil Remedies for Criminal Activities claims as barred by the PSLRA even if the federal RICO claims had been dismissed on that ground.

**2.   Extraterritorial Application of Florida RICO**

Defendant next asserts that plaintiffs' Florida RICO claims fail because the Florida RICO statute has no extraterritorial application. (Docs. ##252, p. 40; 427, p. 3 n.2.) Defendant asserts that the Supreme Court's holding in RJR Nabisco, Inc. is applicable to the Florida RICO statute and bars plaintiffs' Florida RICO claims. (Docs. ##427, p. 3 n.2, p. 15 n.13; 449.) Plaintiffs respond that RJR Nabisco, Inc. does not apply to Florida RICO claims and, even if it does apply, plaintiffs have sufficiently alleged a domestic injury under RJR Nabisco, Inc. (Doc. #426.)

As the Court held previously, Florida civil RICO does not apply extraterritorially. (Doc. #368, p. 17); see also Equitable Life Assurance Soc'y of the U.S. v. McRee, 75 Fla. 257, 265 (1918) ("It is manifest that the statute can have no force beyond the limits of this State."). Nothing in RJR Nabisco, Inc. undermines this determination. With or without RJR Nabisco, Inc., the Florida RICO statute does not apply extraterritorially.

Plaintiffs argue, however, that they have sufficiently alleged a domestic injury to properly plead a Florida RICO claim. The

federal RICO civil remedy provision and the Florida RICO civil remedy provision are nearly identical,[22] and it is clear that the Florida RICO Act is patterned after the federal RICO Act.  Arthur v. JP Morgan Chase Bank, NA, 569 F. App'x 669, 679 (11th Cir. 2014); Jackson v. BellSouth Tellecomms., 372 F.3d 1250, 1263 (11th Cir. 2004) ("We have explained that interpretation of Florida's RICO law is informed by case law interpreting the federal RICO statute . . . on which Chapter 772 is patterned." (alteration in original) (citation omitted)); Lugo v. State, 845 So. 2d 74, 96 n.39 (Fla. 2003).  As such, federal cases interpreting the federal RICO statute have been found to be persuasive when interpreting the Florida RICO Act.  See Jackson, 372 F.3d at 1263-64 ("[T]he analysis we apply

---

[22] The federal RICO civil remedies provision provides in pertinent part: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c).

The Florida RICO civil remedies provision titled "Civil cause of action" provides:

> Any person who proves by clear and convincing evidence that he or she has been injured by reason of any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained and, in any such action, is entitled to a minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

Fla. Stat. § 772.104(1).

to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims." (citation omitted)); O'Malley v. St. Thomas Univ., Inc., 599 So. 2d 999, 1000 (Fla. 3d DCA 1992) ("Since Florida RICO is patterned after federal RICO, Florida courts have looked to the federal courts for guidance in interpreting and applying the act. Therefore, federal decisions should be accorded great weight."). The Court finds that Florida courts would now apply the holding of RJR Nabisco, Inc. to determine if a domestic injury for Florida civil RICO claims is adequately pleaded.

As with the federal RICO claims, the Court finds that the injuries alleged by plaintiffs in the Florida RICO claims were either clearly suffered outside of the United States, or at least were not plausibly alleged as domestic injuries. Accordingly, Counts III and IV of plaintiffs' Amended Complaint are dismissed without prejudice.

## C. Plaintiffs' Unjust Enrichment and "Constructive Trust" Claims

### 1.   Statute of Limitations

Defendant asserts that plaintiffs' remaining claims are barred by the statute of limitations. (Doc. #252, pp. 58-61.) Defendant only discusses plaintiffs' federal and Florida RICO claims being barred by the statute of limitations, and completely fails to argue or discuss how plaintiffs' "other claims" are untimely. (Id.)

"Generally, the existence of an affirmative defense will not support a motion to dismiss," Quiller v. Barclays Am./Credit, Inc.,

60

727 F.2d 1067, 1069 (11th Cir. 1984), aff'd on reh'g, 764 F.2d 1400 (11th Cir. 1985) (en banc) (per curiam) (reinstating panel opinion), because plaintiffs are not required to negate an affirmative defense in their complaint, La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).  A complaint may be dismissed, however, when the existence of an affirmative defense "clearly appears on the face of the complaint." Quiller, 727 F.2d at 1069.  See also La Grasta, 358 F.3d at 845 ("[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred" (quoting Omar ex rel. Cannon v. Lindsey, 334 F.3d 1246, 1251 (11th Cir. 2003))); Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008)(same).

The Court finds defendant has not shown that plaintiffs' claims for unjust enrichment and constructive trust are barred by the statute of limitations as clearly set forth in the Amended Complaint.  Defendant neither discusses what the applicable statutes of limitations are for the "other claims" nor discusses how the claims violate the applicable statute of limitations as clearly set forth in the Amended Complaint.  Accordingly, the Court declines to dismiss Counts V and VI on this basis.

### 2.  Constructive Trust as a Cause of Action

In defendant's Reply, she asserts that Florida law does not recognize a cause of action for constructive trust.  (Doc. #336,

p. 21.)  Plaintiffs argue that raising new arguments in a Reply is improper, and that the Court has already addressed this issue. (Doc. #351, pp. 24 n.20, 25.)

While asserting new arguments in a Reply brief is improper, the parties previously argued this exact issue and the Court ruled on it.  The Court finds no prejudice from the untimely assertion of the issue.  The Court follows its prior determination that, at least in the circumstances of this case, a "constructive trust is not a cause of action, but an equitable remedy based upon an established cause of action."  (Doc. #368, pp. 24-25 (citing Collinson v. Miller, 903 So. 2d 221, 228 (Fla. 2d DCA 2005)). Plaintiffs have requested a constructive trust as a remedy to their unjust enrichment cause of action, and therefore the Court dismisses plaintiffs' freestanding cause of action for constructive trust.  Accordingly, Count VI is dismissed with prejudice.

### 3.   Unjust Enrichment

Also within her Reply, Devine asserts that plaintiffs' claim for unjust enrichment fails because it is premised upon wrongful conduct.  (Doc. #336, p. 21.)  Plaintiffs respond that it is improper to raise new issues in a Reply, plaintiffs' unjust enrichment claim is not predicated on wrongdoing, and, even if it is, there is no distinction between unjust enrichment and wrongful enrichment under Florida law.  (Doc. #351, pp. 24-25.)

As previously noted, it is improper to present new arguments in a Reply.  Herring, 397 F.3d at 1342.  Despite the issue being improperly raised, the Court previously ruled on this exact issue in its Opinion and Order on Devine's Motion to Dissolve Temporary Restraining Order. (Doc. #368, pp. 21-23.)  As previously discussed, while alternative pleading is allowed, plaintiffs have clearly incorporated paragraphs involving wrongdoing into their unjust enrichment claim. (Docs. ##196, ¶ 301; 368, p. 22.)  Also, the Court cannot find, nor have the parties provided, any Florida legal authority for the proposition that an unjust enrichment claim under Florida law cannot be premised upon wrongful conduct. Defendant relies on a footnote in Guyana Telephone & Telegraph Co., Ltd. v. Melbourne International Communications, Ltd. for the proposition that a claim of unjust enrichment cannot be premised on wrongful conduct.  329 F.3d 1241, 1245 n.3 (11th Cir. 2003). However, this statement relies upon a Law Review Article that is not based on Florida law and is merely dicta.  Id.  See State Farm Fire & Cas. Co. v. Silver Star Health & Rehab. Inc., No. 6:10-cv-1103-Orl-31GJK, 2011 WL 6338496, at *6 (M.D. Fla. Dec. 19, 2011), aff'd, 739 F.3d 579 (11th Cir. 2013).  "And dicta is not binding on anyone for any purpose." Edwards, 602 F.3d at 1298 (citations omitted).

Accordingly, the Court denies defendant's Motion to Dismiss as to Count V on this basis.

#### D. Remedy of Disgorgement

Defendant asserts that plaintiffs' disgorgement remedy is not a proper remedy under civil RICO. (Doc. #252, p. 62.) Devine essentially reasserts its previous argument that plaintiffs' claim of unjust enrichment fails because it is based upon wrongful conduct, therefore there is no cause of action to support the disgorgement remedy. (Id.) Plaintiffs respond that challenging a remedy is not within the proper scope of a motion to dismiss, equitable remedies are available under federal RICO, and plaintiffs' other claims support their disgorgement remedy. (Doc. #318, pp. 60-62.)

The Court need not address whether plaintiffs' disgorgement remedy is available under their RICO claims as those claims have been dismissed from the action. As to plaintiffs' unjust enrichment claim, the Court has already addressed whether plaintiffs' unjust enrichment claim is precluded due to allegations of wrongful conduct. Additionally the Court finds that disgorgement is an appropriate measure of damages for an unjust enrichment claim. Montage Grp., Ltd. v. Athle-Tech Comp. Sys., Inc., 889 So. 2d 180, 196 (Fla. 2d DCA 2004) (finding application of remedy of disgorgement was appropriate for unjust enrichment claim).

Accordingly, defendant's Motion to Dismiss Count V is denied. Accordingly, it is now

**ORDERED:**

64

1.    Defendant's   Motion   to   Strike   Plaintiffs'   Amended Complaint (Doc. #254) is **DENIED**.

2.    Defendant's   Request   for   Judicial   Notice   of   Exhibits Attached to Motion to Dismiss Plaintiffs' Amended Complaint (Doc. #253) is **GRANTED in part and DENIED in part**, as set forth herein.

3.    Defendant's   Motion   to   Dismiss   Amended   Complaint   (Doc. #252) is **GRANTED in part and DENIED in part.**

      a. Counts I and II of plaintiffs' Amended Complaint are **dismissed without prejudice**;

      b. Counts III and IV of plaintiffs' Amended Complaint are **dismissed without prejudice**;

      c. Defendant's Motion to Dismiss is **denied** as to Count V; and

      d. Count VI is **dismissed with prejudice.**

4.    Plaintiffs   may   file   a   Second   Amended   Complaint   within **twenty-one (21) days** of the date of this Opinion and Order.

**DONE AND ORDERED** at Fort Myers, Florida, this __8th__ day of February, 2017.

_____

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:  Parties of record